**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **Luisa Lupi and** | § | |
| **Eva Lupi** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **Officer Timothy Diven AP4417,** | § | |
| **Officer Jaime von Seltmann AP5984,** | § | |
| **Officer Rocky Reeves AP7219,** | § | |
| **Officer Michael Guetzke AP4690,** | § | |
| **Officer Lauren Villarreal AP7343,** | § | |
| **Officer Jerry Floyd AP4559,** | § | |
| **Officer Ewa Wegner AP4623,** | § | |
| **Officer Alan Schwettmann AP5826,** | § | **CIVIL ACTION NO.: 1:20-cv-207** |
| **Officer Joshua Visi AP4416,** | § | |
| **Officer Sgt Michael Lewis King AP4127,** | § | |
| **Officer Brian Robinson AP6683,** | § | |
| **Code Enforcement Officer Thomas Horn,** | § | |
| **Code Enforcement Inspector Joseph Lucas** | § | |
| **Officer Number 6609,** | § | |
| **Elizabeth Glidden,** | § | |
| **McKenna Kuhr,** | § | |
| **EMS Technician Timothy Hedrick,** | § | |
| **EMS Technician/Driver Steve White,** | § | |
| **City of Austin,** | § | |
| **Travis County,** | § | |
| **Defendants.** | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs, Luisa Lupi and Eva Lupi, complaining of Defendants, Officer Timothy Diven,

Officer Jaime Von Seltmann, Officer Rocky Reeves, Officer Michael Guetzke, Officer Lauren

Villarreal, Officer Jerry Floyd, Officer Ewa Wegner, Officer Alan Schwettmann, Officer Joshua

1

Visi, Officer Thomas Horn, Officer Michael King, Officer Brian Robinson, Officer Joseph Lucas, Elizabeth Glidden, McKenna Kuhr, EMS Technician Timothy Hedrick, EMS Technician/Driver Steve White, City of Austin, and Travis County, hereby file Plaintiffs' Original Complaint and Jury Demand and respectfully allege the following:

## I.    NATURE OF THE ACTION

1.    This is a civil rights action for declaratory and injunctive relief and damages arising under the Fourth and Fourteenth Amendments to the U. S. Constitution, the Americans with Disabilities Act (ADA), and the laws of Texas.

2.    Plaintiffs (two sisters), one college graduate and another, an attorney, were lawfully exercising their constitutional rights to own and quietly live with their pets on their own property in the City of Austin, Texas. This was not a crime and Plaintiffs have never been charged or convicted of any crimes.

3.    Early in the morning on April 17, 2018, Plaintiff Luisa Lupi ("Luisa") went out to a vet for a pet surgery. After she came back home, she showered and put on comfortable pajamas. Around 9:00 a.m., in broad daylight, multiple people gathered on the front porch of Plaintiffs' home bringing an animal control truck, a Code Enforcement vehicle, a car with a plastic seat molded in the shape of a person and numerous restraining straps across the waist and chest and bars on the windows, and several other vehicles. They called out Luisa's name over and over.

4.    Luisa went on the porch to see what they needed and closed the door behind her. Luisa was in her pajamas and did not have a bra on. The people did not identify themselves as police.

5.      When Luisa was on her front porch, the police blocked her exit forward. Officer Seltmann, wearing rubber gloves, immediately approached Luisa and tried to put her arm around Luisa's back and shoulders and grabbed her left wrist while Officer Reeves was grabbing her right wrist on her own front porch, hurting her wrists.  Luisa said to the officers, "Please stand back," and retreated a few inches until her back was against the door of the house. Luisa was afraid for herself and immediately afraid for Plaintiffs' pets in the house because she was their only protector there at the time.

6.      Officer Seltmann and Reeves then pulled Luisa down the driveway and across the street. Officer Seltmann said to Eva, "It's not her choice. It's my choice. That's my decision. I'm just telling you what's happening. I'm in charge."

7.      Luisa requested the officers, "Please loosen your grip – you're hurting me," but Seltmann and Reeves did not do so.  Officer Seltmann and Reeves threatened to handcuff Luisa, saying, "If you keep pulling I'll put handcuffs on you." Luisa was forced to wait in the sun, essentially on display on a neighbor's lawn across the street from her home. Luisa was not even given a chance to put on her regular clothes instead of her pajamas without a bra on. The two officers illegally seized Luisa with no warrant, no probable cause, no consent, and no exigent circumstances.

8.      Luisa informed the police that she "ha[s] to stay here to take care of the dogs." And Luisa never agreed for the police to seize Plaintiffs' dogs.

9.      Luisa told the police several times that they CANNOT go in [Plaintiffs' home]. When Luisa instructed the police that they cannot go into the house, Officer Seltmann said, "Yes, we

can." Luisa called out on the phone "Help me!" to Eva. And Eva could hear Luisa say "No" several times.

10.     The police would not let Luisa get her keys to lock the house, power cord for her cell phone, or a hairband for her hair. Officer Seltmann could be heard on the audio, saying "I need to take her to the hospital."

11.     Luisa never consented that the police could enter or search Plaintiffs' home without a warrant. Neither did Eva.

12.     Plaintiffs' home was closed (doors and windows), but Defendant Officers entered Plaintiffs' home anyway with no warrant, no probable cause, no consent, and no exigent circumstances. Defendant Officers did so in disregard of Luisa's repeated instructions that they cannot enter her house.

13.     Luisa has never had mental disabilities or illness. When she was seized, she was at her own home. Defendant Officers did not have evidence showing that, at the time of the seizure of Luisa, there was a substantial risk of serious harm to Luisa or others unless she was immediately restrained, or there was insufficient time for the police to obtain a warrant before taking Luisa into custody.

14.     While unlawfully searching and ransacking Plaintiffs' home, Defendant Officers seized Plaintiffs' four dogs inside the house, and further stole Plaintiffs' personal property in their home and never returned it to Plaintiffs.

15.     All defendants, including Defendants Elizabeth Glidden and McKenna Kuhr who acted to be the police witness sources in this case, conspired to conduct all the unlawful actions in a bid to

permanently remove Luisa, whom they perceived to be mentally disabled, from her own home and the neighborhood.

16.     Defendants' harassment of Plaintiffs has been ongoing. Code Enforcement officers are still harassing Plaintiffs with false code violations and threatening to file legal action against Luisa. On February 12, 2020, they attached a citation to Luisa's door alleging code violation of "Accumulation of rubbish or garbage" that occurred on April 17, 2018 at 2:16 p.m. when Luisa Lupi had been illegally detained in the hospital.

17.     The next day, February 13, 2020, Plaintiffs were finally forced to move out of their home due to almost two years of constant harassment and fear that were created by all defendants since April 17, 2018, when Plaintiffs decided to stay there to await their dogs' return.

## II.     DEMAND FOR JURY TRIAL

18.     Plaintiffs demand a trial by jury under FRCP Rule 38.

## III.     PARTIES

19.     Plaintiff Luisa Lupi is a citizen and adult resident of Austin, Texas, U.S.A.

20.     Plaintiff Eva Lupi is a citizen and adult resident of Austin, Texas, U.S.A.

21.     The City of Austin is a Texas municipality that operates the Austin Police Department. At all times relevant to this Complaint, the City of Austin policy makers were Interim Chief Brian Manley and the City Council. The City may be served with Summons through the City Clerk at 301 W. Second St. Austin, TX 78701.

22.     Travis County is a Texas county that operates the Travis County EMS. At all times relevant to this Complaint, the County policymaker was the County Judge Sarah Eckhardt, or

alternatively the County Sheriff for the County Sheriff's Office. The County may be served with Summons through the County Judge at 700 Lavaca, Suite 2.300, Austin, Texas 78701.

23.     Defendant Officer Timothy Diven is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Sergeant. He is sued in his individual capacity and can be served with Summons at his work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

24.     Defendant Officer Jaime Von Seltmann is a white female adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. She is sued in her individual capacity and can be served with Summons at her work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

25.     Defendant Officer Rocky Reeves is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. He is sued in his individual capacity and can be served with Summons at his work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

26.     Defendant Officer Michael Guetzke is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. He is sued in his individual capacity and can be served with Summons at his work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

27.     Defendant Officer Lauren Villarreal is a white female adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. She is sued in her individual capacity and can be served with Summons at her work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

28.     Defendant Officer Jerry Floyd is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. He is sued in his individual capacity and can be served with Summons at his work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

29.     Defendant Officer Ewa Wegner is a white female adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. She is sued in her individual capacity and can be served with Summons at her work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

30.     Defendant Officer Joshua Visi is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. He is sued in his individual capacity and can be served with Summons at his work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

31.     Defendant Officer Alan Schwettmann is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. He is sued in his individual capacity and can be served with Summons at his work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

32.     Defendant Officer Sgt Michael Lewis King is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. He is sued in his individual capacity and can be served with Summons at his work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

33.     Defendant Officer Brian Robinson is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Police Officer. He is sued in

his individual capacity and can be served with Summons at his work address at 715 E 8th St at the City of Austin Police Department, Austin, TX 78701.

34.    Defendant Officer Thomas Horn is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Code Enforcement Officer. He is sued in his individual capacity and can be served with Summons at his work address at the City of Austin Code Department, Austin, TX 78741.

35.    Defendant Officer Joseph Lucas is a white male adult resident of Texas and at all times relevant to this Complaint was employed by the City of Austin as a Code Enforcement Officer. He is sued in his individual capacity and can be served with Summons at his work address at the City of Austin Code Department, Austin, TX 78741.

36.    Defendant Elizabeth Glidden is a white female resident of Austin at 6841 Auckland Drive, Austin, Texas, 78749.

37.    Defendant McKenna Kuhr is a white female resident of Austin at 805 Calico Drive, Austin, Texas, 78748.

38.    Defendant EMS Technician Timothy Hedrick is a white male adult resident of Austin, and at all times relevant to this Complaint was employed by Travis County, Texas.  He is sued in his individual capacity and can be served with Summons at his work address at 11401 Escarpment Blvd, Austin Fire Station 43, Austin, Texas 78739.

39.    Defendant EMS Technician/Driver Steve White is a white male adult resident of Austin, and at all times relevant to this Complaint was employed by Travis County, Texas.  He is sued in his individual capacity and can be served with Summons at his work address at 11401 Escarpment Blvd, Austin Fire Station 43, Austin, Texas 78739.

40.     At all times relevant to this Complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Plaintiffs.

## IV.     JURISDICTION

41.     This action to vindicate Plaintiffs' rights protected by the Fourth, and Fourteenth Amendments to the U.S. Constitution is brought under 42 U.S.C. §§ 1983 and 1988 and under the Americans with Disabilities Act.

42.     This Court has jurisdiction to hear the merits of Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343(a) (3) and (4). This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

## V.     VENUE

43.     Venue is proper under 28 U.S.C. § 1391(b) because one or more Defendants reside in the Western District of Texas.

44.     Venue is also proper under 28 U.S.C. § 1391(b) because all the events or omissions giving rise to the claims occurred in the Austin Division.

## VI.     FACTS

45.     Plaintiff Eva Lupi ("Eva") is the older sister of Plaintiff Luisa Lupi ("Luisa"). Both are law-abiding citizens and have never been charged or convicted of any crimes.

46.     Eva is an attorney. She has a BS degree in Aerospace Engineering and a BA degree in Economics from the University of California Los Angeles (UCLA), an MA degree in Government and International Relations from the University of Notre Dame, and a JD degree in law, *cum Laude*, from Southern Methodist University Dedman School of Law.

9

47.    Luisa has received her Bachelor of Arts in Psychology from California State University Northridge, has written several theses, and does not require or need anyone's assistance in her daily life. She worked as a lifeguard and works as an artist.

48.    Luisa has never been diagnosed with any mental disabilities or illness nor has she sought any such medical assistance. She has no history of physical disabilities, mental disabilities, or criminal behavior.  She takes no medication.

49.    Luisa has an actual disability under the Americans With Disabilities Act (ADA) known as dyslexia, which is a learning disability shared by millions of people in the US and can be accompanied by a slight speech impediment.

**Plaintiffs' great care and love for their family members—**

**the four dogs Sheera, Polar Bear, Indiana, and Ruby**

50.    Plaintiffs bought and moved into their home located at 6837 Auckland Dr., Austin, Texas in 2011. The home was fully paid for and is free of mortgage. Although paid for by both Plaintiffs, the title was intentionally taken under Luisa's name by Plaintiffs.

51.    Plaintiffs have been animal lovers. They moved in with their four beautiful and wonderful dogs, 100% indoor pets—named, Sheera (aged 7 in 2011), an Australian Shepherd, Polar Bear (aged 8), a mix of Labrador Retriever and Husky, Indiana (aged 9), a mix of Rhodesian RidgeBack and Hound, and Ruby (aged 10), a mix of Australian Shepherd and Rhodesian Ridgeback. At the time of the events at issue in this case, all four dogs had been living with Plaintiffs at least 9 years as Plaintiffs' crucial family members—virtually their children in Plaintiffs' eyes. Plaintiffs also had at times multiple cats.

52.     Plaintiffs adopted Sheera, Polar Bear, Indiana, and Ruby, the latter two were medically fragile, and all were from difficult situations. Plaintiffs loved them as their own children, gave them a chance for a great life, and spent large amounts of money on their cutting-edge medical care as illustrated below:

- Full body CAT scan (Ruby)
- MRI scan
- Completely operable Mast cell tumor—because Plaintiffs identified it so early that this normally fatal tumor was completely operable (Ruby)
- Full allergy panel (Indiana)
- ACTH Stim test x 3 (Polar Bear)
- Laser removal of cutaneous lump on spinal area (Sheera)
- Dental for the four dogs 3X annually per veterinary recommendation one year for one dog
- Gland Biopsy (Sheera)
- Extra round of heartworm tests for all when returning from a trip for the four dogs
- X rays
- EKG for the four dogs
- Prescription Food (Sheera and Indiana)
- Thyroid testing (Indiana)
- Limited ingredient specialty food for all dogs

53.     Plaintiffs kept a chart to ensure that the lives of the dogs were fully addressed and not overlooked when taking the dogs to vet visits. Plaintiffs not only created the chart, they also updated and maintained it, for each dog and cat.

54.     Plaintiffs' pets went everywhere with them—skiing, to the beach and on special outings. Each has their own calendar of favorite activities, including agility, swimming, sheepherding, etc.

55.     Each dog has a leash geared towards their special needs. Further, each dog has an emergency harness that could be used to securely transport each dog in case of emergency or frightening situation for them.

11

56. Great care was taken in selecting life jackets: The first issue was the type, which had to ensure that it would keep the dogs in the correct position in the water; second, the presence of a durable but low profile safety handle so it would not create a snagging danger; third, the individualized fit to ensure that each dog had a properly fitting team life jacket; and fourth, each dog and human had their own jacket in the team colors.

57. The dogs had gigantic beds. Because Indiana had become incontinent, everything was cycled through the laundry quickly. Plaintiffs had multiple replacement sets of linen for each dog bed and human bed, just in case.

58. In addition to their own bowls of special food, the dogs shared any dog safe, allergy safe meals with Plaintiffs.

59. The heating and air conditioning in Plaintiffs' house were adjusted for the dogs' comfort. In summer, when they went out to the bathroom and came back in, Plaintiffs would turn down the air conditioner to a temperature at which everyone stopped panting, then continued to adjust. In winter, the house was comfortably heated, but the dogs still each had comfortable covers and blankets for longer naps. Both Plaintiffs constantly got up to check on the dogs and tuck them in— they were supervised all day and night.

60. Plaintiffs studied each of their dog's special issues and built ramps and made other modifications so the ones with special needs could play easily with their brothers and sisters. Plaintiffs put out wading pools in the summer and built them observation posts so the dogs could better see the terrain around.

61. Indiana had significant skin problems from the time Plaintiffs adopted him. In hopes of identifying the problem allergen, they cooked at home for him and their other dogs for over a year

and a half, using organic ingredients from Whole Foods. He had been extensively tested. Plaintiffs had tried every medical treatment available for him. In consultation with their vet, Plaintiffs' next plan was to move to a different environment, where allergens would be reduced (Austin was, and still is, known as "allergy central"). They had noted a reduction in Indiana's symptoms during their trips to certain locations in the country and intended to move there. They had packed their household, planned and prepared for the move in April 2018, and were ready to go when all defendants turned their happy and innocent home into a nightmare that never ends.

62.     Even Judge Phillips, presiding at the county hearing (on appeal), observed, "This house looks like it was designed for dogs." The case was initially filed by the police with the Justice Court Precinct Five, Travis County to deprive Plaintiffs of their ownership interests in the dogs on the same day, April 17, 2018, after the police illegally seized the dogs.

63.     With incredibly great care that Plaintiffs provided for their dogs, Sheera, although 14 years old at the time she was seized, looked like a young pup. The Austin City Vet Rachel Hays ("City Vet Hays"), having examined the dogs the same day of the seizure, estimated that Sheera was 6 years old, based on how well cared for Sheera had been. Like Sheera, Polar Bear was estimated 6 years old (actually 15) and Ruby approximately 10 (actually 17).

64.     Polar Bear was an excellent judge of character: After being illegally seized and sent to Austin Animal Center by Defendant Officers, the center could not manage him, and he sat in a cold crate without the love he so desperately needed. But far from being unmanageable, Polar Bear was Plaintiffs' ambassador with all the injured and abused animals Plaintiffs took in. The more vulnerable his sibling was, the more careful he had been with them.

65.    Ruby was Luisa and Eva's beloved late Mom's special friend. Ruby was their closest link to their Mom. Ruby always took care of them—and Defendant Officers snatched Ruby at the door of her own home and forced her into a world of awful strangers who stole her life. She was supposed to be moved into Plaintiffs' new home the spring of 2018 and enjoy life on the beach and in the mountains. Instead, she's being held captive by strangers, and likely looked around hopefully to see if Eva and Luisa had come to take her home yet. Her beautiful eyes, which had helped Plaintiffs through a dozen traumatic events in the last few years before the incidents in this case, and to which they promised safety forever, were no longer smiling at them.

66.    When Defendant Officers invaded Plaintiffs' home on April 17, 2018,  there were (1) four large white airtight containers of dog food throughout the house in plain view of the cameras, (2) an additional large container and two more unopened large bags of the dogs' specialty food in the pantry, and (3) empty dog food bags being reused to take out recycling (stack of approximately 4 feet of flattened bags in plain view), contrary to Officer Diven's testimony under oath in court later that  he saw no evidence of food.

67.    In the audio (which had been first claimed by County Attorney Cox to be unavailable, then was "found" accidentally by a court tech at the appeal hearing), Defendant Officers can be heard saying:

- "It's actually sanitary in here," and "The floor is actually clear."

- Officer Diven and another officer can be heard counting the numbers of large bowls of clean water for the dogs such as "this is number two," "there's another one over here," etc.—water so crystal clear that the officers had to kick the bowl to determine that there was water in there.

- "The back yard looks normal."

14

68.     After the four dogs were illegally seized by Defendant Officers without a warrant and without consent, under the direction of Austin Police, the City Vet Hays conducted full blood tests on the dogs. The test results showed that EVERY SINGLE FUNCTION MEASURED WAS NORMAL: There was no lameness, no heartworm, no lung problems, no other symptoms normally associated with their advanced age, and no other problems. All four dogs had ABSOLUTELY PERFECT BLOODWORK IN EVERY SINGLE CATEGORY.

69.     City Vet Hays falsely listed in her same day examination report that the dogs had tapeworms, which are transmissible, but Plaintiffs and the cats did not have them, as they would have if the dogs had them. City Vet Hays noted Tapeworm, however, did not administer tapeworm medication until the next day as if someone later suggested or instructed her to put the tapeworm notation down, because if tapeworms were so obvious then she, as the City Vet, should have noticed them right away.

70.     Officer Seltmann claimed, "…the two of the dogs appeared to have severe cases of mange." Officer Diven in his affidavit claimed that on the scene, "inside the house, 4 dogs were found. The two red colored dogs had very bad mange/allergies to where the fur was missing on over half their bodies." City Vet Hays also identified the "mange" issue after she examined the dogs.  She later testified at court on April 24 that the dogs had mange.

71.     At the June 13 hearing, however, City Vet Hays admitted under oath that she understood and no longer believed that Ruby and Indiana had mange.

72.     A competent vet could have tested for mange in a matter of minutes. City Vet Hays held on to her incorrect mange belief for days. She was unable to deduce more complex things like allergies until Plaintiffs told her.

73.     Allergy is a complex assessment requiring a highly trained eye and hundreds of dollars in test. City Vet Hays proved that she did not have a highly trained eye:

- She did not know what an average Australian Shepherd lifespan was.

- She did not know the average lifespan for large dogs.

- She did not know that large dogs generally have a much lower life span.

- She made gross errors regarding the weight of Plaintiffs' four dogs.

- She was unable to determine the age of the dogs within a reasonable standard of care for vets—within what would be normally expected of vets.

- She misdiagnosed a simple illness like mange, which the dogs did not have.

74.     Plaintiffs' pets were not just their best friends, they were also therapy and service dogs for Luisa, helping to keep her active and healthy and cope with her dyslexia. The dogs seemed to instinctively hang out, sleep, and play right next to Plaintiffs, maybe because they created an oasis of happiness, warmth, and health.

75.     When the dogs went zooming out to go to the bathroom, the backyard came alive with cheerfulness. Eva and Luisa built them agility equipment, bought supplies for fun and for them to learn interesting new communication techniques and tricks.

76.     The dogs kept the back yard safe, alive, and happy for Eva and Luisa and their family. Now it is empty—only the echoes of happy times remain—and it is too painful for Plaintiffs to go into the backyard, which only makes them cry.

77.     Plaintiffs' dogs were essential to balance their family. Without the dogs, Plaintiffs were, still are, and will be, incomplete.

78.     At the time Luisa was forced by the police to get into the EMS van that she did not want or need, she saw the last view of her formerly happy home—behind the doors were their dogs and

cats, who for  almost 10 years had only known happiness and safety. Behind the door was that little slice of heaven that Plaintiffs had built over a lifetime, where their pets had known a lifetime of safety and love.

79.     Luisa never agreed that Defendant Officers could seize Plaintiffs' dogs. Neither did Eva. Plaintiffs had knowledgeable and trustworthy people who could have taken care of their pets if special circumstances arose. Defendant Officers would never even be considered for this.

80.     Had Luisa given the police consent to seize Plaintiffs' dogs, Officer Diven did not need to—after all the dogs were seized and transported to the Austin Animal Center—then complete a seizure warrant with an affidavit full of knowingly false statements.

81.     Neither Luisa nor Eva ever cruelly treated Plaintiffs' dogs. Neither Luisa nor Eva ever cruelly treated the dogs by torturing them or by unreasonably depriving the animals of necessary food, care and shelter.

82.     Plaintiffs never cruelly treated and indeed took good care of not only the four dogs, but all of Plaintiffs' pets.

83.     Just an example, one of the rescues Plaintiffs worked with needed a hospice home for a senior, blind Chihuahua they had rescued. The rescue expected the dog to live no more than a month. Plaintiffs volunteered to take the dog and keep her safe and happy. The rescue was careful to say that the dog was not going to live more than a month. Under Luisa's care the dog lived for 2 *years*, running, happily sleeping the in the arms of her friend Polar Bear, playing with the other dogs, barking at the doorbell. The dog had a full dental, her heart trouble was discovered and treated, and Luisa managed a complex schedule of medications that had to be prepared and administered.

**Illegal seizure of Luisa and the dogs and illegal search of Plaintiffs' home**

84.     Since Plaintiffs moved to their home in 2011, they did not have any problems with their neighbors for the entire seven years and always had good relations with them until around September 2017 when a new neighbor, Defendant Elizabeth Glidden ("Ms. Glidden"), moved in next door.

85.     One or both sisters had frequently been away from home for extended periods without issues, and with no undue attention from neighbors before September 2017.

86.     Plaintiffs installed security cameras both outside and inside their home. Security cameras are commonplace, are recommended for home security even by police, and are particularly helpful when people undertake to help medically fragile pets.

87.      Plaintiffs always kept their home nice, clean and well organized whenever they were at home. They both stay perfectly healthy.

88.     Plaintiffs always put their clothing in the laundry and showered every time they came home from outside because of Indiana's allergies.

89.     At least twice per day, but usually more often, one of Plaintiffs walks between the back of their car and the garage in order to provide food and water to birds and any lost animals in need of food or water. Their walking through that area would have broken any incipient spiderwebs. Since they walk past there at a minimum of twice a day, anything between the back of the car and garage would have been formed between Plaintiffs' outings and would therefore have been limited to maybe a strand, NOT cobwebs. Officer Villarreal claimed "cobwebs" to support her belief that Luisa had been abandoned, in addition to Officer Villarreal's other "proof" that Eva's car had not been moved for "a long time."

90.     Even when Plaintiffs were on the way preparing to move to their planned new home and before Defendant Officers searched Plaintiffs' Austin home, the moving boxes in the home were all labeled with the name of the moving company and the contents neatly written in the corner. Each box also had an indication on the side as to the room into which it was to be put in the new home. They were all packed but unsealed yet, waiting to be sealed and loaded into a moving van upon Eva's return from working on a case in California. The moving was scheduled to take place at the end of April 2018.

91.     While Defendant Officers searched Plaintiffs' home, ransacked and dumped out boxes to make the house look very messy, it appeared that they forgot to do the same to the insides of the cabinets in the house to corroborate the allegedly messy outside. The insides were perfectly crystal clear.

92.     In the police video (likely staged and edited because it did not accurately show the interior of Plaintiffs' home), Officer Diven claimed the counters in the Plaintiffs home were covered in trash, but the camera avoids the kitchen counters, and he was falsely showing Eva's desk while claiming it was the kitchen counter.

93.     In July of 2017, Ms. Glidden bought the house next door "sight unseen" according to the seller, and apparently Ms. Glidden didn't want to live next door to a mentally "disabled" person as she perceived Luisa to be after she moved in, although she and Luisa had never spoken with each other and she had never been in Plaintiffs' home. Ms. Glidden began a campaign of harassment in hopes of terrorizing Luisa into selling or abandoning her home, including such as the following:

- Reaching over the fence and spraying Plaintiffs' yard and deck with **Roundup—**a

recognized carcinogen and neurotoxin that is dangerous for their pets (Indiana suffered from incurable complex allergies)—all over: on Plaintiffs' deck, flowerpots, hardscape, deck steps, grape plant, and fence, as shown in a video.

- Making false, denigrating statements to the Police and Adult Protective Services regarding Luisa: That Luisa was unable to care for herself due to her disabilities and she was believed to be intellectually challenged and unable to take care of herself due to her mental disabilities.

94.    Since Ms. Glidden moved in about September 2017, Luisa began receiving notes offering to buy her home at half market price.

95.    In October 2017, Officer Visi came to the front porch of Plaintiffs' house, spoke with Luisa who assured him that she did not require anything, and Officer Visi told Eva that he closed the case.

96.    Plaintiffs believe Ms. Glidden was disappointed and continued to call in false complaints attempting to remove Luisa from her own home.

97.    Defendant McKenna Kuhr ("Ms. Kuhr"), reported to be acting as the police's witness, was not a neighbor to Plaintiffs, and she apparently lives at 805 Calico Dr., Austin, Texas, 78748, which is approximately seven miles away from Plaintiffs' home. The location of her secretary job (her another occupation was identified as Estate Sales) with the employer, Dr Jo Beth Hammer, was about 13 miles away from Plaintiffs' home. She was a stranger to Plaintiffs. To Plaintiffs' knowledge, she had never been inside Plaintiffs' home.

98.    Ms. Kuhr allegedly claimed that she knew Luisa and that Plaintiffs' several anonymous neighbors had contacted her about concerns for Luisa. Ms. Kuhr also falsely, even

disparagingly, claimed that (1) Luisa used to have a caretaker (possibly sister, Eva) who moved out about 8 or 9 months ago, (2) since Eva moved out of the house, no one had come to visit or care for Luisa, (3) Luisa was believed to be intellectually challenged and unable to take care of herself due to her mental disability, (4) the trash had not been seen out on the curb in months and she believed that Luisa was hoarding and living in unsanitary conditions, (5) there had not been any food seen taken into the residence and Ms. Kuhr believed Luisa may not be eating regularly because she was so thin, (6) whenever the neighbors periodically did check on Luisa, Ms. Kuhr claimed they smelled a foul door coming from the inside of the house, and (7) there was a SUV parked in the driveway that had not been moved for months.

99.    But Ms. Kuhr—a stranger who lives  seven miles away and was not medically trained—was not in a position to know if Luisa had a mental disability and needed a caretaker, if Eva lived in the house and how often she was not there, if anyone had come to visit or "care for" Luisa, if the house was in sanitary conditions, and how many times Luisa bought groceries or put the trash out.

100.    And weirdly, the police and Ms. Kuhr claimed that Plaintiffs' several anonymous neighbors had suddenly been calling a non-neighbor, Ms. Kuhr, due to concerns about Luisa because they did not see anyone leave or exit the home for a prolonged period. In fact, Plaintiffs' actual neighbors, except Ms. Glidden, came to them when there was an animal issue. If the neighbors really had concerns about Luisa, they could call her (they had the cell phone numbers of both Luisa and Eva) or the police themselves, or simply come to Luisa to check—instead of calling someone who is not a neighbor and lives miles away—just as they did so when seeking help from Plaintiffs with animal issues.

21

101.    Ms. Kuhr also allegedly claimed that she took care of the home that Ms. Glidden bought. During the summer before Ms. Glidden bought the house next door to Plaintiffs', the person who "took care" of the house drove in and out at high speeds, came only a few times during the summer, and spent only a short time at the house. The last time Ms. Kuhr was seen in Plaintiffs' neighborhood was almost a year before her alleged "call" to police.

102.    On March 30, 2018, due to alleged calls from Ms. Kuhr, Officers Villarreal and Guetzke came to the front porch of Plaintiffs' home, claiming that an anonymous stranger called to say that Luisa needed to be "checked on."

103.    Officer Villarreal asked Luisa, "Are you going to hurt yourself?" Luisa replied, "No." Officer Villarreal then asked, "Are you going to hurt somebody else?" Luisa replied, "No."

104.    Luisa calmly thanked the officers and explained that she did not need anything. At the time Eva was on a business trip.

105.    Officer Villarreal said that she observed that 1) Luisa appeared to be extremely thin and frail given her weight estimated by Officer Villarreal to be 5'7, approximate 90lbs; 2) Luisa's clothing also had a strong smell of being soiled and there appeared to be LICE in her hair; 3) Luisa's clothing was too large for her size and her pants were covered in animal hair; 4) Luisa's cheeks were sunken in and her hair was also very thin.

106.    Luisa's clothing was nice and clean and no smell at all as always. She has been slim and healthy (she weighed 110 lbs, not 90, in the hospital on April 17, 2018, just two weeks later). She likes wearing loose clothing at home as many people do. She has very thin hair due to Nordic/Scandinavian ancestry on both sides.

107.    Officer Villarreal claimed that she could see "lice" while standing a few feet away from Luisa. It is medically impossible, however, because the detection of lice requires careful close-up work even by trained doctors, sometimes involving a microscope. That claim and later (on April 17) Officer Diven's similar claim (standing approximate 10-15 feet away) are contradicted by all rational medical personnel and by the Texas Department of State Health Services as well.

108.    Officer Villarreal stated that she also observed Plaintiffs' vehicle was strangely registered to Eva but with an address to a nearly shopping center (not a residence). It was not strange that the vehicle was registered to Eva, and the vehicle was not registered to a shopping center, but to a P O Box, a practice that is both legal and common due to people's concerns about privacy.

109.    Officer Villarreal painted a falsely negative picture of Luisa by using sensational and degrading words and was an intentional falsification designed to coordinate with Defendant Officers' later unlawful seizures of Luisa and Plaintiffs' pets and unlawful search of Plaintiffs' home.

110.    Officer Guetzke said to Luisa, "As long as we're able to verify that everyone's ok that's living in the household, then we won't be back out here." But the officers refused to leave Plaintiffs' property long after they determined that everyone [Luisa] was patently ok.

111.    Officer Villarreal initially would not leave unless Luisa provided her date of birth. Officer Villarreal told Luisa, she had to have Luisa's date of birth so she could put it in the call system, so the police would not come out to Plaintiffs' home again.

112.    Officer Villarreal prevented Luisa from returning to the house unless she provided her date of birth, and then even required Eva, who was on a business trip and on the phone with Luisa, to provide Eva's date of birth.

113.    Luisa was forced to comply because (1) she was afraid of the two officers, Officer Guetzke was very large and intimidating and Officer Villarreal was overweight and aggressive, and (2) Luisa was beginning to shiver in the cold.

114.    Plaintiffs (Eva on the phone) told the police that they were being harassed by these calls. The police admitted that their responses to the calls may constitute harassment to the victim of these calls.

115.    But Austin Police took no further actions regarding these calls. When Eva asked Officer Guetzke, "How do you stop this from turning it into a harassment situation? What do you guys do if you get multiple calls and they're clearly not warranted and it's clearly somebody doing something?" He responded, "We can't…we don't have the power to do that."

116.    In over 20 minutes of conversation on March 30, Officers Villarreal and Guetzke did not go into Plaintiffs' house and did not see Plaintiffs' pets inside the house. They did not ask Luisa about the pets.

117.    That same day, March 30, having left Plaintiffs' home, Officer Villarreal consulted with Ms. Glidden to check Luisa's backyard and Ms. Glidden took the officer into her backyard to view Plaintiffs'. Officer Villarreal then said that Luisa's backyard appeared to be fine.

118.    Still on that same day, Officer Villarreal alleged that Ms. Glidden said she was planning on making a report to Adult Protective Services because she thought Luisa was unable to care for herself due to her disabilities. Ms. Glidden also allegedly reported one of Plaintiffs'

pets for having a "large sore on it's [*sic*] face," and another for having ribs that were sticking out.

119.    The "large sore" is a small growth about the size of a pinky nail that had been tested and found benign, to be removed electively during his next anesthesia. Even the City Vet Hays who examined the pet called the growth "small." Eva and Luisa's other dogs had complex allergies that had resisted all medical treatment and Eva and Luisa were packed and ready to move to a low allergen part of the country for his sake at the time the incidents of this case occurred.

120.    Officers Villarreal and Guetzke did not go back to ask Luisa to check or verify what Ms. Glidden alleged  "large sore" or "sticking out" rib issues with the pets or Luisa's perceived disabilities.

121.    The "check" on Luisa on March 30 was recorded. Plaintiffs told a social worker who continued to harass Luisa about the recording. Plaintiffs believed that, once Defendant Officers found out that their March 30 check on Luisa was recorded, the police decided to "teach Eva and Luisa a lesson."

122.    Officer Floyd assigned, checked, and approved (on April 10, 2018) the "check" on Luisa by Officers Villarreal and Guetzke on March 30.

123.    On April 5, 2018, Officer Robinson, Lead Investigator, stated that Luisa's case did not meet the criteria for Nuisance Abatement and that the title code had been modified to an EDP [presumably Emotionally Disturbed Person] case and routed.

124.    Officer Sgt King checked and approved Officer Robinson's assignment on April 7, 2018. Officer Sgt King also assigned, checked, and approved Defendant Officers'  actions on April 17, 2018.

125.    Plaintiffs believe that the police modified Luisa's case on April 5 because the cameras inside Plaintiffs' home would disprove Nuisance Abatement case. Further, the police did not have neighbors' support (except Ms. Glidden) because Luisa was well liked and everyone knew of her extraordinary ability with animals, and the care she lavished on them, as well as her kindness. She is a good, generous, and quiet neighbor. She helps her neighbors, makes sure they're ok, and is a positive social force.

126.    On April 6, Defendant Officers determined that Luisa was not an imminent threat to herself or others and notified Adult Protective Services of a follow-up due to Luisa's "poor physical condition". And a joint home visit with Adult Protective Service, Code Enforcement, Animal Cruelty and the Community Health Paramedic Program was planned for April 17, 2018.

127.    Between April 5 and 16, Eva called Officers Visi and Bender (Visi's counterpart), as recommended by Officer Guetzke on March 30, seven times in total. Eva was told by the dispatcher that they were "very good" about returning calls the same day. The dispatcher even confirmed once or twice that they were in the office, as she had seen them. However, no one called Plaintiffs back. The police ignored Plaintiffs' every effort to communicate with them.

128.    Between March 30 and April 17, Luisa stayed the same as always: slim, healthy and rational.

129.    Earlier in the morning on April 17, Luisa went out to take her beloved pup (not one of the four dogs seized) for a vet surgery.

130.     During the entire time of the surgery, Luisa was on the phone with Eva who was on a

business trip, and they were helping keep each other's spirits up about their dog in surgery,

and about how they would all soon be in their new home.

131.     Luisa took a taxi in both directions. Her appearance and behavior were completely

normal, neat, and tidy in every respect when the veterinarian and the taxi driver saw her.

132.     Luisa had been up for over 24 hours watching over Plaintiffs' dogs. After she returned

home from her trip to the vet, she put her clothing in the laundry as they did every time after

coming home from outside and showered due to concern about Indiana's allergies, and put

on her comfortable pajamas sweats to worry and wait while her best friend was in surgery.

133.     At around 9:00 a.m., in broad daylight, multiple people gathered on the front porch of

Plaintiffs' home bringing an animal control truck, a Code Enforcement vehicle, a car with a

molded plastic seat in the shape of a person and numerous restraining straps across the

waist and chest and bars on the windows, and several other vehicles. These people called out

Luisa's name over and over.

134.     Luisa went on the porch, without yelling at all, to see what they needed and closed

the door behind her. Luisa was in her pajamas and did not have a bra on. Both her hair and

clothing were clean because she had just gotten out of the shower. She has clear, healthy skin.

She did not have bugs or lice and has never had! The same day photos taken by Luisa herself

after she was seized also showed that she did not have any bug bites on her clear skin.

135.     Office Diven, like Officer Villarreal, claimed that Luisa was covered in bugs. Officer

Diven also claimed that, though he was "standing 10-15 feet away" from the front door of

Plaintiffs' house, he saw lice crawling over Luisa and that he could see lice and "smell urine." In fact, neither lice nor urine were present.

136.    Officer Diven's claims appear to be made with the intention of increasing his own credibility and the believability of the police fabrication by being the second person to mention lice after Officer Villarreal's mention, and to corroborate and bolster her earlier similar lice claim.

137.    Officer Diven further stated that Luisa appeared to be mentally challenged and had some issues with her speech.

138.    The people at the front porch, including Officer Horn, did not identify themselves as police.

139.    When Luisa went on her front porch, the police blocked her exit forward. Officer Seltmann, wearing rubber gloves, immediately approached Luisa and tried to put her arm around Luisa's back and shoulders and grabbed her left wrist while Officer Reeves was grabbing her right wrist on her own front porch, hurting her wrists.  Luisa said to the officers, "Please stand back," and retreated a few inches until her back was against the door of the house.  Luisa was afraid for herself and immediately afraid for Plaintiffs' pets because she was their only protector there at the time.

140.    While the officers were pulling Luisa down the driveway, Officer Seltmann said to Luisa, "We're going to take you to the hospital get you checked out." "Walk or we'll carry you."

141.     Officer Seltmann and Reeves then pulled Luisa down the driveway and across the street. Officer Seltmann said to Eva, "It's not her choice. It's my choice. That's my decision.

I'm just telling what's happening. I'm in charge."

142.    Luisa asked the officers, "Please loosen your grip – you're hurting me," but Seltmann and Reeves did not do so.  Officer Seltmann and Reeves threatened to handcuff Luisa, saying, "If you keep pulling I'll put handcuffs on you." Luisa was forced to wait in the sun, essentially on display on a neighbor's lawn across the street from her home. Luisa was not even given a chance to put on her regular clothes instead of her pajamas without a bra on.  The two officers illegally seized Luisa with no warrant, no probable cause, no consent, and no exigent circumstances.

143.    Luisa's wrists are not accustomed to the rough treatment which Defendant Officers used towards her. She told them several times, "You're hurting me." But the officers just ignored her.  She was never mistreated in her whole life, until the police did so that day.

144.    Luisa and Eva had been talking on the phone all morning about their dog having surgery. When the police were seizing Luisa, Eva confirmed with Luisa, "So some people showed up and they're trying to take you by force?"  Eva then verified with an officer by asking, "Is she free to leave?" Officer Reeves answered, "No, she's not free to leave."

145.    Luisa informed the police that she "ha[s] to stay here to take care of the dogs." Luisa never agreed for the police to seize Plaintiffs' dogs. And she would never consider the police to even take temporary care of the dogs for her.

146.    Plaintiffs' four dogs were kept inside Plaintiffs' house and they dogs could not be seen from the outside of the house.

147.    Luisa instructed the police several times that they CANNOT go in [Plaintiffs' home].

148.    When Luisa instructed the police that they cannot go into the house, Officer Seltmann said, "Yes, we can."

149.    Luisa called out on the phone "Help me!" to Eva. And Eva could hear Luisa say "No" several times.

150.    The police would not let Luisa get her keys to lock the house, power cord for her cell phone, or a hairband for her hair.

151.    Officer Seltmann could be heard on the audio, saying "I need to take her to the hospital."

152.    Luisa never consented that the police could enter or search Plaintiffs' home without a warrant. Neither did Eva.

153.    Plaintiffs' home was closed (doors and windows), but Defendant Officers entered Plaintiffs' home anyway with no warrant, no probable cause, no consent, and no exigent circumstances.  Defendant Officers entered and searched the home, took Plaintiffs' beloved dogs, and stole and retained Plaintiffs' valuables. Defendant Officer did so in disregard of Luisa's repeated instructions that they cannot enter her house.

154.    Officer Von Seltmann once said in a newspaper article that she based her entry into people's homes on her own "gut feelings," entering homes to "suss out" what's happening whenever her "gut feelings" tell her to.

155.    Eva informed the police twice that Luisa wanted a lawyer and one of the officers responded that Luisa was not entitled to have an attorney.

156.    Defendant Officers, including Officer Schwettmann, used a pole with a wire on the end of it to grab Plaintiffs' senior dogs, ages 14, 15, 16, and 17 years old, around the necks

and drag them away, taking Plaintiffs' four best friends and family members from Plaintiffs. Officer Diven can be heard on the video taken that day saying, "She's [Luisa] not getting these dogs back, and neither is the sister [Eva]."

157.    Defendant Officers did not take the cats, leaving them alone and unprotected, without the person who had taken care of them for so long and who had ensured that they always had clean water and food. Defendant Officers just left them, likely because it would take too long to grab them, and the officers never came back for them.

158.    The dogs were then all transported to the Austin Animal Center. **After** the dogs had been unlawfully seized with no warrant, no probable cause, no consent, and no exigent circumstances, Officer Diven **then** completed a seizure warrant and petitioned the Justice Court, Precinct 5, Travis County, Texas (JP5) to divest ownership of the dogs from Luisa until a hearing could be had to determine proper placement of the dogs.

159.    Defendant Officers, including Officer Diven, were not really concerned about the welfare of the dogs: They did not even ask Luisa about the dogs when they saw her April 17. They did not ask her whether the dogs had any existing medical conditions and what those were.

160.    Defendant Officers carefully planned their April 17, 2018 home invasion to Luisa ahead of time:

- ▪ In his report on April 5 (which was checked by Officer King the same day), Officer Robinson wrote: "This case does not meet the criteria for a Nuisance Abatement. The title code has been modified from Nuisance Abatement to an EDP and routed."

- Officer Seltmann wrote in her report that Luisa was not an imminent threat to herself or others; however, the CIT Unit was notified for follow-up due to Luisa's "poor physical condition"; that Adult Protective Services was also notified. Officer Seltmann wrote, "On April 6, I received an email from Det. Diven from Animal Cruelty concerning this case. After reading the above report, I determined that a home visit needed. Joint home visit with Adult Protective Services, Code Enforcement, Animal Cruelty and the Community health Paramedic Program planned for April 17, 2018."

- Officer Diven wrote in his report, "[4/6/2018] I emailed Ofc. Von Seltmann with CIT to inquire as to their plans to deal with Lupi," "[4/12/2018] Ofc. Von Seltmann advised that they have scheduled a home visit with Lupi on Tue, Apr 17 at 930a. We agreed to met [*sic*] her out there."

- As stated earlier, between April 5 and 16, Plaintiffs called the police, as recommended by Officer Guetzke on March 30, seven times in total with no response at all.

- On April 17, multiple people, as assigned and approved by Officer Sgt King (who was also briefed later that day after Lusia was forcibly taken to hospital), brought with them an animal control truck, a Code Enforcement vehicle, a car with a plastic seat molded in shape of a person and numerous restraining straps across the waist and chest and bars on the windows, and several other vehicles. They did not ask Luisa during their encounter with her about the pets, such as if the dogs had any preexisting medical conditions, which they had.

32

- Defendant Officers seemed to be there to only carry out their plan: they went there to simply seize Luisa, enter and search the house, and seize the dogs, with no warrant, no probable cause, no consent, and no exigent circumstances.

161.    Immediately after the April 17 home invasion by Defendant Officers, Plaintiffs told everyone that the conditions portrayed by the police were fabricated and asked if the proper authorities would like to come to Plaintiffs' house and see that the conditions portrayed by the police were false. But the police refused.

162.    During the entire course of the incidents, Luisa had not committed, was not committing, and was not about to commit, a crime; she did not pose an immediate threat to the safety of the officers or others; she was not actively resisting arrest or attempting to evade arrest by flight.

163.    During the entire course of the incidents,  Luisa had been staying calm and rational. As Officer Reeves said on April 17 after Luisa was seized by Officers Seltmann and Reeves, "She [Luisa] seems very, very rational to me."

164.    As he also stated, "Luisa was not in any way in trouble and no crime had been committed or had committed any crime."

165.    During the entire course of the incidents, Luisa did not pose or even attempt to pose in any manner any danger or possible danger to either herself or Defendant Officers present. She was wearing her comfortable pajamas that many people would do at home. She had only her cellphone with her. She did not have anything such as a knife, much less any weapon, with her. She did not have any firearms. She did not have access to any firearms. She did not state that she was going to commit suicide or threatening to do so in front of the police (or

anyone else at any time). She did not threaten or even attempt to threaten in any way to hurt the officers or anyone around. Defendant Officers did not, and could not, have probable cause to detain Luisa under Emergency Detention without a warrant when they had sufficient time to apply for and obtain one.

166.    After Defendant Officers took Plaintiffs' dogs unlawfully, they did not allow Eva or Luisa or their vet to see or examine the dogs.

167.    After Luisa was forced to enter the EMS truck. When she was told that Officer Seltmann said she was bitten by bugs from Luisa, she pieced together that Defendant Officers were intentionally fabricating facts and that they were going to try to take her to a hospital/mental health facility. Luisa pushed up her sweatshirt sleeves and asked EMS technician Hedrick to view her arms and write that she had no bites of any kind on her arms. Hedrick replied, "I'm not going to undress you, ma'am." Eva confirmed on the phone with Luisa what Hedrick said.

168.    EMS ordered Luisa to get in the EMS van, then get into the gurney in the van, and lay down on the stretcher. EMS strapped Luisa to the gurney with three straps across her ankles, knees and thighs. The van driver White wanted to put straps across Luisa's shoulders, but Hedrick stopped him, saying, "I don't think she needs that."

169.    Luisa was taken to Seton Medical Center Austin. The police did not ask the hospital to check Luisa's wrists, so there would be no contradiction to the story of the police. No one in the hospital ever checked her wrists for injuries, though Luisa told the hospital that her wrists were injured.

170.    Defendant Officers claimed Luisa had "LICE," but never asked the hospital to perform any necessary corresponding checks or tests, which would have disproved their claim. No one in Plaintiffs' family has ever had lice. Luisa has NEVER had lice.

171.    Officer Seltmann claimed that she was bitten by bugs during the incidents and Officer Reeves confirmed that by saying "all over her arm." Yet Officer Seltmann did not ask the hospital to check on the bug bites. Officer Reeves holding Luisa's right arm did not get any bug bites and Luisa did not, either, although she had been in the house for some time.

172.    Officer Diven later admitted at the April 24 hearing, which is to be addressed later, that it was not Officer Seltmann, but he, who had a single bug bite, that he was not covered in bug bites, that the bite was sustained outside Plaintiffs' home, and that it was probably a mosquito bite.

173.    In the Notification of Emergency Detention submitted to the hospital, Officer Seltmann handwrote under the reason to believe Luisa was a substantial risk of serious harm to herself, "Deterioration – Not able to make safe, rational decisions, unable to care for herself (hygiene & physical health, malnourished)."

174.    Under "My belief are based upon the following recent behavior, overt acts, attempts, statements, or threats observed by me or reliably reported to me," Office Seltmann handwrote, "Multiple neighbors including McKenna Kuhr & Elizabeth Glidden are concerned for Luisa's welfare as she is reported to have an intellectual disability, does not leave her home, has a very thin & frail appearance, poor hygiene (lice in her hair, odor of urine/feces on her clothing), hoards, has two dogs that also appear malnourished & ill, Luisa's sister Eva was reported by McKenna to be Luisa's caretaker; however McKenna told officers that she

35

moved out 8 or 9 mos ago & reportedly lives in Cal. No one has come or gone from the residence since that time. The trash has only been taken out one time in that time period & other neighbors, It is unknown how Luisa was getting food. Luisa is very frail & thin and appears to be malnourished. When her neighbors come to her door, she is hesitant to answer & will only do so if her sister, Eva, is on the phone. "

175.     Officer Seltmann did not state in the Notification of Emergency Detention, however, at the time Luisa was seized, what Luisa was doing or saying that she could be a substantial risk of serious harm to herself or others unless she was immediately detained.

176.     The hospital advised that Luisa was not in need of any treatment and would not admit her, but the police would not let her leave.

177.     In the hospital, Luisa was threatened that she would never be permitted to leave unless she gave blood and urine samples. The hospital also forced her to put an oxygen monitor on her finger and took her blood pressure against her wishes.

178.     The police stood guard at Luisa's door and willfully kept her without legal cause in a hot and unventilated room for more than *eight hours without food or water*, which was reported through proper hospital complaint channels with no response. Luisa sat there hopelessly, worried about her best friend in surgery, and unable to check on her, give her comfort, or support her recovery, or communicate with her surgeon.

179.     Because the room was overheated and unventilated, Luisa asked for ventilation. One of the personnel opened the door to the attached bathroom for fresh toilet-air. None of the hospital or police personnel stayed in the room for more than a few minutes at a time.

180.    The hospital took Luisa's temperature twice at the end of the day, and both the readings showed that she had developed a small but increasing fever due to the heat and lack of water.

181.    When Luisa tried to get out of bed to stretch her legs over the eight hours that she was forced to remain on the bed, a police officer told her roughly, "Get back on the bed."

182.    Towards the end of the day, the hospital personnel began asking Luisa to take a "mini psych" test, then they even said she could keep her sister on the phone.

183.    The police tried to compel the hospital to admit Luisa, and eventually the hospital stated in the "Emergency Services Discharge Instructions": "Chief Complaint: Failure To Thrive, " which is only used in veterinary and pediatric circumstances.

184.    After about eight hours with no food, water, or ventilation provided for her, Luisa was released by the hospital, saying that she had no condition requiring an emergency room visit.

185.    Luisa never consented that the police could detain her against her own will in the hospital while she was both physically and mentally normal.

186.    The hospital informed Eva that Luisa was charged for the ER room visit in the amount of $507.71 after the discount for cash payment (the original charge was $998.50).

187.    While in the hospital, Luisa asked for an attorney several times, and each time she was refused.

188.    While in the hospital, Luisa was later served by Officer Diven with a copy of Warrant For Seizure Of Animals (labeled as Page 3 of 4) and Notice Of Hearing (labeled as Page 4 of 4), Cause Number J5-AD-18-001957. But she was not served with a copy of the other two pages, pages 1 and 2 out of 4, containing Officer Diven's affidavit to support his application

37

for the warrant. When Luisa asked where pages 1 and 2 were, Officer Diven said to Luisa, "That's all you need." Luisa's attorney was served by email on April 19 only pages 3 and 4 as well.

189.    Luisa was never served with Officer Diven's Affidavit until the middle of the Magistrate hearing when Judge Nicholas Chu gave Plaintiffs "five minutes to look this over."

190.    The initial hearing was set on April 24, 2018 to determine whether Plaintiffs' four dogs had been cruelly treated.

191.    During the period of time Luisa was inhumanely and illegally detained in the hospital, Defendant Officers, after illicitly entering Plaintiffs' house, had been rummaging through every corner of the house, including bank records, client records, attempting to download the security system videos, digging through hard drives with intellectual property, opening letters, overturning boxes, breaking fragile items, and taking whatever valuables and cash they found and wanted.

192.    A number of items, including antique jewelry and cash on the counter, which were in the Plaintiff's house before Defendant Officers' illegal search, were discovered to be missing after the search. Defendant Officers took the missing items with intent to deprive Plaintiffs of their property rights because the officers never returned the stolen items to Plaintiffs.

193.    Luisa received the house keys at about 3:30 p.m. - 4:00 p.m. while she was in the hospital. Defendant Officers spent at least FIVE AND HALF hours searching and ransacking Plaintiffs' house as the officers pleased. Nothing illegal was found in the house, because neither sister has been involved in anything illegal.

194.    Luisa was finally released after an eight-hour unlawful seizure and willful detention by the police. Although the police took her to the hospital, Luisa had to take a taxi herself going back home.

195.    Interestingly, the next day, April 18, 2018, instead of helping Plaintiffs get their dogs back, Officer Visi was bizarrely asking Eva on the phone, "Who has an ownership interest in the home."

196.    At the April 24 hearing, the police were sitting in a large group and laughing out loud while seeing Plaintiffs struggling to bring their dogs and family back together.

197.    At the April 24 hearing, the County Assistant Attorney Annalynn Cox ("Attorney Cox") claimed that the audio portion of the video taken by the police on April 17 raid of Plaintiffs' house was "unavailable." At the appeal hearing, she pretended that the audio did not work, when it was accidentally made available by the court audio/video tech. The audio portion disproved, at least partially as stated earlier, what Defendant Officers and Attorney Cox claimed that Luisa cruelly treated Plaintiffs' dogs.

198.    Luisa was not allowed to introduce her rebuttal evidence. Neither was Eva.

199.    The magistrate court judge Nicholas Chu literally signed an order dated April 25, 2018 based on anything Attorney Cox wrote, even matters not having been mentioned at the hearing. The order ruled, among other things, that Luisa "has cruelly treated" the four dogs by torturing them and by unreasonably depriving them of necessary food, care and shelter, and that Luisa and all other owners were divested of ownership of the dogs.

200.    Eva, as the joint owner of the four dogs, was never served with any documents regarding the seizure and disposition of the dogs and was not named as a party to the case, making it impossible for her to defend her rights. Yet she was illegally deprived of her ownership (as "all

other owners"). And County Judge Phillips issued a "holding" against Eva (although she was not named as defendant) to punish her for defending Luisa.

201.    Plaintiffs were not provided with any documents for their appeal of the April 25 order to the county court until a few days before the appeal hearing. They still do not have most of the documents involved in the case.

202.    At the appeal hearing, Attorney Cox falsely testified that Luisa only fed two of Plaintiffs' four dogs [because of her alleged mental "challenges"]. But Plaintiffs' veterinary evidence— including under oath statement from their veterinarian about the great care of pets provided by Plaintiffs and half a dozen other affiants, one of them an Austin Police employee for whom Plaintiffs dog sat—was not permitted to be produced to rebut Attorney Cox's testimony. To ensure that Plaintiffs' voluminous rebuttal evidence be not presented and be not admitted, the county even hired an extra attorney for that sole purpose.

203.    It did not matter whether the county met their burden of proof that Luisa did not provide adequate care to Plaintiffs' pets. For instance, Officer Diven stated that he didn't know when Plaintiffs' four dogs had been to the vet. At least from their first visit to Luisa on March 30, Defendant Officers, including later the judges involved and Attorney Cox, perceived and treated Luisa as mentally disabled, and did not treat her in the same way as others.

204.    Apparently, all defendants conspired to reach an agreement to remove perceived disabled Luisa out of her own home and the neighborhood.

205.    After the seizures of Luisa and Plaintiffs' dogs and the search of Plaintiffs' home, Plaintiffs were told that: (1) Eva might be able to get the pets [the hostages] back if Luisa went somewhere else to live (Luisa's attorney Daniel Smith told Plaintiffs that Attorney Cox

said this); (2) They should sell their house and move to a different city; (3) If they tried to get their pets back, the police would file criminal charges even though there was no basis for those charges; and (4) If they filed an appeal, the police would file criminal charges even though there was no basis for those charges.

206.    Attorney Cox told Plaintiffs' attorney that they would never get their pets back and that no discussions would take place as long as Luisa was living at that house (Cleansing the Neighborhood).

207.    Attorney Cox refused to extend to Plaintiffs' attorney any of the courtesies normally extended to opposing counsel. Attorney Cox said to the judge that the reason she wanted hearing #2 so early was because of a statutory deadline requiring the hearing to be held within a certain amount of time. In fact, Attorney Cox had already missed the deadline.

208.    Plaintiffs were forced to pay for the cost of duplicated tests on the dogs, thereby maximizing Plaintiffs' financial burden, in addition to their attorneys' fees, appeal bond, etc., so that they would be financially devastated and eventually give up.

209.    Plaintiffs engaged a firm to write a motion for a new trial (at county court level). The judge refused entirely to rule on the motion.

210.    Plaintiffs have never been able to bring back their dogs that were illegally seized by Defendant Officers.

211.    Eva filed complaints with the office of the Police Monitor of Austin Police Department, which immediately instructed them to file the complaints directly with Internal Affairs. Plaintiffs never received any information on any actions taken by Internal Affairs or any response with questions or for any further information.

212.    Plaintiffs were contacted, however, by Code Enforcement Officer Joseph Lucas, who Plaintiffs believe has been conspiring with other defendants, demanding entry into Plaintiffs' home. If Plaintiffs did not give Officer Lucas permission to enter, he said: "I have 30 years of experience in law enforcement in this town and I retired from the Austin Police Department. I am pretty confident I could obtain a search warrant in a very short time."

213.    Officer Lucas also threatened on January 13, 2020 to file legal action against Luisa, which would have the effect of subjecting her to damages and costs possibly sufficient to drive her out of the neighborhood.

214.    Seven days later, on January 21, Officer Lucas posted a notice of violation on the front door of Plaintiffs' house. The alleged violation of "Accumulation of rubbish or garbage" occurred on April 17, 2018.

215.    On February 12, 2020, Officer Lucas posted a citation numbered 09630 against Luisa, claiming violation of "Accumulation of rubbish or garbage" that occurred on April 17, 2018 at 2:16 p.m. At the time of the alleged violation, Luisa had been seized and was forcibly and unlawfully detained in the hospital. At the time of the alleged violation, Defendant Officers had already been rummaging through and ransacking Plaintiffs' home multiple hours.

216.    Plaintiffs were planning to move out of their home before the police raid of the home on April 17, 2018. But they decided to continue to stay there until their dogs were brought back because they would not move out without their dogs together.

217.    On February 13, 2020, the next day after Officer Lucas's most recent post of the citation, however, Plaintiffs were finally forced to move out of their home because they could

not any longer keep living in almost two years of constant harassment and fear that were created by the defendants.

**Warrant issued after seizure, based on knowingly false facts,**

**and containing contradicting information**

218.     As stated previously, when the police seized Luisa and Plaintiffs' dogs and searched Plaintiffs' house, the police did not have a warrant, did not have consent, did not have probable cause, and did not have exigent circumstances. Only, and only, after the police illegally seized Luisa, illegally entered and searched Plaintiffs' home, and illegally seized Plaintiffs' dogs inside the home, Officer Diven then completed his affidavit to apply for a warrant for seizure of Plaintiffs' pets—an affidavit filled with numerous false, and even deliberately fabricated statements as articulated below:

- Luisa had a caretaker that moved out about 8 months ago and that no one had been coming by to care for Luisa since.

The statement is false because Luisa never has had a caretaker at any time—she has been able to take care of herself and sometime her sister Eva as well—and Eva did not move out.

- Luisa appeared to be intellectually challenged and was unable to care for herself due to her mental disabilities.

The statement is false because Luisa never has had any mental disabilities and she has been taking care of herself.

43

- The trash [from Plaintiffs' home] had not been put out for months.

The statement is false because Luisa, sometimes Eva, has been putting out their trash when they needed (often about every four weeks since they produced very small trash and not at all when they were traveling).

- A foul odor was emanating from the house.

The statement is false because Plaintiffs always kept their home nice and clean and there was no smell from the house.

- Luisa was never seen bringing any food into the house.

The statement is misleading because Luisa ordered delivery food many times. Sometimes Plaintiffs went out to eat.

- Luisa was believed to be hoarder.

The statement is false because Luisa was never a hoarder. Plaintiffs did have well-organized items in moving boxes, which is not hoarding. They were on the way preparing for moving to a new larger home from a three-bedroom house.

- Luisa was living in unsanitary conditions.

The statement is false because Luisa has been living in sanitary conditions shown by the fact that Plaintiffs always keep their house nice and clean and well organized.

- The house smelled strongly of urine and feces when Luisa opened the door on April 17, 2018.

The statement is false because when the police went to the front porch of Plaintiffs' home, Luisa had just got out of shower and put on her clean pajamas and there was no smell of urine or feces from Luisa or the house.

44

(Officers Villarreal and Guetzke made similar false statements that the house smelled strongly of urine and feces when Luisa opened the door. Officer Reeves also claimed, in "corroborating" other officers' stories, that upon walking up to the front door, he could right away smell a strong urine/ammonia smell coming from the house.)

- Luisa was very thin and frail, and her clothing was soiled and smelled.

The statement is false because Luisa was slim but very healthy. And her clothing was nice and clean and no smell.

- Luisa had what appeared to be lice in her hair.

The statement is false and intentionally fabricated to paint a very negative picture of Luisa because she has never had any lice nor has anyone in Plaintiffs' family.  And the detection of lice requires careful close-up work even by trained doctors, sometimes involving a microscope—Officer Diven, standing 10-15 feet away from the front door, was not in a position to make that detection.

- Eva advised the officers that Luisa was taken care of.

The statement is false because Eva did not make that advice and Luisa has never needed to be taken care of.

- Neither Eva nor Luisa were very cooperative with providing information.

 The statement is false because the police were provided with all the information they asked for.

- On the scene, Defendant Officers determined that Luisa was a danger to herself based on what the officers observed, and they completed an emergency detention on Luisa in order to have her mentally evaluated.

The emergency seizure statement did not say what Defendant Officers observed that Luisa was a danger to herself.

- Plaintiffs' two red colored dogs found inside Plaintiffs' home had very bad mange/allergies.

The statement is false because Officer Diven and other Officers on the scene were not in a position to identify the mange/allergies shown by the facts that: (a) Even the City Vet admitted later, after examining the dogs and first claiming she identified the mange issue, that the two dogs did not have mange; (b)  Identification of allergies is more complex than mange and even the City Vet was not able to deduce allergies until Plaintiffs told her.

- [Indiana]… would not get up and walk and had to be carried to the truck [by Officer Schwettmann].

The statement is untrue and misleading because Indiana was very old and was just terrified by aggressive strangers hurting Luisa and invading the home.

- There was a yellow large mixed breed dog that had a large sore on its face.

The statement is false because the "large sore" is a small growth about the size of a pinky nail that had been tested and found benign. Even the City Vet who examined the pet called the growth "small."

- The inside of Plaintiffs' home was a typical hoarder house.

The statement is false because Plaintiffs had well-organized items in moving boxes, which is not hoarding. They were about to move to their new home from a three-bedroom house.

- The smell of ammonia was very strong.

The statement is false because Plaintiffs' home was nice and clean and no smell.

- Luisa was covered in bugs.

The statement is false and deliberately fabricated because Luisa never had bugs and did not have at the time she was seized. Luisa's skin was clear and healthy as evidenced by the photos taken by herself the same day, after she was seized.

- There was trash, debris, and belongings stacked floor to ceiling in all corners of Plaintiffs' home.

The statement is false because there was no trash or debris except in trash bags—Plaintiffs recycled dog and cat food bags and used them as recycling bags.  Plaintiffs' moving boxes were stacked; boxes had some of Plaintiffs' personal items on top that were not going to be packed in the moving van but were going to be taken in their SUV—and they were only in some corners.

- A window was opened in a room to allow Plaintiffs' cats to get in and out as necessary to survive.

The statement is intentionally made misleading because the only window opened was seven feet high that was almost impossible for Plaintiffs' domestic cats to get in and out. It is more likely that the window was opened so that someone might get in and out later.

- Luisa cruelly treated the dogs.

The statement is false because Plaintiffs provided only great care and love to their dogs—virtually their children—and neither Luisa nor Eva ever cruelly treated them.

- Two of the four dogs were in really bad condition.

The statement is false and misleading because the two dogs, Ruby and Indiana, were very old but happy, warm and cool as appropriate, fed lavishly, always had access to lots of fresh water, and were loved, understood, and cherished.

219.    The JP5 received Officer Diven's Affidavit for Seizure of Animals at April 17, 2018 at 2:41p.m. and issued the warrant for seizure of animals.

220.    But it seems that Officer Diven obtained the warrant at 2:20 p.m., even 21 minutes before he applied for the warrant, and competed the warrant at 3:00 p.m.

### Harassment never ends

221.    After the seizure of Plaintiffs' dogs, Ms. Glidden turned her attention to Code Enforcement, from which Plaintiffs received a barrage of threats, calls, emails, and visits.

222.    On February 6, 2019, Officer Lucas emailed Eva, stating that he received an anonymous complaint that Plaintiffs' backyard had "much junk" and "raccoons nesting there." Five days later, Officer Lucas informed Eva that he did not really see anything that was too bad.

223.    About 14 days later, Luisa heard some noise outside. She saw a tree trimmer on the roof of her house without her permission. The tree trimmer's truck was parked in front of Ms. Glidden's home and Ms. Glidden was on her back porch and talking with the tree trimmer.

224.    On March 11, 2019, Officer Lucas emailed Eva that there was a new complaint, claiming that "Tall weeds unmaintained yard, strong smell of urine" coming from Plaintiffs' home. He sent Eva another email, saying "The grass/weeds are under 12 inches tall. I don't deal with trees and brush. I did not smell urine from the front yard."

225.    As stated earlier, Officer Lucas threatened in January 2020 to file a lawsuit against Luisa, and on February 12, 2020, he posted the citation for a claimed code violation that occurred on April 17, 2018 while Luisa was in the hospital.

### General

226.    As a direct and proximate result of the conduct of all defendants, Plaintiffs suffered substantial damages, including pain and suffering, emotional distress and harm, embarrassment, loss of enjoyment of life, and loss of financial damages.

227.    At all times relevant to this Complaint, the conduct of all defendants was in willful, reckless, and callous disregard of Plaintiffs' rights under federal and state law.

### V.     CAUSES OF ACTION

### Count I

### Actions against all defendants under 42 U.S.C. § 1983 violations of the Fourth and Fourteenth Amendments

228.    Plaintiffs adopt by reference the facts and allegations set forth above as though fully set forth herein.

229.    All causes of action under § 1983 are alleged against all defendants under conspiracy.

230.    The Fourth Amendment protects citizens from unreasonable seizures and searches. And the Fourth Amendment applies to the states through the Fourteenth Amendment.

231.    The Fourth Amendment right to be free from unreasonable seizure of a person without a warrant supported by probable cause was clearly established at the time of the events in this case.

232.    The Fourth Amendment right to be free from unreasonable search of a person's home without a warrant supported by probable cause was clearly established at the time of the events in this case.

233.    The Fourth Amendment right to be free from unreasonable seizure of a person's pets and other personal property without a warrant supported by probable cause was clearly established at the time of the events in this case.

234.    The Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property without due process of law."

235.    Under the Tex. Health & Safety Code § 573.001, a peace officer may, without a warrant, take a person into custody if (1) the officer has reason to believe and does believe that a person is mentally ill and because of that illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody.

A.    **Fourth Amendment and Probable Cause**

a.    **Emergency Detention -**

236.    On April 17, 2018, Defendant Officers did not have a warrant or Luisa's consent to seize her and did not meet any of the exceptions for the seizure without a warrant.

237.    There was no probable cause for the seizure of Luisa without a warrant under Texas Health and Safety Code § 573.001 et seq. and Defendant Officers did not comply with the requirements of the statute.

238.    Luisa did not have mental disabilities as all defendants perceived and she has never had any mental disabilities.

239.    Defendant Officers did not observe on the scene Luisa engage in any conduct suggesting any substantial risk of serious harm to herself or others unless she was immediately detained.

240.    Defendant Officers had sufficient time to obtain a warrant before they seized Luisa because they well planned ahead of time the seizure of Luisa on April 17, 2018.

241.    Under the totality of the circumstances, Defendant Officers did not have probable cause to seize Luisa without a warrant and without consent and have her taken to Seton Medical Center Austin.

**b.      Entry into and search of home without a warrant or consent -**

242.    On April 17, 2018, Defendant Officers forcibly seized and took into custody Luisa, they then entered Plaintiffs' home without a warrant and disregarded Luisa's repeated instructions that they cannot enter the home.

243.    None of the circumstances constituting a recognized exception to the Fourth Amendment requirement of a warrant were present to justify Defendant Officers' warrantless entry into Plaintiffs' home.

244.    After entering Plaintiffs' home without a warrant or consent, Defendant Officers searched Plaintiffs' home, upon information and belief, at least five and half hours, without a warrant or consent from Luisa or Eva.

245.    None of the circumstances constituting a recognized exception to the Fourth Amendment requirement of a warrant were present to justify Defendant Officers' warrantless search of Plaintiffs' home.

**c.      Seizure of Plaintiffs' four dogs without a warrant or consent -**

246.    On April 17, 2018, Defendant Officers illegally entered and searched Plaintiffs' home, and seized Plaintiffs' four dogs inside the home and transported them to Austin Animal Center without a warrant and without consent from either Luisa or Eva.

247.    None of the circumstances constituting a recognized exception to the Fourth Amendment requirement of a warrant were present to justify Defendant Officers' warrantless seizure of Plaintiffs' dogs.

**B.      Fourteenth Amendment –**

**a.      Substantive Due Process**

248.    At all times relevant to this Complaint, all defendants conspired to willfully, recklessly, callously harass Plaintiffs, especially Luisa, and egregiously violate their due process rights to own, use and quietly enjoy their home and  enjoy their lives,  to own their pets and other property, and to enjoy the companionship of their pets.

249.    At all times relevant to this Complaint, Defendant Officers Villarreal, Seltmann, Reeves, and Diven deliberately fabricated evidence to seize Plaintiffs' dogs, falsely testified in court,  used the fabricated evidence against Plaintiffs in court, thus unlawfully but effectively depriving Plaintiffs of their ownership interest in and companionship of their pet dogs. Plaintiffs have never been able to bring back their dogs—their family members.

**b.      Procedural Due Process**

250.    Upon information and belief, conspiring with County Attorney Cox who prosecuted the case to determine whether Luisa cruelly treated the dogs and divest Plaintiffs' ownership of their dogs, Defendant Officers willfully, recklessly, and callously prohibited Plaintiffs from receiving

full service of process, producing Plaintiffs' evidence, or obtaining exculpatory evidence withheld by Attorney Cox.

251.    By doing so, Defendant Officers willfully, recklessly, and callously deprived Plaintiffs of their rights to a fair trial.

**C.    Supervisory Liabilities**

252.    Upon information and belief, Officer Floyd was callously indifferent in supervising, training, or both, the subordinates on how to conduct proper investigation into a person that was perceived to be mentally disabled, and the callous indifference proximately caused Officers Villarreal and Guetzke's unconstitutional conduct violating Luisa's constitutional rights.

253.    Upon information and belief, Officer Floyd exhibited deliberate indifference to Luisa's constitutional rights by failing to act on information indicating Officers Villarreal and Guetzke's unconstitutional conduct were occurring.

254.    Upon information and belief, Officer Robinson was callously indifferent in supervising, training, or both, the subordinates on how to conduct proper investigation into a person that was perceived to be mentally disabled, how to legally enter and search a person's home, how to legally seize a person under emergency detention, and  how to legally seize personal property of the person. That callous indifference proximately caused Defendant Officers unconstitutional conduct violating Luisa's constitutional rights on April 17, 2018.

255.    Upon information and belief, Officer Robinson exhibited deliberate indifference to Luisa's constitutional rights by failing to discipline or take other actions on information indicating Defendant Officers' unconstitutional conduct were occurring.

256.    Upon information and belief, Officer Seltmann was callously indifferent in supervising, training, or both, the subordinates on how to conduct proper investigation into a person that was perceived to be mentally disabled, how to legally enter and search a person's home, how to legally seize a person under emergency detention, and  how to legally seize personal property of the person. Officer Seltmann was also callously indifferent in participating in violating Plaintiffs' constitutional rights. That callous indifference proximately caused Defendant Officers unconstitutional conduct violating Luisa's constitutional rights on April 17, 2018.

257.    Upon information and belief, Officer Seltmann exhibited deliberate indifference to Luisa's constitutional rights by failing to prevent, discipline or take other actions on information indicating Defendant Officers' unconstitutional conduct were occurring.

258.    Upon information and belief, Officer King was callously indifferent in supervising, training, or both, the subordinates on how to conduct proper investigation into a person that was perceived to be mentally disabled, how to legally enter and search a person's home, how to legally seize a person under emergency detention, and  how to legally seize personal property of the person. That callous indifference proximately caused Defendant Officers unconstitutional conduct violating Luisa's constitutional rights on April 17, 2018.

259.    Upon information and belief, Officer King exhibited deliberate indifference to Luisa's constitutional rights by failing to discipline or take other actions on information indicating Defendant Officers' unconstitutional conduct were occurring.

**D.      City of Austin and Travis County**

260.    The violations of Plaintiffs' constitutional rights and/or the conduct of Defendant Officers, were directly and proximately caused by the actions and inactions of Defendants

City of Austin and Travis County, which have encouraged, tolerated, ratified, and have been deliberately indifferent to the following policies, patterns, practices and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

i. Legal cause to seize a citizen perceived to be mentally ill without a warrant.

ii. Legal cause to seize a pet perceived to be cruelly treated without a warrant.

iii. Legal cause to search a citizen's house without a warrant.

iv. Officer's duties and responsibilities to engage in proper investigative techniques.

v. Officer's constitutional duties to disclose exculpatory evidence.

vi. The failure to identify and take remedial or disciplinary action against officers who were the subject of civilian complaints of misconduct.

261. The failure to properly sanction or discipline officers who are aware of and conceal and/or aid and abet constitutional and statutory violations of citizens' rights by the officers of City of Austin and Travis County.

262. Upon information and belief, the City of Austin, through its policy maker, the then Interim APD Chief Brian Manley, or the City Council, or both had notice of the violations of constitutional rights by its officers and failed and refused to take action to stop and prevent such violations.

263. Upon information and belief, Travis County, through its policy maker, Travis County Judge or County Sheriff, had notice of the violations of constitutional rights by its officers and failed and refused to take action to stop and prevent such violations.

**Count II**

**Actions against the City of Austin under ADA -**
**Protection against discrimination based on perceived disabilities**

264.   Plaintiffs adopt by reference the facts and allegations set forth above as though fully set forth herein.

265.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation or denied the benefits of the services, programs or activities of a public entity." 42 U.S.C. § 12132.

266.   Under the ADA, a "disability" means: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(3).

267.   At all times relevant to this Complaint, Defendant Officers had been perceiving Luisa to be mentally disabled  and had knowledge of her dyslexia on April 17, 2018 when they seized Luisa in the front porch of her own house. Based on her perceived disabilities, dyslexia, or both, Defendant Officers illegally seized her without a warrant, consent, probable cause, or exigent circumstances and took her to Seton Medical Center Austin to be mentally evaluated.

268.   Based on Luisa's perceived disabilities, dyslexia, or both, after Defendant Officers seized Plaintiffs' dogs without a warrant or consent, Defendant officers then intentionally fabricated evidence and falsely accused Luisa that she cruelly treated Plaintiffs' dogs; Defendant Officers further made false testimony against Luisa in subsequent court proceedings.

269.   Based on Luisa's perceived disabilities, dyslexia, or both, Defendant Officers has been harassing Plaintiffs,  and attempting to remove Luisa out of Plaintiffs' home and the neighborhood.

270.   Defendant Officers' actions and omissions, based on Luisa's perceived or actual disability, denied her the benefits of her rights to be free from unreasonable seizure, search (of her house) and to fair legal proceedings, the benefits of her ownership interests in her house and Plaintiffs'

pets and of her rights to thee companionship of the pets, the benefits of quiet use and enjoyment of her house, and the benefits of her rights to decide where she wanted to live.

271.    The City of Austin, a public entity, through all Defendant Officers' illegal actions or omissions, subjected Luisa to discrimination based on her perceived disabilities, dyslexia, or both.

## Count III

### Actions against all Defendants under Texas Theft Liability Act

272.    Plaintiffs adopt by reference the facts and allegations set forth above as though fully set forth herein.

273.    On April 17, 2018, Defendant Officers unlawfully entered Plaintiffs' home, then  stole or converted Plaintiffs' personal property without consent and with intent to deprive Plaintiffs' of their property rights while illegally searching Plaintiffs' home in violation of the Texas Theft Liability Act ("TTLA") and Plaintiffs suffered financial loss from the actions of Defendant Officers.

274.    All actions under the laws of Texas are alleged against all defendants under conspiracy.

## VI.    APPLICATION FOR

## PRELIMINARY AND PERMANENT INJUNCTION

275.    Plaintiffs adopt by reference the facts and allegations set forth above as though fully set forth herein.

276.    Plaintiffs seek preliminary and permanent injunctions against all defendants for the immediate release of Plaintiffs' four dogs and stolen jewelry items and for immediate enjoinment from any actions or proceedings, brought or to be brought, against either plaintiff.

## VIII.   LACK OF QUALIFIED IMMUNITY

277.    Plaintiffs adopt by reference the facts and allegations set forth above as though fully set forth herein.

278.    Defendant Officers' actions violated "clearly established statutory and constitutional rights of which a reasonable officer would have known."

279.    Defendant Officers are not entitled to qualified immunity because they detained and seized Luisa without a warrant or consent and failed to comply with the statutory requirements for emergent detention of Luisa.

280.    Defendant Officers did not observe Luisa engage in any behavior that would have given any reasonable officer any reason to believe that there was a substantial risk of serious harm to Luisa herself or others unless she was immediately restrained and are therefore not entitled to qualified immunity for the seizure of Luisa without a warrant.

281.    Defendant Officers did not have any or sufficient evidence other than Luisa's mental disabilities they perceived. Defendant Officers intentionally disregarded the fact that Luisa was normal and rational on the scene and they knew the fact.

282.    No reasonable officer confronting a situation under the same or similar circumstances as Defendant Officers would have concluded that seizing Luisa and taking her to Seton Medical Center Austin without obtaining a warrant was appropriate, and Defendant Officers should not be entitled to any protection of qualified immunity to avoid accountability in this case.

283.    No reasonable officer would have entered and searched Plaintiffs' home under the same or similar circumstances as Defendant Officers did without a warrant, consent, probable cause, and exigent circumstances, and Defendant Officers should not be entitled to qualified immunity.

284.    No reasonable officer would have seized Plaintiffs' four dogs under the same or similar circumstances as Defendant Officers did without obtaining a warrant or consent, and Defendant Officers should not be entitled to qualified immunity.

285.    No reasonable officer would have deliberately fabricated evidence and used the evidence against Plaintiffs in later court proceedings to deprive them of the rights to fair trials and ownership interest in their dogs under the same or similar circumstances as Officers Villarreal, Seltmann, Reeves, and Diven did, and the officers should not be entitled to qualified immunity

286.    No reasonable officer would have willfully and egregiously harassed Plaintiffs, especially Luisa, and attempted to deprive them of their rights to (1) own, use, and quietly enjoy their home, (2) enjoy a normal life free from harassment and fear of the police, and (3) own their pets and enjoy their companionship under the same or similar circumstances as Defendant Officers did, and they should not be entitled to qualified immunity.

## IX.    DAMAGES AND ATTORNEY'S FEES

287.    Plaintiffs adopt by reference the facts and allegations set forth above as though fully set forth herein.

288.    As a direct and proximate result of all defendants' unlawful actions, Plaintiffs suffered deprivations of their constitutional rights guaranteed by the Fourth and Fourteenth Amendments to the U.S. Constitution.

289.    As a direct and proximate result of Defendant City of Austin's unlawful actions, Luisa suffered deprivations of her rights protected by the Americans with Disabilities Act.

290.    As a direct and proximate result of Defendant Officers' unlawful actions, Plaintiffs suffered deprivations of their rights protected by the Texas Theft Liabilities Act.

291.   As a direct and proximate result of the conduct of all defendants, Plaintiffs suffered financial loss totaling $290,278: Stolen jewelry valued at $220,000; stolen Helmust Lang jeans $278;  approximately 10 $100 bills on counter: $1,000; loss of ability to rent $56,700; appeal bond $1,800; attorneys' fees charged for both magistrate and county courts $10,500.

292.   As a direct and proximate result of the conduct of all defendants, Plaintiffs suffered extraordinary damages, some of which may be permanent, including Luisa's loss of liberty and having been living in constant fear that she might be taken by the police any time again, and Plaintiffs' loss of the companionship of their long-term beloved dogs, emotional distress and trauma, loss of the enjoyment of life and home, and physical symptoms of anxiety, stress and fear such as headaches, difficulty sleeping and nightmares, loss of reputation, shame, embarrassment, humiliation, mental anguish, pain and suffering, and such other compensatory and tangible consequential damages as the law entitles Plaintiffs to recover.

293.   Plaintiffs are entitled to damages for their mental anguish and any other damages to which they might be legally entitled as a result of the actions of all defendants.

294.   Plaintiffs seek punitive damages against Defendant Officers for their intentional, willful and wanton acts violating "clearly established statutory and constitutional rights of which a reasonable officer would have known."

295.   Plaintiffs seek punitive damages against Defendants Kuhr and Glidden for their intentional, willful and wanton acts violating Plaintiffs' rights protected by the Fourth and Fourteenth Amendments and by the laws of both the United States and Texas.

296.   Plaintiffs hereby sue for their damages in the amount of ten million and pray for just and fair recovery thereof.

297.    Plaintiffs are entitled to an award of attorney fees and costs under 42 U.S.C. § 1988(b) and the Texas Theft Liabilities Act.

## X.    PRAYER FOR RELIEF

298.    For the foregoing reasons, Plaintiffs respectfully request judgement the following and ask the Court to:

a.    Enter a declaratory judgment that the Defendants violated Plaintiffs' rights.

b.    Enter a preliminary and permanent injunction against all defendants ordering them to find and release Plaintiffs' all four pet dogs.

c.    Enter a preliminary and permanent injunction against all defendants ordering them to return to Plaintiffs all antique jewelry items taken from Plaintiffs' home.

d.    Enter a preliminary and permanent injunction against all defendants ordering them be enjoined from any actions or proceedings, brought or to be brought, against either plaintiff.

e.    Award actual/compensatory damages against all defendants, jointly and severally, in an amount to be determined at trial.

f.    Alternatively award nominal damages for the violations of Plaintiff's Constitutional rights.

g.    Award punitive damages against all individual defendants.

h.    Enter an award for costs, expenses, and counsel fees pursuant to 42 U.S.C. § 1988(b) and the Texas Theft Liabilities Act; and

i.    Enter such other relief as this honorable Court may deem just and deserving.

DATED this 25th day of February 2020.

Respectfully submitted,

By: __s/ Kervyn B. Altaffer Jr.
Kervyn B. Altaffer Jr.
State Bar No. 01116575
Email: kervyn@altafferlaw.com
Lunbing Chen
State Bar No. 24097493
Email: lunbing@altafferlaw.com

Altaffer & Chen PLLC
4054 McKinney Ave Ste 310
Dallas, TX 75204
Tel: 972-234-3633
Fax: 972-947-3663

ATTORNEYS FOR PLAINTIFFS

# CERTIFICATE OF SERVICE

This Plaintiffs' Original Complaint and Jury Demand is being served upon each defendant by hand delivery.