### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **Luisa Lupi and** | § | |
| **Eva Lupi** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **Officer Timothy Diven AP4417,** | § | |
| **Officer Jaime von Seltmann AP5984,** | § | |
| **Officer Rocky Reeves AP7219,** | § | |
| **Officer Michael Guetzke AP4690,** | § | |
| **Officer Lauren Villareal AP7343,** | § | |
| **Officer Jerry Floyd AP4559,** | § | |
| **Officer Ewa Wegner AP4623,** | § | |
| **Officer Alan Schwettmann AP5826,** | § | **CIVIL ACTION NO.: 1:20-cv-207** |
| **Officer Joshua Visi AP4416,** | § | |
| **Officer Sgt Michael Lewis King AP4127,** | § | |
| **Officer Brian Robinson AP6683,** | § | |
| **Code Enforcement Officer Thomas Horn,** | § | |
| **Code Enforcement Inspector Joseph Lucas** | § | |
| **Officer Number 6609,** | § | |
| **Elizabeth Glidden,** | § | |
| **McKenna Kuhr,** | § | |
| **EMS Technician Timothy Hedrick,** | § | |
| **EMS Technician/Driver Steve White,** | § | |
| **City of Austin,** | § | |
| **Travis County,** | § | |
| **Defendants.** | § | |

### PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION
### AND BRIEF IN SUPPORT

## I.    INTRODUCTION

1.    Plaintiffs file this Application for a Preliminary Injunction to (1) prevent the irreparable

loss and death of Plaintiffs' aged pets that were seized illegally without a warrant, consent,

probable cause, or exigent circumstances, and (2) prevent the irreparable loss of Plaintiffs'

1

irreplaceable antique jewelry that was stolen in the illegal search of Plaintiffs' home without a warrant, consent, probable cause, or exigent circumstances.

2.       Plaintiffs' Complaint alleges numerous violations of their constitutional rights protected by the Fourth and Fourteenth Amendments to the U.S. Constitution, the Americans with Disabilities Act, and by the laws of Texas. Several violations can be remedied only by the immediate release of Plaintiffs' dogs and missing antique jewelry from the defendants. Plaintiffs can show a substantial likelihood of success on most if not all of their claims. In particular, the merits of Count I – A(c) "Seizure of Plaintiffs' four dogs without a warrant or consent" and Count III – A. "Texas Theft Liability Act" of the Complaint compel the immediate release of Plaintiffs' dogs and jewelry that have a unique irreplaceable nature to Plaintiffs.

## II.    ARGUMENT

3.       A plaintiff seeking a preliminary injunction must clearly show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest. *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017).While each factor must be shown, their relative importance will vary in each case—i.e., they should be applied on a case-by-case basis, sliding-scale basis.  *Knights of the Ku Klux Klan, Realm of La. v. East Baton Rouge Parish Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978).  "Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others." *Id.*

## Background

4.      Plaintiff Eva Lupi ("Eva") is the older sister of Plaintiff Luisa Lupi ("Luisa"). Both are law-abiding citizens and have never been charged or convicted of any crimes. Eva is an attorney. She has a BS degree in Aerospace Engineering and a BA degree in Economics from the University of California Los Angeles (UCLA), an MA degree in Government and International Relations from the University of Notre Dame, and a JD degree in law, *cum Laude*, from Southern Methodist University Dedman School of Law.

5.      Luisa received her Bachelor of Arts in Psychology from California State University Northridge, wrote several theses, and worked as a lifeguard. She works as an artist and does not require or need anyone's assistance in her daily life.  She has been slim and healthy.

6.      Luisa has never been diagnosed with any mental disabilities or illness nor has she sought any such medical assistance. She has no history of physical disabilities, mental disabilities, or criminal behavior.  She takes no medication.

7.      Luisa has an actual disability under the Americans With Disabilities Act (ADA) known as dyslexia, which is a learning disability shared by millions of people in the US and can be accompanied by a slight speech impediment.

8.      Plaintiffs bought and moved into their home located at 6837 Auckland Dr., in Austin, Texas in 2011. The home was fully paid for and is free of mortgage. Although paid for by both Plaintiffs, the title was intentionally taken under Luisa's name by Plaintiffs.

9.      Plaintiffs have been animal lovers. They moved in with their four beautiful and wonderful dogs, 100% indoor pets—named, Sheera (aged 7 in 2011), an Australian Shepherd, Polar Bear (aged 8), a mix of Labrador Retriever and Husky, Indiana (aged 9), a mix of Rhodesian RidgeBack and Hound, and Ruby (aged 10), a mix of Australian Shepherd and Rhodesian Ridgeback. (See

Exhibits A-D) At the time of the events at issue in this case, all four dogs had been living with Plaintiffs at least 9 years as Plaintiffs' crucial family members—virtually their children in Plaintiffs' eyes.

10.     Plaintiffs did not have any problems with their neighbors for the entire seven years and always had good relations with them until around September 2017 when a new neighbor, Defendant Elizabeth Glidden ("Ms. Glidden"), moved in next door.

11.     Luisa has never had mental disabilities or illness. Luisa has dyslexia, which is often classified  as a disability under the ADA and can be accompanied by a slight problem in speaking.

12.     Ms. Glidden didn't want a disabled person—she perceived Luisa to be mentally disabled although she and Luisa had never spoken with each other—living next door, so she concocted continually escalating false complaints to Austin Police about Luisa. To remove Luisa permanently from the neighborhood and take her home and assets, Austin Police conspired with Ms. Glidden, Defendant McKenna Kuhr ("Ms. Kuhr," who lived seven miles away from Plaintiffs' home) and the officers from other departments of both the City of Austin and Travis County, to create a set of false reports reflective of the worst discriminatory statements and attitudes towards Luisa.

13.     On March 30, 2018, due to alleged calls from Ms. Kuhr, Officers Villarreal and Guetzke conducted a welfare "check" on Luisa. (See Exhibit E)

14.     Officer Villarreal asked Luisa, "Are you going to hurt yourself?" Luisa replied, "No." Officer Villarreal then asked, "Are you going to hurt somebody else?" Luisa replied, "No."

15.     Luisa  calmly thanked the officers and informed them she did not need anything.

16.     Officer Villarreal wrote in her report, "I observed that Luisa appeared to be extremely thin and frail given her weight (5'7 approx 90lbs). I observed that Luisa's clothing also had a strong smell of being soiled and there appeared to be LICE in her hair. Her clothing was too large for her

4

size and her pants were covered in animal hair. Her cheeks were sunken in and her hair was also very thin." (See Exhibit F)

17.     Luisa's clothing was nice and clean and no smell at all as always. She has been slim and healthy (she weighed 110 lbs, not 90, in the hospital on April 17, 2018, just two weeks later). She likes wearing loose clothing at home as many people do. She has very thin hair due to Nordic/Scandinavian ancestry on both sides.

18.     Officer Villarreal claimed that she could see "lice" (See Exhibit F) while standing a few feet away from Luisa. It is medically impossible, however, because the detection of lice requires careful close-up work even by trained doctors, sometimes involving a microscope. That claim and later (on April 17) Officer Diven's similar claim (while standing approximate 10-15 feet away from the front door of Plaintiffs' home and from Luisa) (See Exhibit G) are contradicted by all rational medical personnel and the Texas Department of State Health Services as well.

19.     In over 20 minutes of conversation on March 30, Officers Villarreal and Guetzke did not go into Plaintiffs' house and did not see Plaintiffs' pets inside the house. They did not ask Luisa about the pets.

20.     That same day, having left Plaintiffs' home, Officer Villarreal consulted with Ms. Glidden to check Luisa's backyard and Ms. Glidden took the officer into her backyard to view Plaintiffs'. Officer Villarreal determined that "Luisa's "backyard appeared to be fine." (See Exhibit H)

21.     Still on that same day, Officer Villarreal stated in her report that Ms. Glidden said she was planning on making a report to Adult Protective Services because she thought Luisa was unable to care for herself due to her disabilities. Ms. Glidden also allegedly reported one of Plaintiffs' pets for having a "large sore on it's [sic] face," and another for having ribs that were sticking out. (See Exhibit H)

22.     The "large sore" is a small growth about the size of a pinky nail that had been tested and found benign, to be removed electively during his next anesthesia. Even the Austin City Vet Rachel Hays ("City Vet Hays") who examined the pet called the growth "small." Plaintiffs' other dogs had complex allergies that had resisted all medical treatment and they were packed and ready to move to a low allergen part of the country for his sake at the time the incidents of this case occurred.

23.     Officers Villarreal and Guetzke did not go back to ask Luisa to check or verify what Ms. Glidden alleged  "large sore" or "sticking out" rib issues with the pets or her perception of Luisa's disabilities.

24.     On April 5, 2018, Officer Robinson, Lead Investigator, wrote that "This case [Luisa's case] does not meet the criteria for  Nuisance Abatement. The title code has been modified to an EDP [presumably Emotionally Disturbed Person] case and routed." (See Exhibit I)

25.     Plaintiffs believe that the police modified Luisa's case on April 5 because the cameras inside Plaintiffs' home would disapprove Nuisance Abatement case. Further, the police did not have neighbors' support (except Ms. Glidden) because Luisa was well liked and everyone knew of her extraordinary ability with animals, and the care she lavished on them, as well as her kindness. (See Exhibit L - L2, L3, L4, L5, L6, L8)

26.     On April 6, according to Officer Seltmann's report, Defendant Officers determined that Luisa "was not an imminent threat to herself or others; however, the CIT Unit was notified for follow-up due to Luisa's poor physical condition. Adult Protective Services was notified." And a joint home visit with Adult Protective Service, Code Enforcement, Animal Cruelty and the Community Health Paramedic Program was planned for April 17, 2018. (See Exhibit J)

27.     Between April 5 and 16, Eva called the police, as recommended by Officer Guetzke on March 30, seven times in total. However, no one called Plaintiffs back. The police ignored Plaintiffs' every effort to communicate with them.

28.     On April 17, multiple people went to Luisa's house and brought with them an animal control truck, a Code Enforcement vehicle, a car with a plastic seat molded in shape of a person and numerous restraining straps across the waist and chest and bars on the windows, and several other vehicles.

29.     In sum, Defendant Officers carefully planned ahead of time the home invasion of Luisa on April 17, 2018 and illegally seized Luisa, illegally entered and searched Plaintiffs' home, and illegally seized Plaintiffs' dogs in violation of Plaintiffs' constitutional rights protected by the Fourth and Fourteenth Amendments.

30.     All defendants, including Ms. Glidden and Ms. Kuhr who acted to be the police witness sources in this case, conspired to conduct all the unlawful actions in a bid to permanently remove Luisa, whom they perceived to be mentally disabled, from her own home and the neighborhood.

31.     Defendants' harassment of Plaintiffs has been ongoing. Code Enforcement officers are still harassing Plaintiffs with false code violations and threatening to file legal action against Luisa (See Exhibit X). On February 12, 2020, they attached a citation to Luisa's door alleging code violation of "Accumulation of rubbish or garbage" that occurred on April 17, 2018 at 2:16 p.m. (See Exhibit P) when Luisa Lupi had been illegally detained in the hospital.

32.     The next day, February 13, 2020, Plaintiffs were finally forced to move out of their home due to almost two years constant harassment and fear that were created by all defendants since April 17, 2018 when Plaintiffs decided to stay there to await their dogs' return.

**A.     Plaintiffs are substantially likely to prevail on the merits of their claims under the Fourth Amendment because Defendant Officers illegally seized Plaintiffs' dogs with no warrant, no consent, no probable cause, and no exigent circumstances.**

> **1.     Defendant Officers did not have legal right to enter and search Plaintiffs' home; Defendant Officers did not have legal right to further seize Plaintiffs' dogs inside the house without a warrant, consent, probable cause, or exigent circumstances.**

Officer Diven stated in his Follow Up Report #4, April 19, 2018,

> "… *The 4 dogs were then all transported to the Austin Animal Center* where they will be cared for. Based on the conditions of the house and the animals and the horrific living conditions, I believed that these animals were cruelly treated. *I then completed a seizure warrant* and …" (See Exhibit K)

33.     At the time Plaintiffs' dogs were seized by Defendant Officers, they did not have a warrant.

34.     The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) (internal citation omitted).

35.     Earlier in the morning on April 17, 2018, Luisa went out to take her beloved pup (not one of the four dogs seized) to a vet for surgery.

36.     Luisa took a taxi in both directions. Her appearance and behavior were completely normal, neat, and tidy in every respect when the veterinarian and the taxi driver saw her. (See Exhibit L - L1, L5)

37.     Luisa had been up for over 24 hours watching over Plaintiffs' dogs. After she returned home from her trip to the vet, she put her clothing in the laundry as they did every time after

8

coming home from outside and showered due to concern about Indiana's allergies, and put on her comfortable pajamas sweats to worry and wait while her best friend was in surgery.

38.     At around 9:00 a.m., in broad daylight, multiple people gathered on the front porch of Plaintiffs' home bringing an animal control truck, a Code Enforcement vehicle, a car with a plastic seat molded in shape of a person and numerous restraining straps across the waist and chest and bars on the windows, and several other vehicles. They called out Luisa's name over and over.

39.     Plaintiffs' dogs were kept inside Plaintiffs' house and the dogs could not be seen from the outside of the house.

40.     Luisa went on the porch, without yelling at all, contrary to Officer Seltmann's statement in her report (See Exhibit M), to see what they needed and closed the door behind her. Luisa was in her pajamas and did not have a bra on. Both her hair and clothing were clean because she had just gotten out of the shower. She has clear, healthy skin. She did not have bugs or lice and has never had! The same day photos taken by Luisa herself after she was seized also showed that she did not have any bug bites on her clear skin. (See Exhibit W)

41.     Office Diven, like Officer Villarreal, claimed in his report that Luisa was covered in bugs. Officer Diven also claimed that, although he was "standing 10-15 feet away" from the front door, he saw "lice crawling over [her]" and that he could see lice and "smell urine." (See Exhibit G) In fact, neither lice nor urine were present.

42.     Officer Diven's claims appear to be made with the intention of increasing his own credibility and the believability of the police fabrication by being the second person to mention lice after Officer Villarreal's mention, and to corroborate and bolster her earlier similar lice claim.

43.     The people at the front porch, including Officer Horn, did not identify themselves as police.

44.     When Luisa went on her front porch, the police blocked her exit forward. Officer Seltmann, wearing rubber gloves, immediately approached Luisa and tried to put her arm around Luisa's back and shoulders and grabbed her left wrist while Officer Reeves was grabbing her right wrist on her own front porch, hurting her wrists.  Luisa said to the officers, "Please stand back," and retreated a few inches until her back was against the door of the house.  Luisa was afraid for herself and immediately afraid for Plaintiffs' pets inside the house because she was their only protector there at the time.

45.     While the officers were pulling Luisa down the driveway, Officer Seltmann said to Luisa, "We're going to take you to the hospital get you checked out." "Walk or we'll carry you."

46.     Officer Seltmann and Reeves then pulled Luisa down the driveway and across the street. Officer Seltmann said to Eva, "It's not her choice. It's my choice. That's my decision. I'm just telling you what's happening. I'm in charge."

47.     Luisa told the officers, "Please loosen your grip – you're hurting me," but Seltmann and Reeves did not do so.  Officer Seltmann and Reeves threatened to handcuff Luisa, saying, "If you keep pulling I'll put handcuffs on you." Luisa was forced to wait in the sun, essentially on display on a neighbor's lawn across the street from her home. Luisa was not even given a chance to put on her regular clothes instead of her pajamas without a bra on.  The two officers illegally seized Luisa with no warrant, no probable cause, no consent, and no exigent circumstances.

48.     Luisa informed the police that she "ha[s] to stay here to take care of the dogs." And Luisa never agreed for the police to seize Plaintiffs' dogs.

49.     Luisa told the police several times that they CANNOT go in [Plaintiffs' home].

50.     When Luisa instructed the police that they cannot go into the house, Officer Seltmann said, "Yes, we can."

51.     Luisa called out on the phone "Help me!" to Eva. And Eva could hear Luisa say "No" several times.

52.     The police would not let Luisa get her keys to lock the house, power cord for her cell phone, or a hairband for her hair.

53.     Officer Seltmann could be heard on the audio, saying "I need to take her to the hospital."

54.     Plaintiffs' home was closed (doors and windows), but Defendant Officers entered Plaintiffs' home anyway with no warrant, no probable cause, no consent, and no exigent circumstances.  Defendant Officers entered and searched the home, took Plaintiffs' beloved dogs, and stole and retained Plaintiffs' valuables, although there were no exigent circumstances; Defendant Officer did so in disregard of Luisa's repeated instructions that they cannot enter her house.

55.     Luisa was forced to enter the EMS truck. When she was told that Officer Seltmann said she was bitten by bugs from Luisa, she pieced together that Defendant Officers were intentionally fabricating facts and that they were going to try to take her to a hospital/mental health facility. Luisa pushed up her sweatshirt sleeves and asked EMS technician Hedrick to view her arms and write that she had no bites of any kind on her arms. Hedrick replied, "I'm not going to undress you, ma'am."

56.     EMS ordered Luisa to get in the EMS van, then get into the gurney in the van, and lay down on the stretcher. EMS strapped Luisa to the gurney with three straps across her ankles, knees and thighs. The van driver White wanted to put straps across Luisa's shoulders, but Hedrick stopped him, saying, "I don't think she needs that."

57.     Luisa was taken to Seton Medical Center Austin. The hospital advised that Luisa was not in need of any treatment and would not admit her, but the police would not let her leave.

58.    Luisa was illegally and inhumanely detained in a hot and unventilated room of the hospital for more than *eight hours without food or water.*

59.    Luisa never consented that the police could enter or search Plaintiffs' home without a warrant. Neither did Eva.

60.    There were no justified exceptions to Defendant Officers' warrantless entry and search of Plaintiffs' home.

61.    Officer Von Seltmann once said in a newspaper article that she based her entry into people's homes on her own "gut feelings," entering homes to "suss out" what's happening whenever her "gut feelings" tell her to. (See Exhibit N)

62.    Eva informed the police twice that Luisa wanted a lawyer and one of the officers responded that Luisa was not entitled to have an attorney.

63.    Having seized Luisa, Defendant Officers, including Officer Schwettmann, used a pole with a wire on the end of it to grab Plaintiffs' senior dogs, ages 14, 15, 16, and 17, around the necks and drag them away, (See Exhibit O) taking Plaintiffs' four best friends and family members from Plaintiffs' house. Officer Diven can be heard on the video saying, "She's [Luisa] not getting these dogs back, and neither is the sister [Eva]."

64.    Defendant Officers did not take the cats, leaving them alone and unprotected, without the person who had taken care of them for so long and who had ensured that they always had clean water and food. Defendant Officers just left them, likely because it would take too long to grab them, and the officers never came back for them.

65.    The dogs were then all transported to the Austin Animal Center. Defendant Officers did not have a warrant or consent at the time they seized Plaintiffs' dogs.

66.    **After** the dogs had been unlawfully seized with no warrant, no probable cause, no consent,

and no exigent circumstances, Officer Diven **then** completed a seizure warrant and petitioned the Justice Court, Precinct 5, Travis County, Texas (JP5) to divest ownership of the dogs from Luisa until a hearing could be had to determine proper placement of the dogs. (See Exhibit K)

67.    Defendant Officers, including Officer Diven, were not really concerned about the welfare of the dogs: They did not even ask Luisa about the dogs when they saw her on April 17. They did not ask her whether the dogs had any existing medical conditions and what those were.

68.    Defendant Officers carefully planned their April 17, 2018 home invasion to Luisa ahead of time as shown by the below facts:

- In his report on April 5 (which was checked by Officer Sgt King the same day), Officer Robinson wrote: "This case does not meet the criteria for a Nuisance Abatement. The title code has been modified from Nuisance Abatement to an EDP [presumably Emotionally Disturbed Person] and routed." (See Exhibit I)

-  Officer Seltmann wrote in her report that Luisa was not an imminent threat to herself or others; however, the CIT Unit was notified for follow-up due to Luisa's "poor physical condition"; that Adult Protective Services was notified. Officer Seltmann wrote, "On April 6, I received an email from Det. Diven from Animal Cruelty concerning this case. After reading the above report, I determined that a home visit needed. Joint home visit with Adult Protective Services, Code Enforcement, Animal Cruelty and the Community health Paramedic Program planned for April 17, 2018." (See Exhibit J)

- Officer Diven wrote in his report, "[4/6/2018] I emailed Ofc. Von Seltmann with CIT to inquire as to their plans to deal with Lupi," "[4/12/2018] Ofc. Von Seltmann

advised that they have scheduled a home visit with Lupi on Tue, Apr 17 at 930a. We agreed to met [*sic*] her out there." (See Exhibit G)

- As stated earlier, between April 5 and 16, Plaintiffs called the police, as recommended by Officer Guetzke on March 30, seven times in total with no response at all.

- On April 17, multiple Defendant Officers, as assigned and approved by Officer King (See Exhibit S) (who was also briefed later that day after Lusia was forcibly taken to hospital) (See Exhibit Q), brought with them an animal control truck, a Code Enforcement vehicle, a van equipped for special purposes, and several other vehicles. They did not ask Luisa during their encounter with her about the pets, such as if the dogs had any preexisting medical conditions and which they had.

- Defendant Officers seemed to be there to only carry out their plan: they went there to simply seize Luisa, enter and search the house, and seize the dogs with no warrant, no probable cause, no consent, and no exigent circumstances.

69.     Immediately after the April 17 home invasion by Defendant Officers, Plaintiffs told everyone that the conditions portrayed by the police were fabricated and asked if the proper authorities would like to come to Plaintiffs' house and see that the conditions portrayed by the police were false. But the police refused.

70.     As shown above, Luisa never consented that the officers could seize Plaintiffs' dogs. The dogs were inside Plaintiffs' house and the dogs could not be seen from the outside. When Luisa went on the front porch to see what the people needed and closed the door behind her.

71.     And there were no exigent circumstances since Defendant Officers well planned the home visit to Luisa on April 17, 2018 and had even brought animal control truck when they went to

Plaintiffs' home. Defendant Officers had sufficient time to at least attempt to obtain a warrant to enter and search Plaintiffs' home, seize Plaintiffs' dogs, or both before their warrantless entry and search of Plaintiffs' home and warrantless seizure of Plaintiffs' dogs.

72.     Even assuming there were any exigent circumstances that Defendant Officers could claim, the exigencies of the circumstances could not justify their illegal seizure of Plaintiffs' dogs because Defendant Officers entered and searched Plaintiffs' home at the beginning with no warrant, no consent, no probable cause, and no exigent circumstances.

73.     "'[T]he chief evil against which…the Fourth Amendment is directed' is warrantless entry and search of home." *Illinois v. McArthur,* 531 U.S. 326, 331 (1980) (internal citation and quotations omitted).

74.     Therefore, Defendant Officers first illegally entered and searched Plaintiffs' home without a warrant, consent, probable cause, or exigent circumstances, and then illegally seized Plaintiffs' four dogs without a warrant, consent, probable cause, or exigent circumstances, in violation of Plaintiffs' constitutional rights guaranteed by the Fourth Amendment.

75.     No reasonable officer would have entered and searched Plaintiffs' home under the same or similar circumstances as Defendant Officers did without a warrant, consent, probable cause, and exigent circumstances, and Defendant Officers should not be entitled to qualified immunity.

76.     No reasonable officer would have seized Plaintiffs' four dogs under the same or similar circumstances as Defendant Officers did without a warrant, consent, probable cause, or exigent circumstances, and Defendant Officers should not be entitled to qualified immunity.

**2.     Defendant Officers never obtained a valid warrant for the seizure of Plaintiffs' dogs.**

**(a)     Officer Diven obtained an invalid warrant for the seizure of Plaintiffs' dogs based on a false affidavit after the actual seizure.**

77.     "The Supreme Court has defined probable cause as the facts and circumstances within the

officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution,

in believing, in the circumstances shown, that the suspect has committed, is committing, or is about

to commit an offense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (internal

quotation marks and citations omitted). Probable cause cannot exist where the affidavit supporting

a warrant contains materially false statements or omissions that are deliberate falsehoods or

evidence a reckless disregard for the truth. *Deleon v. City of Dallas*, 345 Fed.Appx. 21, 23 (5th

Cir. 2009) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667

(1978)).

**After-The-Fact Warrant**

78.     As stated above, after the four dogs were seized and all transported to the Austin Animal

Center, "I [Officer Diven] then completed a seizure warrant…"

**False Affidavit Used to Apply for a Warrant**

79.     Only, and only, after the police illegally seized Luisa, illegally searched Plaintiffs' home

and illegally seized Plaintiffs' dogs, Officer Diven then completed his under-oath affidavit to apply

for a warrant for the seizure of Plaintiffs' pets—an affidavit filled with numerous false, and even

deliberately fabricated material statements as articulated below:

- Luisa had a caretaker that moved out about 8 months ago and that no one had been
  coming by to care for Luisa since.

The statement is false because Luisa never has had a caretaker at any time—she has been

able to take care of herself and sometime her sister Eva as well—and Eva did not move out.

- Luisa appeared to be intellectually challenged and was unable to care for herself due to
  her mental disabilities.

16

The statement is materially false because Luisa never has had any mental disabilities and she has been taking care of herself.

- The trash [from Plaintiffs' home] had not been put out for months.

The statement is false because Luisa, sometimes Eva, has been putting out their trash when they needed (often about every four weeks since they produced very small trash and not at all when they were traveling).

- A foul odor emanating from the house.

The statement is false because Plaintiffs always kept their home nice and clean and there was no smell from the house.

- Luisa was never seen bringing any food into the house.

The statement is misleading because Luisa ordered delivery food many times. Sometimes Plaintiffs went out to eat.

- Luisa was believed to be hoarder…

The statement is false because Luisa was never a hoarder. Plaintiffs did have well-organized items in moving boxes, which is not hoarding. They were on the way preparing for moving to a new larger home from a three-bedroom house.

- Luisa was "… living in unsanitary conditions."

The statement is materially false because Luisa has been living in sanitary conditions shown by the fact that Plaintiffs always keep their house nice and clean and well organized.

- The house smelled strongly of urine and feces when Luisa opened the door on April 17, 2018.

The statement is knowingly false because when the police went to the front porch of Plaintiffs' home, Luisa had just got out of shower and put on her clean pajamas and there was no smell of urine or feces from Luisa or the house.

(Officers Villarreal and Guetzke made similar false statements that "the house smelled strongly of urine and feces when she [Luisa] opened the door" and "…the house smelled strongly of urine and feces when she opened the door." (See Exhibit F) In his report, Officer Reeves also claimed, in "corroborating" other officers' stories, "… upon walking up to the front door I could right away smell a strong urine/ammonia smell coming from the house." (See Exhibit Q))

- Luisa was very thin and frail, and her clothing was soiled and smelled.

The statement is false because Luisa was slim but very healthy. And her clothing was nice and clean and no smell.

- Luisa had what appeared to be lice in her hair.

The statement is false and intentionally fabricated to paint a very negative picture of Luisa because she has never had any lice nor has anyone in Plaintiffs' family. And the detection of lice requires careful close-up work even by trained doctors, sometimes involving a microscope—Officer Diven, standing 10-15 feet away from the front door, was not in a position to make that detection.

- Eva advised the officers that Luisa was taken care of.

The statement is false because Eva did not make that advice and Luisa has never needed to be taken care of.

- Neither Eva nor Luisa were very cooperative with providing information.

The statement is false because the police were provided with all the information they asked for.

- On the scene, Defendant Officers determined that Luisa was a danger to herself based on what the officers observed, and they completed an emergency detention on Luisa in order to have her mentally evaluated.

The emergency seizure statement did not say what Defendant Officers observed that Luisa was a danger to herself.

- Plaintiffs' two red colored dogs found inside Plaintiffs' home had very bad mange/allergies...

The statement is intentionally fabricated because Officer Diven and other Officers on the scene were not in a position to identify the mange/allergies shown by the facts that: (a) Even the City Vet Hays admitted later, after examining the dogs and first claiming she identified the mange issue, that the two dogs did not have mange; (b) Identification of allergies is more complex than mange and even the City Vet Hays was not able to deduce allergies until Plaintiffs told her.

- [Indiana]… would not get up and walk and had to be carried to the truck [by Officer Schwettmann].

The statement is untrue and misleading because Indiana was very old and was just terrified by aggressive strangers hurting Luisa and invading the home.

- There was a yellow large mixed breed dog that had a large sore on its face.

The statement is false because the "large sore" is a small growth about the size of a pinky nail that had been tested and found benign. Even the City Vet Hays who examined the pet called the growth "small."

- The inside of Plaintiffs' home was a typical hoarder house.

The statement is false because Plaintiffs had well-organized items in moving boxes, which is not hoarding. They were about to move to their new home from a three-bedroom house.

19

- The smell of ammonia was very strong.

The statement is false because Plaintiffs' home was nice and clean and no smell.

- Luisa was covered in bugs.

The statement is false and deliberately fabricated because Luisa never had bugs and did not have at the time she was seized. Luisa's skin was clear and healthy as evidenced by the photos taken by herself the same day, after she was seized.

- There was trash, debris, and belongings stacked floor to ceiling in all corners of Plaintiffs' home.

The statement is false because there was no trash or debris except in trash bags—Plaintiffs recycled dog and cat food bags and used them as recycling bags.  Plaintiffs' moving boxes were stacked; boxes had some of Plaintiffs' personal items on top that were not going to be packed in the moving van but were going to be taken in their SUV—and they were only in some corners.

- A window was opened in a room to allow Plaintiffs' cats to get in and out as necessary to survive.

The statement is intentionally made misleading because the only window opened was seven feet high that was almost impossible for Plaintiffs' domestic cats to get in and out. It is more likely that the window was opened so that someone might get in and out later.

- Luisa cruelly treated the dogs.

The statement is false because Plaintiffs provided only great care and love to their dogs— virtually their children—and neither Luisa nor Eva ever cruelly treated them.  (See Exhibit L - L1, L2, L3, L4, L5, L6, L8, L9)

- Two of the four dogs were in really bad condition.

20

The statement is false and misleading because the two dogs, Ruby and Indiana, were very old but happy, warm and cool as appropriate, fed lavishly, always had access to lots of fresh water, and were loved, understood, and cherished.

**Warrant Containing Contradicting Information**

80.    The JP5 received Officer Diven's Affidavit for Seizure of Animals on April 17, 2018 at 2:41p.m. and issued the warrant for seizure of animals. (See Exhibit R)

81.    But it seems that Officer Diven obtained the warrant at 2:20 p.m., even 21 minutes before he applied for the warrant, and executed the warrant at 3:00 p.m. (See Exhibit T)

> **(b)    Plaintiffs provided great care and love for the four dogs—never cruelly treated them by torturing them or by unreasonably depriving them of necessary food, care and shelter.**

82.    Plaintiffs adopted Sheera, Polar Bear, Indiana, and Ruby, the latter two were medically fragile, and all were from difficult situations. Plaintiffs loved them as their own children, gave them a chance for a great life, and spent large amounts of money on their cutting-edge medical care illustrated below:

- Full body CAT scan (Ruby)
- Successful treatment of usually fatal Mast cell tumor (Ruby)—because Plaintiffs identified the tumor so early, this normally fatal tumor was completely operable, and Ruby made a full recovery
- Ultrasound – gallbladder and liver (Polar Bear)
- Full allergy panel (Indiana)
- ACTH Stim test x 3 (Polar Bear)
- Laser removal of cutaneous lump on spinal area (Sheera)
- Dental 3X annually per veterinary recommendation for the four dogs
- Gland Biopsy (Sheera)
- Extra round of heartworm tests for all when returning from a trip to the South for the four dogs
- X rays
- EKG for the four dogs
- Prescription Food (Sheera and Indiana)
- Thyroid testing (Indiana)
- Limited ingredient specialty food for all dogs

83.     Plaintiffs kept a chart (See Exhibit U) to ensure that the lives of the dogs were fully addressed and not overlooked when taking the dogs to vet visits. Plaintiffs not only created the chart, they also updated and maintained it, for each dog and cat.

84.     Plaintiffs' pets went everywhere with them—skiing, to the beach and on special outings. Each has their own calendar of favorite activities, including agility, swimming, sheepherding, etc.

85.     Each dog had a leash geared towards their special needs. Further, each dog had an emergency harness that could be used to securely transport each dog in case of emergency or frightening situation for them.

86.     Great care was taken in selecting life jackets: The first issue was the type, which had to ensure that it would keep the dogs in the correct position in the water; second, the presence of a durable but low profile safety handle so it would not create a snagging danger; third, the individualized fit to ensure that each dog had a properly fitting team life jacket; fourth, each dog and human had their own jacket in the team colors.

87.     The dogs had gigantic beds. Because Indiana had become incontinent, everything was cycled through the laundry quickly. Plaintiffs had multiple replacement sets of linen for each dog bed and human bed, just in case.

88.     The dogs were never put in a crate.

89.     The four dogs had their own bowls of special food. The dogs shared any dog safe, allergy safe meals with Plaintiffs.

90.     The heating and air conditioning in Plaintiffs' house were adjusted for the dogs' comfort. In summer, when the dogs went out to the bathroom and came back in, Plaintiffs would turn down the air conditioner to a temperature at which everyone stopped panting, then continued to adjust. In winter, the house was comfortably heated, but the dogs still each had comfortable covers and

blankets for longer naps. Both Plaintiffs constantly got up to check on the dogs and tuck them in—they were supervised all day and night.

91.    Plaintiffs studied each of their dog's special issues and built ramps and made other modifications so the ones with special needs could play easily with their brothers and sisters. Plaintiffs put out wading pools in the summer and built them observation posts so the dogs could better see the terrain around.

92.    Indiana had the significant skin problems from the time Plaintiffs adopted him. In hopes of identifying the problem allergen, they cooked at home for him and their other dogs for over a year and a half, using organic ingredients from Whole Foods. Indianan had been extensively tested. Plaintiffs had tried every medical treatment available for him. In consultation with their vet, Plaintiffs' next plan was to move to a different environment, where allergens would be reduced (Austin was, and still is, known as "allergy central"). (See Exhibit L - L3, L6, L7, L8) They had noted a reduction in Indiana's symptoms during their trips to certain locations in the country and intended to move there. They had packed their household, planned and prepared for the move in April 2018, and were ready to go when Defendants turned their happy and innocent home into a nightmare that never ends. (See Exhibit L - L3, L6, L7, L8)

93.    Even Judge Phillips, presiding at the county hearing (on appeal), observed, "This house looks like it was designed for dogs." The case was initially filed by the police with the Justice Court Precinct Five to deprive Plaintiffs of their ownership interests of the dogs the same day, April 17, 2018, after the police illegally seized them.

94.    With incredibly great care that Plaintiffs provided for their dogs (See Exhibit L), Sheera, although 14 years old at the time she was seized, looked like a young pup. City Vet Hays, having examined the dogs the same day of the seizure, estimated that Sheera was 6 years old, based on

how well cared for Sheera had been. Like Sheera, Polar Bear was estimated to be 6 years old (he was actually 15) and Ruby approximately 10 (actually 17). (See Exhibit L - L1, L2, L3, L4, L5, L6, L8, L9)

95.    Polar Bear was an excellent judge of character: After being illegally seized and sent to Austin Animal Center by Defendant Officers, the center could not manage him, and he sat in a cold crate without the love he so desperately needed. But far from being unmanageable, Polar Bear was Plaintiffs' ambassador with all the injured and abused animals Plaintiffs took in. The more vulnerable his sibling was, the more careful he had been with them. (See Exhibit A, B, C, D)

96.    Ruby was Luisa and Eva's beloved late Mom's special friend. Ruby was their closest link to their Mom. Ruby always took care of them—and Defendant Officers snatched Ruby at the door of her own home and forced her into a world of awful strangers who stole her life. She was supposed to be moved into Plaintiffs' new home in the spring of 2018, enjoying life on the beach and in the mountains. Instead, she's being held captive by strangers, and likely looked around hopefully to see if Eva and Luisa had come to take her home yet. Her beautiful eyes, which had helped Plaintiffs through a dozen traumatic events in the last few years before the incidents in this case, and to which they promised safety forever, were no longer smiling at them.

97.    When Defendant Officers invaded Plaintiffs' home on April 17, 2018,  there were (1) four large white airtight containers of dog food throughout the house in plain view of the cameras, (2) an additional large container and two more unopened large bags of the dogs' specialty food in the pantry, and (3) empty dog food bags being reused to take out recycling (stack of approximately 4 feet of flattened bags in plain view), contrary to Officer Diven's testimony under oath in court later that  he saw no evidence of food.

98.   In the audio (which had been first claimed by County Attorney Cox to be unavailable, then was "found" accidentally by a court tech at the appeal hearing), Defendant Officers can be heard saying:

- "It's actually sanitary in here," and "The floor is actually clear."

- Officer Diven and another officer can be heard counting the numbers of large bowls of clean water for the dogs such as "this is number two," "there's another one over here," etc.—water so crystal clear that the officers had to kick the bowl to determine that there was water in there.

- "The back yard looks normal."

99.   After the four dogs were unlawfully taken by Defendant Officers, they did not allow Eva or Luisa or their vet to see or examine the dogs.

100.   Under the direction of Austin Police, City Vet Hays conducted full blood tests on the dogs. The test results showed that EVERY SINGLE FUNCTION MEASURED WAS NORMAL: There was no lameness, no heartworm, no lung problems, no other symptoms normally associated with their advanced age, and no other problems. All four dogs had ABSOLUTELY PERFECT BLOODWORK IN EVERY SINGLE CATEGORY.

101.   City Vet Hays falsely listed in her same day examination report that the dogs had tapeworms, which are transmissible, but Plaintiffs and the cats did not have them, as they would have if the dogs had them. Ms. Hays noted Tapeworm, however, did not administer tapeworm medication until the next day as if someone later suggested or instructed her to put the tapeworm notation down, because if tapeworms were so obvious then she, as the City Vet, should have noticed them right away.

102.   Officer Seltmann claimed in her initial report, "…the two of the dogs appeared to have severe cases of mange." (See Exhibit V) Officer Diven in his affidavit under oath claimed that on

the scene, "inside the house, 4 dogs were found. The two red colored dogs had very bad mange/allergies to where the fur was missing on over half their bodies." (See Exhibit R) City Vet Hays also identified the "mange" issue after she examined the dogs. She later testified at court on April 24 that the dogs had mange.

103.    At the June 13 hearing, however, City Vet Hays admitted under oath that she understood and no longer believed that Ruby and Indiana had mange.

104.    A competent vet could have tested for mange in a matter of minutes. City Vet Hays held on to her incorrect mange belief for days. She was unable to deduce more complex things like allergies until Plaintiffs told her.

105.    Allergy is a complex assessment requiring a highly trained eye and hundreds of dollars in test. City Vet Hays proved that she did not have a highly trained eye:

- She did not know what an average Australian Shepherd lifespan was.

- She did not know the average lifespan for large dogs.

- She did not know that large dogs generally have a much lower life span.

- She made gross errors regarding the weight of Plaintiffs' four dogs.

- She was unable to determine the age of the dogs within a reasonable standard of care for vets—within what would be normally expected of vets.

- She misdiagnosed a simple illness like mange, which the dogs did not have.

106.    Plaintiffs' pets were not just their best friends, they were also therapy and service dogs for Luisa, helping to keep her active and healthy and cope with her dyslexia. The dogs seemed to instinctively hang out, sleep, and play right next to Plaintiffs, maybe because they created an oasis of happiness, warmth, and health. (See Exhibits A, B, C, D)

107.    When the dogs went zooming out to go to the bathroom, the backyard came alive with cheerfulness. Eva and Luisa built them agility equipment, bought supplies for fun and for them to learn interesting new communication techniques and tricks. (See Exhibits A, B, C, D)

108.    The dogs kept the back yard safe, alive, and happy for Eva and Luisa and their family. Now it is empty—only the echoes of happy times remain—and it is too painful for Plaintiffs to go into the backyard, which only makes them cry.

109.    Plaintiffs' dogs were essential to balance their family. Without the dogs, Plaintiffs were, still are, and will be, incomplete.

110.    At the time Luisa was forced by the police to get into a EMS van that she did not want  or need, she saw the last view of her formerly happy home—behind the doors were their dogs and cats, who for almost 10 years had only known happiness and safety. Behind the door was that little slice of heaven that Plaintiffs had built over a lifetime, where their pets had known a lifetime of safety and love.

111.    Luisa never agreed that Defendant Officers could seize Plaintiffs' dogs. Neither did Eva.

112.    Had Luisa given the police consent to seize Plaintiffs' dogs, Officer Diven did not need to—after all the dogs were seized and transported to the Austin Animal Center—"then complete[d] a seizure warrant" (See Exhibit K) with an affidavit full of knowingly false statements (See Exhibit R).

113.    Neither Luisa nor Eva ever cruelly treated Plaintiffs' dogs. Neither Luisa nor Eva ever cruelly treated the dogs by torturing them or by unreasonably depriving the animals of necessary food, care and shelter. (See Exhibit L - L1, L2, L3, L4, L5, L6, L8, L9)

114.    Plaintiffs never cruelly treated and indeed took good care of not only the four dogs, but all of Plaintiffs' pets. (See Exhibit L - L1, L2, L3, L4, L5, L6, L8, L9)

115.    Just an example, one of the rescues Plaintiffs worked with needed a hospice home for a senior, blind Chihuahua they had rescued. The rescue expected the dog to live no more than a month. Plaintiffs volunteered to take the dog and keep her safe and happy. The rescue was careful to say that the dog was not going to live more than a month. Under Luisa's care the dog lived for 2 *years*, running, happily sleeping the in the arms of her friend Polar Bear, playing with the other dogs, barking at the doorbell. The dog had a full dental, her heart trouble was discovered and treated, and Luisa managed a complex schedule of medications that had to be prepared and administered.

116.    Therefore, even the warrant Officer Diven had after the seizure of the dogs was invalid for the lack of probable cause; the probable cause did not exist because Officer Diven's affidavit supporting the warrant contained materially false statements that were deliberate falsehoods or evidence a reckless disregard for the truth as detailed previously.

117.    In sum, Defendant Officers did not have a warrant at the time they seized Plaintiffs' dogs. Defendant Officers did not have Plaintiffs' consent to seize the dogs. The warrant Officer Diven obtained after the seizure of the dogs cannot render the illegal seizure legal because it was obtained after the seizure and it was invalid anyway for the lack of probable cause. Defendant Officers' illegal actions violated Plaintiffs' clearly established constitutional rights protected by the Fourth Amendment.

118.    No reasonable officer would have deliberately made materially false affidavit to show probable cause and thus obtain a warrant after a seizure was completed under the same or similar circumstances as Defendant Officers did without a warrant, consent, probable cause, or exigent circumstances, and Defendant Officers should not be entitled to qualified immunity.

119.   No reasonable officer would have seized Plaintiffs' four dogs by deliberately fabricating material statements to show probable cause and thus obtain a warrant after the seizure was completed under the same or similar circumstances as Defendant Officers did, and Defendant Officers should not be entitled to qualified immunity.

**B.     Plaintiffs are substantially likely to succeed on their claims that Defendant Officers illegally took Plaintiffs' personal property, the jewelry, in their home while Defendant Officers illegally entered and searched Plaintiffs' home in violation of the Fourth Amendment and the Texas Theft Liabilities Act.**

### 1.     Substantial likelihood to succeed under the Fourth Amendment

120.   The Fourth Amendment protects citizens from unreasonable seizures and searches.

121.   Luisa received her house keys at about 3:30 p.m. - 4:00 p.m. while she was in the hospital. Defendant Officers had spent at least FIVE AND HALF hours searching and ransacking Plaintiffs' home as the officers pleased.

122.   After entering Plaintiffs' home, Defendant Officers had been rummaging through every corner of the house, including bank records, client records, attempting to download the security system videos, digging through hard drives with intellectual property, opening letters, overturning boxes, breaking fragile items, and taking whatever valuables and cash they found and wanted.

123.   Defendant Officers entered and searched Plaintiffs' home without a warrant, consent, probable cause, or exigent circumstances in violation of Plaintiffs' clearly established constitutional rights under the Fourth Amendment.

124.   No reasonable officer would have entered and search Plaintiffs' home under the same or similar circumstances as Defendant Officers did without a warrant, consent, probable cause, and exigent circumstances, and Defendant Officers should not be entitled to qualified immunity.

125.   A number of items, including Plaintiffs' antique jewelry, which were in the house before the police illegal search, were discovered to be missing after the search.

29

126.    Defendant Officers took these items with the intent to deprive Plaintiffs of their property rights because the officers never returned the items to Plaintiffs.

127.    The total market value of the stolen jewelry items is around **$220,000**. Below is a list of these items:

- Watch – Patek Philippe women's oval, 18k band and case, valued at $35,000

- Watch – Patek Philippe women's cream face, calligrapy numerals, 18k Gold band, valued at $35,000

- Chronograph Men's platinum band, Hublot, valued at $80,000

- Men's mail bracelet 18k gold, cream face, 18k case, Patek Philippe, valued at $38,000

- Watch – women's 18k band, Longines, valued at $14,000

- Pocketwatch – 18k case, engraved, light cream face, manual winding, valued at $15,000

- Necklace – twisted gold chains, valued at $3,000

### 2.    Substantial likelihood to succeed under the Texas Theft Liabilities Act

128.    Defendant Officers' illegal search of Plaintiffs' home and stealing of a number of Plaintiffs' personal property, including the antique irreplaceable jewelry listed above, in the home also violated the Texas Theft Liabilities Act. Sec. 134.002(2) of the Act defines that "theft" means unlawfully appropriating property or unlawfully obtaining services as described by Section 31.03, 31.04, 31.06, 31.07, 31.11, 31.12, 31.13, or 31.14, Penal Code. Sec. 134.003(a) of the Act states, "A person who commits theft is liable for the damages resulting from the theft." Defendant Officer did not have legal authority to take these personal property items; Neither Luisa nor Eva ever consented that Defendant Officers could take these items. Defendant Officers knew that they did not have any property rights in these items. Defendant Officers stole these items with intent to

deprive Plaintiffs of their ownership rights in these items as evidenced by the fact that the police never returned the stolen items to Plaintiffs. And Plaintiffs suffered financial loss of around $220,000 from Defendant Officers' stealing.

129.    Therefore, Plaintiffs clearly establish that they will be substantially likely to prevail on the merits of their claims under the Fourth Amendment that Defendant Officers illegally seized Plaintiffs' jewelry without a warrant or consent and under the Texas Theft Liabilities Act that Defendant Officers stole Plaintiffs' jewelry with the intent to deprive them of their property rights. Plaintiffs hence meet the first requirement for granting the preliminary injunction application.

**C.      There is a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted.**

130.    To show irreparable injury in a preliminary injunction context, it is not necessary to demonstrate that the harm is inevitable and irreparable. *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). A plaintiff need only show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.*

131.    At the time the dogs were unlawfully seized by Defendant Officers, the dogs were already aged. Now, Sheera is 16 years old (equivalent to humans' age of 87), Polar Bear, 17 (equivalent to humans' age of 104),  Indiana, 18 (equivalent to humans' age of 96), and Ruby, 19 (equivalent to humans' age of 101), and since the seizure, all the dogs have been held in strangers' hands without the great care and love that they were provided by Plaintiffs—they might die at any time. And money damages would not repair or fully repair the harm to Plaintiffs resulting from the loss of their dogs.

132.    The missing jewelry items were antique with particular personal significance and large quantities of precious metals, which are irreplaceable—they might be gone at any time because the metal could be converted and sold for its intrinsic value, and the timepieces can be sold and

never found again.  Because of the antique and custom nature of the jewelry, there is no possibility of finding another "like" item, and they will not be recoverable forever.

133.    Plaintiffs therefore satisfy the irreparable injury requirement for granting the preliminary injunction application.

**D.     Defendants will suffer no threatened harm by immediate release of the dogs and jewelry and the public interest will not be disserved.**

134.    As shown previously, Plaintiffs had been lavishly treating the dogs as their children with the greater care that Plaintiffs could have possibly thought of and done, and with Plaintiffs' endless love; neither Luisa nor Eva ever cruelly treated the dogs as Defendant Officers falsely claimed; Defendant Officers illegally seized the dogs and stole Plaintiffs' jewelry.

135.    Defendants had no ownership interest in either the dogs or the stolen jewelry.

136.    Plaintiffs already moved out of Plaintiffs' home on February 13, 2020, which was what all defendants wanted—Luisa's not living in the neighborhood.

137.    There will be no harm to the defendants if the injunction is granted and the dogs and jewelry are immediately released since Defendant Officers' unlawful actions would be rectified, they had no ownership interest therein, and they already received what they wanted. Even assuming the defendants had any interest, it would be outweighed by the harm Plaintiffs were, are, and will continue to suffer.

138.    The public interest in not continuing to incur the costs of keeping the dogs and jewelry resulting from the police's illegal actions will be served—not disserved. Further, the public interest in ensuring that injustice or police abuse of power resulting in irreparable injuries is corrected as soon as possible will be advanced by the immediate release of Plaintiffs' dogs and jewelry.

139.    Plaintiffs thus satisfy the third and fourth requirements for preliminary injunctive relief— harm to the defendants and public interest.

**E.      Defendants will incur no costs, and no bond is needed.**

140.    Although Fed. R. Civ. P. 65(c) requires security to be posted before a preliminary injunction application is granted, trial courts have the discretion to require no security at all. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).  Defendants will incur no costs in releasing the dogs and jewelry and indeed will save costs of continuing to keep the dogs and jewelry. No bond is necessary.

### III.      RELIEF REQUESTED

141.    Plaintiffs request expedited consideration of their application for a preliminary injunction, but do not specifically request a hearing on the application.

142.    The application and all supporting papers have been served on all defendants.

143.    Plaintiffs will withdraw this application if Defendants stipulate in writing that they will immediately return Plaintiffs' dogs and missing jewelry items to Plaintiffs.

144.    Assuming that such stipulation is not forthcoming, Plaintiffs request that the Court enter a preliminary injunction ordering all defendants to immediately release Plaintiffs' dogs and stolen jewelry items to Plaintiffs.

### IV.      CONCLUSION

145.    For the reasons set forth above, Plaintiffs' Application for a Preliminary Injunction Ordering all defendants immediately release Plaintiffs' dogs and jewelry items to Plaintiffs should be granted.

Dated: February 25, 2020.

Respectfully submitted,

By:  s/ Kervyn B. Altaffer Jr.
Kervyn B. Altaffer Jr.
State Bar No. 01116575
Email: kervyn@altafferlaw.com
Lunbing Chen
State Bar No. 24097493
Email: lunbing@altafferlaw.com

Altaffer & Chen PLLC
4054 McKinney Ave Ste 310
Dallas, TX 75204
Tel: 972-234-3633
Fax: 972-947-3663

ATTORNEYS FOR PLAINTIFFS

# CERTIFICATE OF SERVICE

This Plaintiffs' Application for a Preliminary Injunction and Brief in Support is being served upon each defendant by hand delivery.