# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| Luisa Lupi and | § | |
| Eva Lupi | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| Officer Timothy Diven AP4417, | § | |
| Officer Jaime von Seltmann AP5984, | § | |
| Officer Rocky Reeves AP7219, | § | |
| Officer Michael Guetzke AP4690, | § | |
| Officer Lauren Villareal AP7343, | § | |
| Officer Jerry Floyd AP4559, | § | |
| Officer Ewa Wegner AP4623, | § | |
| Officer Alan Schwettmann AP5826, | § | CIVIL ACTION NO.: 1:20-cv-207 |
| Officer Joshua Visi AP4416, | § | |
| Officer Sgt Michael Lewis King AP4127, | § | |
| Officer Brian Robinson AP6683, | § | |
| Code Enforcement Officer Thomas Horn, | § | |
| Code Enforcement Inspector Joseph Lucas | § | |
| Officer Number 6609, | § | |
| Elizabeth Glidden, | § | |
| McKenna Kuhr, | § | |
| EMS Technician Timothy Hedrick, | § | |
| EMS Technician/Driver Steve White, | § | |
| City of Austin, | § | |
| Travis County, | § | |
| Defendants. | § | |

## PLAINTIFFS' APPENDIX TO
## PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION
## AND BRIEF IN SUPPORT

| DOCUMENTS | PAGE(S) |
|---|---|
| **A-D:** Pup's pictures | 5 |

| | | |
|---|---|---|
| **E.** | Austin Police Department – General Offense Hardcopy (EDP Intervention with Contact) – GO# 2018-890666, "Initial Report" by Officer Villarreal, page 7 | 2 |
| **F.** | Austin Police Department – General Offense Hardcopy (EDP Intervention with Contact) – GO# 2018-890666, "Initial Report" by Officer Villarreal, page 8 | 2 |
| **G.** | Austin Police Department – General Offense Hardcopy (EDP Intervention with Contact) – GO# 2018-890666, "Investigator's Report" by Officer Diven, pages 24-25 | 3 |
| **H.** | Austin Police Department – General Offense Hardcopy (EDP Intervention with Contact) – GO# 2018-890666, "Initial Report" by Officer Villarreal, pages 8-9 | 3 |
| **I.** | Austin Police Department – General Offense Hardcopy (EDP Intervention with Contact) – GO# 2018-890666, "Investigator's Report" by Officer Robinson, page 12 | 2 |
| **J.** | Austin Police Department – General Offense Hardcopy (EDP Intervention with Contact) – GO# 2018-890666, "Investigator's Report" by Officer Seltmann, page 14 | 2 |
| **K.** | Austin Police Department – General Offense Hardcopy (EDP Intervention with Contact) – GO# 2018-890666, "Investigator's Report" by Officer Diven, page 26 | 4 |
| **L.** | Affidavits – <br> L1:  Dr. Charles Bradley Singleton (2 pages) <br> L2:  Carol Logan (2 pages) <br> L3:  Fred Kempf (2 pages) <br> L4:  Frank Brown (2 pages) <br> L5:  Stella Arredondo (2 pages) <br> L6:  Stephanie Gilbert (4 pages) <br> L7:  Lester Gilbert (4 pages) <br> L8:  Richard Lee (3 pages) <br> L9:  Warren N. Sams, III (2 pages) | 23 |
| **M.** | Austin Police Department – General Offense Hardcopy (Emergency Detention) – GO# 2018-1070418, "Initial Report" by Officer Seltmann, page 6 | 2 |
| **N.** | Austin Chronicle Article | 9 |
| **O.** | Austin Police Department – General Offense Hardcopy (EDP Intervention with Contact) – GO# 2018-890666, "Investigator's Report" by Officer Diven, page 25 | 2 |
| **P.** | City of Austin Code Department (Administrative) Citation, Citation Number 09630 | 2 |

| | | |
|---|---|---|
| **Q.** | Austin Police Department – General Offense Hardcopy (Emergency Detention) – GO# 2018-1070418, "Supplements" by Officer Reeves, page 8 | 2 |
| **R.** | Officer Diven's "Affidavit for Seizure of Animals," pages 1-2 of 4 | 2 |
| **S.** | Austin Police Department – General Offense Hardcopy (Emergency Detention) – GO# 2018-1070418, "Supplements" by Officer Reeves, page 10 | 2 |
| **T.** | Warrant for Seizure of Animals | 1 |
| **U.** | Pup Chart | 1 |
| **V.** | Austin Police Department – General Offense Hardcopy (Emergency Detention) – GO# 2018-1070418, "Initial Report" by Officer Seltmann, page 7 | 3 |
| **W.** | Pictures of Luisa (showing no bites on 4/17/2018) | 2 |
| **X.** | City of Austin Code Department – Notice of Violation, Case Number: CV-2018-071401; Email from Joseph Lucas RE: Auckland on Tue 1/21/2020 5:04 PM | 5 |

Respectfully submitted,

By:  s/ Kervyn B. Altaffer Jr.
Kervyn B. Altaffer Jr.
State Bar No. 01116575
Email: kervyn@altafferlaw.com
Lunbing Chen
State Bar No. 24097493
Email: lunbing@altafferlaw.com

Altaffer & Chen PLLC
4054 McKinney Ave Ste 310
Dallas, TX 75204
Tel: 972-234-3633
Fax: 972-947-3663

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This Plaintiffs' Application for a Preliminary Injunction and Brief in Support is being served upon each defendant by hand delivery.

Sheera









All images copyright Eva Lupi and Luisa Lupi and may not be reproduced for any reason.



EXHIBIT

*A*

# Polar Bear






All images copyright Eva Lupi and Luisa Lupi and may not be reproduced for any reason.



EXHIBIT
B

Indiana







All images copyright Eva Lupi and Luisa Lupi and may not be reproduced for any reason.



EXHIBIT

C

# Our Family



All images copyright Eva Lupi and Luisa Lupi and **may not** be rep
reason.

Ruby

All images copyright Eva Lupi and Luisa Lupi and may not be reproduced for any reason.





**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EDP INTERVENTION WITH CONTACT)**
**GO#  2018-890666**



EXHIBIT

*E*



**AUSTIN POLICE DEPARTMENT**

GO# 2018-890666
OPEN

**GENERAL OFFENSE HARDCOPY**
**(EDP INTERVENTION WITH CONTACT)**

## Related Text Page(s)

| | |
|---|---|
| **Document** | INITIAL REPORT |
| **Author** | AP7343 - VILLARREAL, LAUREN |
| **Related Date/Time** | MAR-30-2018 (FRI.) 1318 |

On 3/30/18 I Officer Villarreal#7343 responded to a check welfare call at
6837 Auckland Dr.

The caller was identified as:

Kuhr, Mckenna w/f dob 5/17/70

she identified the resident at this address as:

Lupi, Luisa w/f dob 5/9/74

Kuhr stated that she was in charge of the estate at the residence next door
during the summer time and that is how she knows Luisa and the neighbors
in the area. Kuhr stated that several neighbors have contacted her about
concerns for Luisa and that they wish to remain anonymous which is why she
called on their behalf.

Kuhr stated that Luisa used to have a caretaker (possibly sister, Eva) who
moved out about 8 or 9 months ago. Kuhr stated that since the caretaker
moved out of the house, no one has come to visit or care for Luisa. Luisa is
believed to be intellectually challenged and unable to take care of herself
due to her mental disabilities.

Kuhr stated that the trash has not been seen out on the curb in months
and that she believes that Luisa is hoarding and living in unsanitary
conditions. She also stated that there has not been any food seen taking
into the residence and believes she may not be eating regularly because
she is so thin. Whenever the neighbors periodically do check on Luisa, they
smell a foul odor coming from the inside of the house.

Kuhr also stated that there is a suv parked in the driveway that hasn't been
moved for months. Kuhr stated that Luisa has a sister who is supposedly is
an attorney who moved back to California. The sister was identified as:

Lupi, Eva w/f dob 4/24/72

When I arrived on scene, I observed a large camera inside the narrow window
to the left of the front door. I knocked on the door and could hear several
dogs barking from the inside the house. I announced "Austin Police" and



**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EDP INTERVENTION WITH CONTACT)**
**GO#  2018-890666**





# AUSTIN POLICE DEPARTMENT
## GENERAL OFFENSE HARDCOPY
### (EDP INTERVENTION WITH CONTACT)

Luisa came to the door with her cell phone in her hand. She stated that her sister was on speakerphone and was constantly asking her sister what she should say/answer to my questions. I explained to Luisa that someone called because they were concerned for her well-being.

When Luisa opened the door, I was unable to see inside the residence because she was very secretive. I did however smell a strong odor of urine and feces coming from the inside the residence. I observed that Luisa appeared to be extremely thin and frail given her height (5'7 approx 90lbs). I observed that Luisa's clothing also had a strong smell of being soiled and there appeared to be LICE in her hair. Her clothing was too large for her size and her pants were covered in animal hair. Her cheeks were sunken in and her hair was also very thin.

I also observed the vehicle in the driveway appeared to have not been driven in months, since there were cobwebs extending from the back end of the SUV to the front of the garage. The vehicle was strangely registered to her sister Eva, but with an address to a nearby shopping center (not a residence.)

Luisa remained on the phone the entire time during our interactions with her sister who was very apprehensive and evasive with my questions. She was not very cooperative and told me she was only giving me her date of birth "under protest". She was insistent that we
(the police) are harassing them and disturbing their quality of life and wanted to know how she could make sure police didn't respond to the residence again. Luisa's sister was very controlling of her during my interactions and it was difficult to get a true assessment of Luisa due to this. The sister insisted that everything was just fine and told us that she lives here with her sister, even though several other neighbors/witnesses say otherwise and there are no indications that she is indeed staying there, no less visiting her.

I contacted Adult Protective services and spoke with Kim emp#5261 Case#70565686 who stated they would send someone out within 24hours and said it was a "priority 2" case.

I then contacted Cpl. Floyd to brief him on this call. Myself and Officer Guetzke then decided to return and speak with the next door neighbor  who lives at 6841 Auckland Dr. She was identified as:

Glidden, Elizabeth w/f dob 12/4/52

We asked Elizabeth if we would be able to access her backyard in order to see the conditions of Luisa's yard since we were being told she was hoarding items there that were covered in tarps. The backyard appeared to be fine, however Elizabeth did have concerns for Luisa's dogs that she sees out there sometimes.



**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EDP INTERVENTION WITH CONTACT)**
**GO#  2018-890666**



EXHIBIT

G



**AUSTIN POLICE DEPARTMENT**
GENERAL OFFENSE HARDCOPY
(EDP INTERVENTION WITH CONTACT)

GO# 2018-890666
OPEN

Follow Up Report #   **4 - NOT COMPLETED**

## Related Text Page(s)

| | |
|---|---|
| **Narrative Text #** | 4 |
| **Document** | INVESTIGATOR'S REPORT |
| **Author** | AP4417 - DIVEN, TIMOTHY |
| **Subject** | REPORT |
| **Related Date/Time** | APR-19-2018  (THU.) 0846 |

I assigned myself as lead investigator on this report, as CIT created a 2nd report (18-1070418) and will conduct their follow up reports under that case.

4/6/18
I reviewed this report. This appears to be a mental health case as the female at the house (Lupi) appears to be having trouble caring for herself, her house, and possibly even her animals. The report mentions 2 dogs possibly being skinny, but that alone is not enough to file any type of seizure warrant at this time. Further investigation will be necessary. With this possibly being a mental health issue, I emailed Ofc. Von Seltmann with CIT to inquire as to their plans to deal with Lupi. She advised that she is coordinating with APS, Code Enforcement, and EMS to do a home visit all together at some point next week and see if they can speak to Lupi and determine the best course of action. Ofc. Von Seltmann advised she would get back to me about a date/time to go out there.

4/12/18
Ofc. Von Seltmann advised that they have scheduled a home visit with Lupi on Tue, Apr 17 at 930a. We agreed to met her out there.

4/17/18
SPC Schwettmann and I met with CIT (Ofc. Von Seltmann and Ofc. Reeves), APS social worker, Code Enforcement Officer Horn, as well as several EMS personnel. CIT and CE were to take the lead and were going to make first contact with Lupi, if she would answer the door. Ofc. Horn knocked and Lupi began talking to him through the front door. I was standing back so could not hear what was being said. While standing approx 10-15ft away from the front door, I could smell a strong odor of ammonia, urine, feces, emanating from the front door. Lupi eventually came and opened the front door and just barely opened the front door wide enough to squeeze outside and shut it behind her. The smell from early immediately got much stronger. Lupi was wearing soiled oversized clothing. She appears to be mentally challenged and has some issues with her speech. I could hear several dogs barking from just inside the front door. CIT spoke to Lupi for a short time and Lupi then tried to go back inside the house. It was then that CIT decided that Lupi needed to be mentally evaluated based on what they observed at the scene and her past history. They then walked Lupi to the ambulance and had her detained under an emergency detention. See their report for all the details under the other case number.

Once Lupi realized she was being taken to the hospital, she asked about the care of her dogs. She said she had 4 dogs inside the house. She did not mention any other pets. I told her that her dogs would be safe and that we would have Animal Control take the dogs to the shelter for safe keeping and to get any medical care they needed. Lupi agreed to this. While Lupi was being attended by EMS, it was noted that she had bugs



**AUSTIN POLICE DEPARTMENT**

GO# 2018-890666
OPEN

**GENERAL OFFENSE HARDCOPY**
**(EDP INTERVENTION WITH CONTACT)**

**Follow Up Report #   4 - NOT COMPLETED**

and possibly lice crawling over here. Ofc. Von Seltmann was even bitten by one on her arm while holding Lupi. Myself and SPC Schwettmann decided to don full PPE suits, boots, and gloves in order to enter the house to secure the animals. We did not want to be bitten or become a host to the bugs that may be inside the residence. Also based on the strong smell of ammonia just from the front porch, we both donned respirator masks with special filters to filter out the ammonia in the air.

When we tried to open the front door, 3 dogs were there barking. Animal Control was able to open the front door slightly and used the catch pole to contain one of the red colored shepherd mixes (later given ID #A770275 named Ruby) and brought her outside while shutting the door to keep the other 2 dogs contained. Ruby appeared to be in bad health. She was missing fur on large portions of her body and also appeared geriatric. She was also a bit thin. The 2nd dog removed by the front door was a yellow shepherd mix (A770276 named Polar Bear). Polar Bear had a open wound on its muzzle and was a little thin. The 3rd dog removed through the front door was a blk/bro/whi shepherd mix dog (A770273 named Sheera). Sheera appeared unkempt but had lots of fur so it was hard to tell her overall condition. All 3 of these dogs were put on the Animal Control truck. Once it was determined there were no more aggressive dogs at the front door, entry was made into the residence to find the 4th dog that Lupi mentioned.

The house can only be described as a hoarder house. There was boxes and boxes of items and trash piled from floor to ceiling covering at least 80-90% of the space in the house. There was only a small pathway in between all of this stuff in order to move around from room to room. There was dust, dirt, and debris over everything. The kitchen was littered with trash on every surface and most of it covered in dust and dirt. The living room had 2 small mattresses lying on the ground and appears to be the sleeping area for the dogs and Lupi. Every surface was covered in hair and dirt. This living arrangement is not healthy for Lupi or the dogs. In the living room, we found one more dog lying on the mattress. The dog was the worst condition of the 4. It too was missing fur over half of its body and the areas of skin had turned gray and looked like elephant skin. The dog was very thin and you could see its ribs and hip bones protruding from its skin. Since the dog would not move, SPC Schwettmann picked up the dog and carried it to the truck. The dog was later assigned ID #A770274 and we had no name associated with this dog. We then searched the house for more animals. It appears the house is a 3 bed, 1 bath house. 2 of the bedrooms are used as cat rooms. Inside each room there was a large metal dog kennel with a litter box inside that were both full of feces and urine. The rooms smelled strongly of urine/ammonia. On each door was a sign indicating the name of the cat in each room. The rooms were also filled floor to ceiling with boxes and items barely had room to move around. I observed one blk/whi cat in one of the rooms but Animal Control was never able to catch it as it ran up into the plethora of boxes and hiding spots and without moving everything out of that room there was no way to find the cat. We saw no cat(s) in the other room. It was then that I made the decision to open a window on the back of the house leading into this one room where the blk/whi cat was observed. At this time we had no idea how long Lupi would be committed and she said she had no one in town to care for her animals. There was some water and food for the cat, so by opening the window the cat could at least come and go as needed and we didn't have to worry about it dying in that room if she ended up being committed for a long period of time. I was the one who made that decision and take full responsibility for that. Lupi would later tell me at the hospital that she has a total of 4 cats inside the house. She later asked if we had left the doors shut so the cats could not get out into the rest of the house and I told her no, that we opened all the doors so that way no cats would be trapped in one room. In the 3rd bedroom we were not able to enter because the room was filled from floor to ceiling with boxes, to the point that the door would only open about 1-1.5ft. I also left that door open in case there were any cats in there. Only the one window was left open. Video was taken of the house while I was walking around to document everything. It was then that we believed we had gotten all the dogs and had left access for any cats to get outside if needed. We found keys



**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EDP INTERVENTION WITH CONTACT)**
**GO#  2018-890666**



EXHIBIT

H



**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
(EDP INTERVENTION WITH CONTACT)

GO# 2018-890666
OPEN

Luisa came to the door with her cell phone in her hand. She stated that her sister was on speakerphone and was constantly asking her sister what she should say/answer to my questions. I explained to Luisa that someone called because they were concerned for her well-being.

When Luisa opened the door, I was unable to see inside the residence because she was very secretive. I did however smell a strong odor of urine and feces coming from the inside the residence. I observed that Luisa appeared to be extremely thin and frail given her height (5'7 approx 90lbs). I observed that Luisa's clothing also had a strong smell of being soiled and there appeared to be LICE in her hair. Her clothing was too large for her size and her pants were covered in animal hair. Her cheeks were sunken in and her hair was also very thin.

I also observed the vehicle in the driveway appeared to have not been driven in months, since there were cobwebs extending from the back end of the SUV to the front of the garage. The vehicle was strangely registered to her sister Eva, but with an address to a nearby shopping center (not a residence.)

Luisa remained on the phone the entire time during our interactions with her sister who was very apprehensive and evasive with my questions. She was not very cooperative and told me she was only giving me her date of birth "under protest". She was insistent that we
(the police) are harassing them and disturbing their quality of life and wanted to know how she could make sure police didn't respond to the residence again. Luisa's sister was very controlling of her during my interactions and it was difficult to get a true assessment of Luisa due to this. The sister insisted that everything was just fine and told us that she lives here with her sister, even though several other neighbors/witnesses say otherwise and there are no indications that she is indeed staying there, no less visiting her.

I contacted Adult Protective services and spoke with Kim emp#5261 Case#70565686 who stated they would send someone out within 24hours and said it was a "priority 2" case.

I then contacted Cpl. Floyd to brief him on this call. Myself and Officer Guetzke then decided to return and speak with the next door neighbor  who lives at 6841 Auckland Dr. She was identified as:

Glidden, Elizabeth w/f dob 12/4/52

We asked Elizabeth if we would be able to access her backyard in order to see the conditions of Luisa's yard since we were being told she was hoarding items there that were covered in tarps. The backyard appeared to be fine, however Elizabeth did have concerns for Luisa's dogs that she sees out there sometimes.



## AUSTIN POLICE DEPARTMENT

### GENERAL OFFENSE HARDCOPY
#### (EDP INTERVENTION WITH CONTACT)

GO# 2018-890666
OPEN

Elizabeth stated she has seen 2 different dogs in the backyard within the past week. She noticed that one is skin and bones with "ribs sticking out" and the other dog had a large "sore" on it's face. Elizabeth stated that she too is concerned for Luisa's welfare and knows that no one has been at the house to care for her. Elizabeth stated she also was planning on making a report to Adult Protective Services about her observations because she does think that Luisa is unable to care for herself due to her disabilities. Elizabeth stated that Luisa will hardly ever answer the door, and that when she does, she is always on the phone with her sister. Elizabeth state she has lived here since September 2017 and has not seen anyone else living there other than Luisa. She also stated she has only seen the trash go out once. Elizabeth stated there is another neighbor named Maria who has brought dog food to Luisa in the past.

********Requesting MENTAL HEALTH UNIT conduct follow-up in person************

NOI
LV7343



**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EDP INTERVENTION WITH CONTACT)**
**GO#  2018-890666**



EXHIBIT



# AUSTIN POLICE DEPARTMENT

### GENERAL OFFENSE HARDCOPY
#### (EDP INTERVENTION WITH CONTACT)

GO# 2018-890666
OPEN

Follow Up Report #   2

## Related Text Page(s)

| | |
|---|---|
| **Narrative Text #** | 1 |
| **Document** | INVESTIGATOR'S REPORT |
| **Author** | AP6683 - ROBINSON, BRIAN |
| **Subject** | RECLASSIFIED TO EDP |
| **Related Date/Time** | APR-05-2018  (THU.) 0936 |

<u>**04/05/18**</u>

This case does not meet the criteria for a Nuisance Abatement.
The title code has been modified to an EDP case and routed.

BR#6683



# AUSTIN POLICE DEPARTMENT
## GENERAL OFFENSE HARDCOPY
## (EDP INTERVENTION WITH CONTACT)
## GO#  2018-890666



EXHIBIT

J



# AUSTIN POLICE DEPARTMENT
## GENERAL OFFENSE HARDCOPY
### (EDP INTERVENTION WITH CONTACT)

GO# 2018-890666
OPEN

**Follow Up Report #   3**

## Related Text Page(s)

| | |
|---|---|
| **Narrative Text #** | 1 |
| **Document** | INVESTIGATOR'S REPORT |
| **Author** | AP5984 - VON SELTMANN, JAIME |
| **Subject** | CIT SUPP-EDP CONTACT |
| **Related Date/Time** | APR-17-2018  (TUE.) 0835 |

Case details reviewed by CIT on 04/06/2018.

Officers met with the subject: Luisa Lupi and determined that that time that she was not an immenient threat to herself or others; however, the CIT Unit was notified for follow-up due to Luisa's poor physical condition. Adult Protective Services was notified.

**CIT UNIT FOLLOW-UP**
On 04/06/18, I received an email from Det. Diven from Animal Cruelty concerning this case. After reading the above report, I determined that a home visit needed. Joint home visit with Adult Protective Services, Code Enforcement, Animal Cruelty and the Community Health Paramedic Program planned for 04/17/18.
*We ended up placing Luisa on an ED. Please see ED Case#18-107418 for further details.

No further CIT follow-up at this time.
CIT PORTION CLEARED.
JVS #5984



**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EDP INTERVENTION WITH CONTACT)**
**GO#  2018-890666**



EXHIBIT

K



**AUSTIN POLICE DEPARTMENT**

**GENERAL OFFENSE HARDCOPY**

**(EDP INTERVENTION WITH CONTACT)**

GO# 2018-890666
OPEN

Follow Up Report # 4 - NOT COMPLETED

## Related Text Page(s)

| | |
|---|---|
| **Narrative Text #** | 4 |
| **Document** | INVESTIGATOR'S REPORT |
| **Author** | AP4417 - DIVEN, TIMOTHY |
| **Subject** | REPORT |
| **Related Date/Time** | APR-19-2018 (THU.) 0846 |

I assigned myself as lead investigator on this report, as CIT created a 2nd report (18-1070418) and will conduct their follow up reports under that case.

4/6/18
I reviewed this report. This appears to be a mental health case as the female at the house (Lupi) appears to be having trouble caring for herself, her house, and possibly even her animals. The report mentions 2 dogs possibly being skinny, but that alone is not enough to file any type of seizure warrant at this time. Further investigation will be necessary. With this possibly being a mental health issue, I emailed Ofc. Von Seltmann with CIT to inquire as to their plans to deal with Lupi. She advised that she is coordinating with APS, Code Enforcement, and EMS to do a home visit all together at some point next week and see if they can speak to Lupi and determine the best course of action. Ofc. Von Seltmann advised she would get back to me about a date/time to go out there.

4/12/18
Ofc. Von Seltmann advised that they have scheduled a home visit with Lupi on Tue, Apr 17 at 930a. We agreed to met her out there.

4/17/18
SPC Schwettmann and I met with CIT (Ofc. Von Seltmann and Ofc. Reeves), APS social worker, Code Enforcement Officer Horn, as well as several EMS personnel. CIT and CE were to take the lead and were going to make first contact with Lupi, if she would answer the door. Ofc. Horn knocked and Lupi began talking to him through the front door. I was standing back so could not hear what was being said. While standing approx 10-15ft away from the front door, I could smell a strong odor of ammonia, urine, feces, emanating from the front door. Lupi eventually came and opened the front door and just barely opened the front door wide enough to squeeze outside and shut it behind her. The smell from early immediately got much stronger. Lupi was wearing soiled oversized clothing. She appears to be mentally challenged and has some issues with her speech. I could hear several dogs barking from just inside the front door. CIT spoke to Lupi for a short time and Lupi then tried to go back inside the house. It was then that CIT decided that Lupi needed to be mentally evaluated based on what they observed at the scene and her past history. They then walked Lupi to the ambulance and had her detained under an emergency detention. See their report for all the details under the other case number.

Once Lupi realized she was being taken to the hospital, she asked about the care of her dogs. She said she had 4 dogs inside the house. She did not mention any other pets. I told her that her dogs would be safe and that we would have Animal Control take the dogs to the shelter for safe keeping and to get any medical care they needed. Lupi agreed to this. While Lupi was being attended by EMS, it was noted that she had bugs



# AUSTIN POLICE DEPARTMENT

## GENERAL OFFENSE HARDCOPY
### (EDP INTERVENTION WITH CONTACT)

GO# 2018-890666
OPEN

**Follow Up Report #   4 - NOT COMPLETED**

and possibly lice crawling over here. Ofc. Von Seltmann was even bitten by one on her arm while holding Lupi. Myself and SPC Schwettmann decided to don full PPE suits, boots, and gloves in order to enter the house to secure the animals. We did not want to be bitten or become a host to the bugs that may be inside the residence. Also based on the strong smell of ammonia just from the front porch, we both donned respirator masks with special filters to filter out the ammonia in the air.

When we tried to open the front door, 3 dogs were there barking. Animal Control was able to open the front door slightly and used the catch pole to contain one of the red colored shepherd mixes (later given ID #A770275 named Ruby) and brought her outside while shutting the door to keep the other 2 dogs contained. Ruby appeared to be in bad health. She was missing fur on large portions of her body and also appeared geriatric. She was also a bit thin. The 2nd dog removed by the front door was a yellow shepherd mix (A770276 named Polar Bear). Polar Bear had an open wound on its muzzle and was a little thin. The 3rd dog removed through the front door was a blk/bro/whi shepherd mix dog (A770273 named Sheera). Sheera appeared unkempt but had lots of fur so it was hard to tell her overall condition. All 3 of these dogs were put on the Animal Control truck. Once it was determined there were no more aggressive dogs at the front door, entry was made into the residence to find the 4th dog that Lupi mentioned.

The house can only be described as a hoarder house. There was boxes and boxes of items and trash piled from floor to ceiling covering at least 80-90% of the space in the house. There was only a small pathway in between all of this stuff in order to move around from room to room. There was dust, dirt, and debris over everything. The kitchen was littered with trash on every surface and most of it covered in dust and dirt. The living room had 2 small mattresses lying on the ground and appears to be the sleeping area for the dogs and Lupi. Every surface was covered in hair and dirt. This living arrangement is not healthy for Lupi or the dogs. In the living room, we found one more dog lying on the mattress. The dog was the worst condition of the 4. It too was missing fur over half of its body and the areas of skin had turned gray and looked like elephant skin. The dog was very thin and you could see its ribs and hip bones protruding from its skin. Since the dog would not move, SPC Schwettmann picked up the dog and carried it to the truck. The dog was later assigned ID #A770274 and we had no name associated with this dog. We then searched the house for more animals. It appears the house is a 3 bed, 1 bath house. 2 of the bedrooms are used as cat rooms. Inside each room there was a large metal dog kennel with a litter box inside that were both full of feces and urine. The rooms smelled strongly of urine/ammonia. On each door was a sign indicating the name of the cat in each room. The rooms were also filled floor to ceiling with boxes and items barely had room to move around. I observed one blk/whi cat in one of the rooms but Animal Control was never able to catch it as it ran up into the plethora of boxes and hiding spots and without moving everything out of that room there was no way to find the cat. We saw no cat(s) in the other room. It was then that I made the decision to open a window on the back of the house leading into this one room where the blk/whi cat was observed. At this time we had no idea how long Lupi would be committed and she said she had no one in town to care for her animals. There was some water and food for the cat, so by opening the window the cat could at least come and go as needed and we didn't have to worry about it dying in that room if she ended up being committed for a long period of time. I was the one who made that decision and take full responsibility for that. Lupi would later tell me at the hospital that she has a total of 4 cats inside the house. She later asked if we had left the doors shut so the cats could not get out into the rest of the house and I told her no, that we opened all the doors so that way no cats would be trapped in one room. In the 3rd bedroom we were not able to enter because the room was filled from floor to ceiling with boxes, to the point that the door would only open about 1-1.5ft. I also left that door open in case there were any cats in there. Only the one window was left open. Video was taken of the house while I was walking around to document everything. It was then that we believed we had gotten all the dogs and had left access for any cats to get outside if needed. We found keys



# AUSTIN POLICE DEPARTMENT

## GENERAL OFFENSE HARDCOPY

### (EDP INTERVENTION WITH CONTACT)

GO# 2018-890666
OPEN

**Follow Up Report #   4 - NOT COMPLETED**

to the house and were able to leave and locked both the front and back doors. Ofc. Von Seltmann took the keys.

The 4 dogs were then all transported to the Austin Animal Center where they will be cared for.

Based on the conditions of the house and the animals and the horrific living conditions, I believed that these animals were cruelly treated. I then completed a seizure warrant and petitioned the court (JP5) to divest ownership of these 4 dogs from Lupi until a hearing could be had to determine proper placement of these dogs. The warrant was signed by Judge Meeker and I then went straight to the hospital and served Lupi with the notice of hearing and a copy of the warrant. I explained to her and her sister (on the phone) about the process and what they need to do if they want the opportunity to explain the situation and try to get their dogs back. They said they understood and I left the hospital. Hearing is set for Tue, Apr 24 at 230p in JP5.

I asked the vets at AAC to conduct full cruelty exams on the 4 dogs, to include photos. I will add those exam reports to this report once completed.

4/19/18
I was out of the office yesterday, but today I had been notified that attorney Will Hale is representing Lupi and would like to get a copy of the notice of hearing and warrant. I emailed those to him this morning at will@whalelaw.com. I also referred him to the prosecutor, Annalynn Cox.

All the cruelty exams were completed by Dr. Hays. I added them each as a separate supplement into this report. See those reports for details.

CAUSE NO. C-1-CV-18-004292

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE COUNTY COURT |
|    Plaintiff | § | |
| | § | |
| v. | § | AT LAW NO. 2 |
| | § | |
| LUISA MONICA LUPI | § | |
|    Defendant | § | TRAVIS COUNTY, TEXAS |

## AFFIDAVIT OF DR. CHARLES BRADLEY SINGLETON

Before me, the undersigned authority, on this day, personally appeared Dr. Charles Bradley Singleton, to me after being duly sword, did say:

"My name is Charles Bradley Singleton, I am a general practice small animal veterinarian in Austin, TX. I own and practice from South Park Animal Hospital, Southwest Vet, and Dripping Springs Animal Hospital. I am licensed in the State of Texas to practice veterinary medicine have practiced for 11 years. I cannot be present at the hearing as I already had scheduled appointments with patients at South Park Animal Hospital, but I wanted to outline my interactions with Eva and Luisa Lupi (collectively "Lupis") regarding the care I have provided to their dogs and cats.

I first treated one of the Lupis' dogs in 2011 at South Park Animal Hospital. I did not treat their pets again until 2015, but since 2015, they have had an office visit with physical exams at one of our clinics 11 times for 5 dogs and 2 cats. There were 4 separate other visits at which time they purchased medications for their pets, but I performed no physical examinations on these occasions. In the last 3 years alone, the Lupis have spent over $4,000 on their pets, which I believe speaks volumes as to how much the Lupis care about their pets—and how seriously they consider their health.

I last examined Indiana in July 2017. We are fairly certain that Indiana's skin condition is allergic in origin. There were some blood tests performed prior to me becoming their vet that suggested many different food allergies, and I suspect there are also environmental allergies (e.g. grass or tree pollen) present as well.

There are no cures for allergies, only various treatments to help manage the symptoms. There are many things that are typically very effective but carry side effects, and there are many things that are very safe, but not very effective. Unfortunately, there is nothing that is very effective and perfectly safe.

The Lupis tried several things considered effective, such as Cytopoint® injections and Apoquel® tablets. Cytopoint® caused tremors in Indiana, and the owners elected to discontinue due to side effects. Apoquel® did not cause any side effects at the time, but the Lupis did not see enough improvement to warrant the cost of the drug. For reference, the initial 30 tablets cost them $71.20 at our hospital.

---



EXHIBIT
L-L1

Indiana received Cytopoint® at another veterinarian, however for reference, Indiana's dose would be $116 at our hospital and should last about 4 to 6 weeks.

Since many pet owners cannot afford these medications long term, or their pet may have detrimental side effects, many pets are treated with antihistamines such as Benadryl®, Zyrtec® and fish oil. These are not always effective, but they don't have bad side effects and are extremely safe and affordable. The Lupi family used Benadryl®, fish oil, medicated shampoo, and topical ointments to treat their dogs.

We last examined Indiana, Ruby, Polar Bear, and Sheera in May and July of 2017 for their annual wellness visits. At that time, they were vaccinated, heartworm and fecal tested, and dispensed heartworm preventative. Indiana also received Apoquel® for skin allergies and Mometemax® Ear Ointment for an ear infection. Sheera had a urinary tract infection. Aside from those issues, they were healthy at that time.

In May 2017, Polar Bear weighed 52.8 lbs and Ruby weighed 53.2 lbs. In July 2017, Indiana weighed 55.8 lbs, Sheera was 40.4 lbs. Heartworm tests and fecal parasite tests were negative on all pets at that time.

In the time I have known Eva and Luisa Lupi, I have found them to be very concerned about their pet's well- being. When I last examined their dogs in May 2017 and July 2017, there were no findings that indicated to me that they were not providing adequate care to these animals. There were the skin issues that can't be cured, and Sheera had a urinary tract infection—which is common—and the Lupis purchased medications at that time to address these conditions.

On April 17, 2018, I met with Luisa Lupi at my clinic to perform a surgery to remove a mass for their dog Spirit, which was unsuccessful. Spirit passed away post-operation. The surgery and post-operation care cost $4,001.27. Although I was not looking specifically, I did not observe that Luisa Lupi had any indications of lice or bug bites at that time.

FURTHER AFFIANT SAYETH NOT.

_____
DR. CHARLES BRADLEY SINGLETON

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 11 day of June 2018.

_____
Notary Public, State of Texas

FORREST JUSTICE
Notary Public, State of Texas
Expires MARCH 3, 2019
I.D. # 130139321

## AFFIDAVIT OF CAROL LOGAN

My name is Carol Logan.   I am of sound mind and capable of making this sworn statement.  I have personal knowledge of the information described herein.

Luisa Lupi and Eva Lupi are my neighbors from 2 doors down the street.  Over time during the last few years we have become acquainted, mostly on the basis of our common love of dogs.

I have had 2 very large breed dogs during the time I have known them, and one medium size dog.   When I walk by their home and they are out working in the yard, they always greet each of my dogs by name and spontaneously give them each special attention so my dogs have come to know them and look forward to stopping by their home during our evening walks.

On other occasions, I have seen them as they are walking their dogs and I have observed them interacting with their dogs and I have listened to their loving stories about each of their dogs personalities and preferences.

They have talked about how they have rescued and opened up their home to several 'special needs' and elderly dogs and they have discussed the veterinary care they have sought to take make sure they secured the top level of veterinary care for their animals.

One Saturday, my Australian Shepard, 'Pancake' escaped out the front door without my knowledge, but fortunately she headed straight to Eva and Luisa's home where she knew she would get loving attention.  Eva and Luisa didn't disappoint her, and then returned her to me before I even knew she was gone.  I believe that it is a common practice of theirs if they see a stray dog in the neighborhood, to catch them and return them safely to wherever they belong.

My dogs seemed to be so fond of Eva and Luisa that I asked them to care for the dogs on a couple of occasions when I had to be away on a business trip in the past.  My large breed dog was elderly, suffered from arthritis, and had special needs dog at the time so caring for her took extra effort and I was certain that Eva and Luisa would provide this.

On each occasion that Luisa and Eva cared for my dogs while I was out of town, it was clear that the dogs were very happy and well treated.   I never felt apprehensive about leaving my dogs with Luisa and Eva, and I knew they would be well cared for and be loved in my absence.

And on each occasion when I was away, my home was left clean and in an orderly manner with all dog water and food bowls filled at the appropriate levels.



EXHIBIT

L-L2

Luisa and Eva have told me stories about their travels with their pets, and they clearly enjoy the company of their dogs.

Ever since they have lived in the neighborhood I have noticed that Luisa and Eva provide water as well as food outside their home for stray and homeless animals and it has seemed to me that Luisa and Eva's dogs are always clean, well cared for, happy, and well fed.

Luisa and Eva adopt special needs dogs, and go out of their way to take care of the dogs that need the most attention. They have cared for many ill dogs and seem to be watchful regarding their dogs' veterinary needs. They have frequently discussed the veterinary care their dogs are undergoing.

It is clear that Luisa and Eva dote on their dogs, and love them. They don't treat them as pets, but as members of the family. Luisa and Eva treat and refer to their dogs as individuals, and clearly cherish each one, regardless of any special problems. And it has always been apparent to be that Luisa and Eva's dogs clearly love their humans.

For these reasons, I believe it is in the best interests of the dogs that they be returned to their home with Luisa and Eva.

Signed May 30, 2018.

_____
Signature of Affiant

CAROL LOGAN

**Affiant**

State of Texas
County of Travis

Before me, the undersigned authority, this day personally appeared Carol Logan, and by oath stated that the facts herein stated are true and correct. Sworn to and subscribed before me on this day, May 30, 2018.

_____
Notary Public's Signature, State of Texas

08/26/2020
_____
My Commission expires

TRACY GUAGLIARDO
Notary Public, State of Texas
Notary ID# 13080098-0
My Commission Expires
AUGUST 26, 2020

## AFFIDAVIT OF FRED KEMPF

My name is Frederick J. Kempf.

I am of sound mind and capable of making this sworn statement. I have personal knowledge of the information described herein.

I am an attorney in Dallas, Texas. My address is 6328 Bandera Avenue, Unit C, Dallas, Texas 75225.

I have known Eva Lupi and her sister Luisa Lupi for approximately 15 years, as Eva and I were classmates in law school, and have remained good friends ever since.

I can testify to Eva's integrity, sense of accountability and strong sense of stewardship from firsthand knowledge. Eva is a thoughtful, compassionate and careful person, who clearly enjoys giving to others. Luisa is a kind, giving and highly intelligent person, who tends to be shy at times until she gets to know a person.

Eva and Louisa love animals, and have often "adopted" as pets, dogs that have been abused, that have special needs, or are in danger of being put down. Eva and Louisa have a history of sparing no expense in providing shelter, veterinary services, medicines, or whatever else the animals might need.

I find their commitment to their pets admirable, even if I also think at times they may go farther than most people might be willing to go. By way of example:

I spoke with Eva and Luisa a number of times last year about their plans to move out of Austin and Texas, in order to help their pets, several of which had developed significant allergies. Based on our phone calls, their reason for leaving Texas was to move their dogs to a place that had fewer allergy "triggers." Eva expressed concerns that for at least one of these dogs, the allergy-related problems were life-threatening. I know Eva and her sister have enjoyed living in Austin, but they are so strongly committed to taking care of their dogs, that they made the decision to move. I believe it was late last year when she first told me they were considering moving to a less allergy-prone location than Austin. Her goal was to move by the end of spring, likely in April. I remember that, because April is the month of my birthday, and I teased her about missing my birthday.

Eva and Louisa are in a somewhat unique and enviable position, in that I believe they have the resources to be able to live just about anywhere they want. And because Eva is an excellent attorney, she can work from home, flying out as needed to meet clients (etc.).



In no small part because Eva and Luisa talk about their dogs so often in our calls, I believe their love for these animals is undeniable. I've never met anyone that has the concern for their pets that Eva and Louisa share. Nor have I known anyone who tries as hard to plan and execute activities with their dogs that will make the dogs happy. And I gather from our calls that Eva and Louisa have traveled regularly with their dogs, in no small part because the dogs apparently enjoy the trips and the activities Eva and Louise provide during these trips.

To an outsider, I'm sure Eva and Louisa can come off as "eccentric" because of the way they treat their pets. As I noted however, they have the means to do it, and from what I can tell, their dogs really do live a very good life under their care. Taking care of the dogs makes Eva and Louisa happy, and from what they've told me, the dogs seem to understand that they are loved, wanted, and protected. I have no problem with that, and only wish more pet owners could give that same sense to their pets.

I'm hard-pressed to imagine those dogs getting better care than they get in their home with Eva and Louisa. While I don't understand why the animals were taken from Eva and Louisa, I would imagine that this has been a shock for the animals. I firmly believe that these dogs will get unmatched care when returned to the home they have come to know with Eva and Louisa.

I declare under penalty of perjury that the above is true and correct.

This ___8___ day of June, 2018.

*Frederick Kempf*
Frederick Kempf

State of Texas
County of Dallas

Before me, the undersigned authority, this day personally appeared Frederick Kempf, and by oath stated that the facts herein stated are true and correct. Sworn to and subscribed before me on this day, June ___8___, 2018.

**ALDEN JENKINS**
Notary Public, State of Texas
My Commission Expires
October 08, 2019

*Alden Jenkins*
Notary Public's Signature, State of Texas

OCTOBER 8, 2019
My Commission expires

Page 2 of 2

CAUSE NO. C-1-CV-18-004292

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE COUNTY COURT |
| Plaintiff | § | |
| | § | |
| v. | § | AT LAW NO. 2 |
| | § | |
| LUISA MONICA LUPI | § | |
| Defendant | § | TRAVIS COUNTY, TEXAS |

## AFFIDAVIT OF FRANK BROWN

Before me, the undersigned authority, on this day, personally appeared Frank Brown, to me after being duly sword, did say:

"My name is Frank Brown.

I am of sound mind and capable of making this sworn statement.  I have personal knowledge of the information described herein.

I am worked at Austin State Hospital for 28 years in adult psychiatric care, and am now retired.

I have known Eva Lupi and Luisa Lupi as customers for several years.

I drove Luisa Lupi to a number of locations to run errands on one day during the week preceding April 17, 2018.  During these errands, Luisa looked clean and neat and was dressed normally.  She conversed well with me, and asked how my family was doing.

I also drove Luisa and her dog back home from the vet on April 16, 2018.  At that time, Luisa also looked clean and was neatly dressed.

There was nothing unusual about Luisa's appearance on any of the days when I drove her.  Luisa did not have any visible insects or lice on her on either of those days.  She has never appeared to have any insects or lice on her at any time.

She was concerned about her dog's upcoming surgery the next day.  She secured a ride with my wife for the next day's surgery, and scheduled the time.

AFFIDAVIT OF FRANK BROWN



EXHIBIT
L-L4

Page 1 of 2

To my knowledge, Eva and Luisa care a great deal about their pets.  They enjoy talking about their own and other people's pets, and when I drive them to various locations we talk about pets most of the time.

From my observations, Luisa is a kind and gentle person who cares about the people and animals around her."

FURTHER AFFIANT SAYETH NOT.

_____

FRANK BROWN

SUBSCRIBED AND SWORN TO BEFORE ME, on this the _11_ day of June 2018.

_____

Notary Public, State of Texas



CAUSE NO. C-1-CV-18-004292

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE COUNTY COURT |
| Plaintiff | § | |
| | § | |
| v. | § | AT LAW NO. 2 |
| | § | |
| LUISA MONICA LUPI | § | |
| Defendant | § | TRAVIS COUNTY, TEXAS |

## **AFFIDAVIT OF STELLA ARREDONDO**

Before me, the undersigned authority, on this day, personally appeared Stella Arredondo, to me after being duly sword, did say:

## **AFFIDAVIT OF STELLA ARREDONDO**

"My name is Stella Arredondo.

I am of sound mind and capable of making this sworn statement. I have personal knowledge of the information described herein.

I worked as a Crisis Manager with Bluebonnet MHMR for 5 years. I worked at Austin State Hospital for 25 years in adult psychiatric care, and am now retired. I worked on the Forensic Unit at Austin State Hospital for approximately 15 years.

I did volunteer work with Austin Police Department for Victims' Services.

I have known Eva Lupi and Luisa Lupi as customers for several years.

I drove Luisa and her dog from her home to the vet clinic on April 16, 2018. Luisa looked clean and was neatly dressed. Her clothing, appearance, and behavior didn't strike me as unusual. She behaved appropriately in every way.

I drove Luisa and her dog from home to the vet clinic in the early morning of April 17, 2018, and then drove Luisa home from the vet clinic later that same morning.

Luisa looked clean and was neatly dressed, and there was nothing unusual about her appearance on April 17, 2018. There was nothing unusual about Luisa's appearance or behavior on any of the days on which I have driven her.

AFFIDAVIT OF STELLA BROWN



Page 1 of 2

When I arrived at Luisa's house on April 17, 2018, Luisa brought her dog out from the house and gently helped her into my car.  I got out of my cab to provide back up in case Luisa needed it.  Luisa was careful with her dog and took her time to settle the dog into my taxi.

Luisa's dog looked clean, well fed, and well cared for.  The dog's leash and harness also appeared clean.

Luisa was careful to ask me to keep the doors closed so her dog couldn't accidentally get out of the cab and onto the street.  Luisa said she was going back into the house to check on her other dogs to make sure they were not upset.  She was gone for a few minutes, then returned to the cab and we left for the vet's office.

Luisa was very careful to make sure her dog was comfortable during the trip, and spoke to her dog soothingly.  It was obvious to me that she cared about her dog's comfort and happiness very much.

Even though I could tell Luisa was worried about her dog's upcoming surgery, Luisa asked during the ride how my family was and we talked about our pets.

Luisa did not have any visible insects or lice on her on either of those days.  She has never appeared to have any insects or lice on her at any time.

I could tell from her interaction with her dog that Luisa cared very much about her dog.  She's the kind of person who goes out of her way to help her animals."


FURTHER AFFIANT SAYETH NOT.


*Stella E. Arredondo*
_____
STELLA ARREDONDO


SUBSCRIBED AND SWORN TO BEFORE ME, on this the ___ day of June 2018.


_____
Notary Public, State of Texas

## AFFIDAVIT OF STEPHANIE GILBERT

My name is Stephanie Gilbert.

I am of sound mind and capable of making this sworn statement. I have personal knowledge of the information described herein.

I am a professional teacher with a valid California state teaching license. I spent 20 years teaching at various levels in the California State Prison system.

I have a Bachelor's degree and teaching certificate.

I possess a valid, current California state Teacher's License, plus an Administrative Services Credential.

Luisa has a form of dyslexia, but is highly intelligent and holds a Bachelor or Arts degree from California State University, Northridge.

I have known Luisa from approximately 1999. She is a highly intelligent young woman, but people often misperceive her because, like some people with dyslexia, she has a slight speech impediment.

I worked with the mental health unit, to include psychologists and psychiatrists, over a 20 year period.

I worked extensively with Luisa and Eva's mother, a well known psychiatrist, with my own learning disabled students, over a 10 year period.

I have taught various learning disorders, to include dyslexia, aphasia, and also those students considered to be mentally challenged with IQs from 80 to 100.

I know Luisa to be a very charming young woman who has a great degree of self control in difficult situations.

Luisa is a very intelligent young woman about whom people have made incorrect assumptions due to her slight speech impediment, which is a symptom of dyslexia.

I have often seen Luisa marginalized due to her ADA disability.

Her dogs are a very precious part of her life, and anyone who has worked in the learning disability field as a professional would understand that.

While Eva was residing in California, I often visited the home she stayed in. The house was left in immaculate condition, as Eva is an extremely organized and thorough person. The house was cleaner when she left than when she arrived.



EXHIBIT
L-L6

Luisa is also a clean and tidy person, and a very careful person.

Both Luisa and Eva were brought up with very high standards of responsibility and accountability.

During the last few weeks before April 17, 2018, Luisa was dealing with a large dog whose incontinence had increased, and was doing her best to make sure he was comfortable.

Eva and Luisa told me of their plan to move out of Texas by April 30 for the sake of their allergic dog, Indiana. This move was frequently discussed and carefully planned.

Luisa and Eva had each discussed with me that the main impetus for the move was the comfort of their dog, Indiana, who had developed worsening allergies.

Luisa and Eva told me about their moving preparation many times, and were preparing for the move with their pets foremost in their minds. Their pets' needs came first.

Luisa and Eva were looking forward to bringing their pets to a new location where Indiana wouldn't be allergic.

Luisa mentioned to me that she was using a variety of methods to deal with Indiana's incontinence, and had developed a system that allowed her to focus on him and keep him clean and dry.

The animals required much care, which Luisa performed on a daily basis.

Luisa never complained about the increase in workload, but kept Indiana and her other dogs constant company.

Luisa was waiting for her sister to come home, and discussed with me that they planned to immediately move Indiana to an allergy free location.

Eva and Luisa are both extremely, overly responsible with pets, and take very good care of them, as evidenced by the monument of veterinary bills.

I was on the telephone with Eva and Luisa on April 17, 2018.

I heard the conversations of April 17, 2018 and realized that it was a serious situation that should never have happened.

I am willing to testify about these matters.

I heard a man speaking to Luisa in her hospital room.

The man identified himself as a police officer and with animal control.

I heard the officer give something to Luisa.

Luisa stated that he had given her two sheets of paper, and stated that one had "Notice of Hearing" on the top, and the other stated "Warrant for Seizure of Animals."

I heard Luisa inquiring continuously about her dogs, but receiving no definitive answer.

There were many false statements made about the condition of the dogs, as well as a statement that Luisa would never get out of there unless she did a blood test and a urine test.

The officer told Luisa that two of her dogs had mange.

Luisa responded that the two dogs did not have mange. Luisa explained that they had allergies.

The officer responded to Luisa that her dogs did have mange.

While at the hospital, Luisa continued to be very concerned about the dogs' welfare because they had been removed from the home.

Luisa stated that they had been removed without her consent. She did not want people in the house.

Luisa was concerned because Indiana was being fed the wrong food and his allergies were not being acknowledged.

Luisa had a very meticulous schedule for feeding the dogs, as well as for changing water in their bowls.

Luisa always made sure that the dogs' needs were being taken care of, and made sure their food and water was taken care of before they needed it.

I know the agony which Luisa and Eva have experienced since April 17, 2018 because of the loss of their pets during the traumatic events of April 17, 2018.

I was horrified at the way Luisa was being treated in an emergency room in the state of Texas.

*Stephanie Gilbert*

**Signature of Affiant**

*Stephanie Gilbert*

**Affiant**

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California
County of Los Angeles

Subscribed and sworn to before me on this 30th day of May, 2018, by Stephanie Gilbert, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

LUIS CANCINO RUIZ
COMM. # 2214214
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES SEPT. 15, 2021

**Seal**

**Notary Public's Signature, State of California**

My name is Lester Gilbert.

I am of sound mind and capable of making this sworn statement. I have personal knowledge of the information described herein.

I am a United States Marine, retired.

I met Luisa and Eva, along with their mother, in 1999.

After the President's Day holiday in February of 2018, my wife, Stephanie, spoke with me about the possibility of storing a container for Eva and Luisa on our rural California property.

Stephanie mentioned to me that one of their dogs, Indiana, had become very allergic, and that Eva and Luisa were planning to move with him out of Texas to help his allergies.

They needed to store the container so that they could find a location that was good for the dog's allergies before they moved there permanently.

Eva and Luisa planned to move out of Austin by the end of April, 2018, and send the container to our California property.

While here in California, Eva described her dogs' allergies, and how she and her sister, Luisa, hoped that getting them away from the high allergy location in Texas would help.

Eva was anxious to move her family to an allergy free location. She was hopeful that her dogs would be able to improve and heal in their new, low allergen environment.

Stephanie discussed Eva and Luisa's move in detail with Eva on several occasions, as they refined their plans and made preparations.

I heard Stephanie discuss with Eva and Luisa that they were packed and were waiting to order the container to move their belongings out.

Due to circumstances beyond Eva and Luisa's control, they were not able to leave Austin by April 30, 2018. Stephanie and I are looking forward to Luisa and Eva and their dogs moving to California as soon as possible.





EXHIBIT
L-L7

_Lester E Gilbert_

**Affiant**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

Subscribed and sworn to before me on this _____ day of June, 2018, by Lester Gilbert, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

See Attached CA Jurat with Affiant Statement

Seal                                    **Notary Public's Signature, State of California**

2

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**  GOVERNMENT CODE § 8202

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], not Notary)

_____     _____
*Signature of Document Signer No. 1*        *Signature of Document Signer No. 2 (if any)*

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of Los Angeles

STEPHANIE WILLIAMS
Commission # 2106905
Notary Public - California
Los Angeles County
My Comm. Expires Apr 13, 2019

*Place Notary Seal and/or Stamp Above*

Subscribed and sworn to (or affirmed) before me

on this 8 day of June, 20 18,
by        *Date*              *Month*        *Year*

(1) Lester Gilbert

(and 2) _____).
                    *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _Bil Williams_
                *Signature of Notary Public*

──────────────── **OPTIONAL** ────────────────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: Affidavit of Lester Gilbert

Document Date: 6/08/18                    Number of Pages: 2

Signer(s) Other Than Named Above: None

©2017 National Notary Association

# California Jurat With Affiant Statement

If no other format is prescribed, this form may be used when an individual is signing and swearing (or affirming) that certain written statements are true.

The text space provided (lines 1–5) are available for a document signer to type or neatly print (in ink) a written statement. This portion of the certificate should not be completed by the Notary. A person completing any of lines 1–5 must sign this form on line 6 in the presence of the Notary, who would also administer an oath or affirmation.

If this form is to be attached to another document, then the Notary should cross out lines 1–6. The signer would affix a signature on the attached document, not on this certificate, in the Notary's presence.

The optional section at the bottom can deter alteration of the document or fraudulent reattachment of this form to an unintended document. The insertions in this section are not required by law. Failure to fill out this section will not affect the validity of the jurat certificate.

## Instructions:

**❶ DOCUMENT OPTION.** Check the first box if this Jurat certificate is going to be used on a document. If so, then cross out lines 1–6 on certificate. Check the second box if the affiant is going to use this form to make a statement.

**❷ AFFIANT STATEMENT.** These lines are provided for the affiant to complete his or her own statement, and should not be completed by the Notary. If affiant is not using this certificate to make a statement, lines 1–6 should be crossed out by the Notary.

**❸ SIGNATURE(S) OF AFFIANT(S).** This is signed by the person(s) who completed the statement in lines 1–5. If an attached document is signed instead, these spaces should be lined through by the Notary.

**❹ NAME OF COUNTY** where Notary performs notarization.

**❺ DATE OF NOTARIZATION.** Actual day, month and year in which the affiant(s) appear(s) before Notary to sign this certificate or an attached document and take an oath or affirmation.

**❻ NAME(S) OF AFFIANT SIGNER(S)** name(s) signed before the Notary. Initials and spelling of name(s) should agree with document, ID card and journal signatures. If only one signer is appearing before the Notary, cross out any remaining space.

**❼ SIGNATURE OF NOTARY** exactly as name appears on commissioning papers and in seal.

**❽ NOTARY SEAL IMPRINT,** clearly and legibly affixed.

*SPACES 9–12 ARE OPTIONAL.* Omission of information here will not affect the document's validity. However, completing these spaces can deter alteration of the document or fraudulent reattachment of this form to an unintended document.

**❾ TITLE OR TYPE OF DOCUMENT** notarized, such as "Affidavit of Loss."

**❿ DATE OF DOCUMENT** notarized. If the certificate is being attached to a document, most, but not all, will have a date, usually at the top or following the signature. If none, insert "No Date."

**⓫ NUMBER OF PAGES** in the notarized document. This may point out fraudulent addition or removal of pages. If the certificate is being attached to a document, do not count it as a page if the certificate is the document, page count would be "One."

**⓬ SIGNER(S) OTHER THAN NAMED IN SPACE(S) 6.** Since all affiant signers might not be named on the same Notary certificate, insert name(s) of signer(s) here that appear(s) or will appear on other certificates – as many as space allows. If none, insert "No Other Signers."





**NATIONAL NOTARY ASSOCIATION**

## AFFIDAVIT OF RICHARD LEE

My name is Richard Lee.

I am of sound mind and capable of making this sworn statement.  I have personal knowledge of the information described herein.

I am a United States Marine, retired.

I am a former school principal in the California Department of Corrections educational system.

Eva Lupi is a friend of ours, and I can testify to Eva's integrity and responsible attitude from firsthand knowledge.  Eva's mother, a psychiatrist, was a colleague of my wife, Maria, at work and Eva and Luisa have been friends with my wife for nearly 20 years.

For several months during 2018, Eva stayed at our home in Los Angeles to complete various projects related to her work as an attorney.

In February, 2018 my wife and I spoke with Eva several times about Eva and her sister, Luisa Lupi's plans to move out of Austin, Texas in order to help their pets, who had developed significant allergies.

Eva said outright that their reason for leaving Texas was to help the dogs' allergies subside.  When asked why she and Luisa didn't stay in Texas Eva told us that, though there were many things she liked about Texas, the most important factor in her plans was that their dogs needed to go to a location with fewer allergens.

Since that time Eva, along with my wife, Maria, and I have had several discussions regarding the move.  Eva planned to be out of Austin before the end of April, 2018.

Eva told us about their nearly complete preparations.   My wife spoke with Luisa about the move over the phone several times in my presence, and received updates on the plans.

Eva described some of the trips she and Luisa had taken with their pets, and how they often went on trips, always bringing their dogs.  Eva and Luisa apparently have a network of hotels that cater to enthusiastic dogs and their owners, and the dogs and hotel staff enjoyed their visits.

Eva and Luisa seemed to be experienced travelers with pets, and described the many ways in which they made travel fun and comfortable for their pets.



EXHIBIT

L-L8

Eva described the personalities and histories of each of her pets, and told my wife and me of the special treatment each one received. I saw photos of the pets, who looked very happy and comfortable at home. They appeared enthusiastic, well fed, clean, and extremely content.

Some of Eva and Luisa's pets have special needs, and Eva described how they had adopted them when no one else would, knowing that she and Luisa could give the pets the special love and support they needed to live a full and happy life.

Eva is a very thoughtful and careful person, who clearly enjoys giving to others.

Eva was looking forward to being reunited with her pets at the end of her trip to California. She enjoyed talking about her future plans with her pets, and it was clear to me that Eva and Luisa's pets were the central focus of their lives.

Particularly because these pets are seniors, I believe they should be kept with those who have spent a lifetime giving them comfort and getting to know their individual personalities. I don't believe anyone else would be able to give these pets the comfort and love they receive from Eva and Luisa. Family bonds are very important.

Eva and Luisa have owned their pets for a very long time. In my view, Eva and Luisa's pets are an integral part of their lives, and I believe Eva, Luisa, and their pets belong together and are a family. Neither the pets nor the humans in this situation would be happy without the other.

Signature of Affiant

Richard Lee
Affiant

A notary public or other officer
completing this certificate verifies only
the identity of the individual who
signed the document to which this
certificate is attached, and not the
truthfulness, accuracy, or validity of
that document.

State of California
County of Los Angeles

Subscribed and sworn to before me on this ____07____ day of June, 2018, by Richard
Lee, proved to me on the basis of satisfactory evidence to be the person who
appeared before me.



Seal                               Notary Public's Signature, State of California



GLORIA VALERIE MALDONADO
COMM. # 2192328
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. APRIL 17, 2021

Page 3 of 3

STATE OF GEORGIA

COUNTY OF FULTON

### AFFIDAVIT OF WARREN N. SAMS, III

1.

I, Warren N. Sams, III, personally appeared before the undersigned notary public, and under oath or affirmation make the following statements:

2.

My name is Warren N. Sams, III.

3.

I am of sound mind and capable of making this sworn statement.  I have personal knowledge of the information described herein.

4.

I am an attorney in Atlanta, Georgia and my address is 303 Peachtree St., N.E., Suite 413, Atlanta, Georgia, 30308.

5.

Eva Lupi was a colleague of mine in Atlanta, Georgia.

6.

Sheera, a tri color Australian Shepherd mix, was a gift from me and my family to Eva Lupi in either 2006 or 2007.

7.

For several years after giving Sheera to Ms. Lupi, I was able to check in on Sheera, and she was in very good health and spirits each time I saw her.

This _1st_ day of June, 2018.

_____
Signature of Affiant


EXHIBIT
L-L9

Signed and sworn to before me on this ___1ST___ day of June, 2018 by Warren N. Sams III, who proved to me on the basis of satisfactory evidence to be the person who appeared before me.

_____ Personally Known
     or
_____ Produced Identification

Type of ID _GA Driver's License_

_Marlon Boyce_
Signature of notary public

_Marlon Boyce_
(Name of notary, typed, stamped, or printed)
Notary Public State of Georgia

Stamp/Seal

My commission expires: _06/03/2018_



**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EMERGENCY DETENTION)**
**GO#  2018-1070418**



EXHIBIT

*M*



# AUSTIN POLICE DEPARTMENT

GO# 2018-1070418
NOT APPROVED

## GENERAL OFFENSE HARDCOPY
### (EMERGENCY DETENTION)

## Related Text Page(s)

| | |
|---|---|
| **Document** | INITIAL REPORT |
| **Author** | AP5984 - VON SELTMANN, JAIME |
| **Subject** | CIT UNIT EMERGENCY DETENTION |
| **Related Date/Time** | APR-17-2018  (TUE.) 1228 |

On 04/17/18, I conducted a home visit with the subject:

Luisa Lupi W/F 05/09/74

I am assigned as a follow-up investigator to a related case #18-1070418 in which several neighbors called police concerned for Luisa's welfare. Neighbor and witness:

McKeena Kuhr

reported that Luisa had been living in the home for eight or nine months. Kuhr had been involved in the family's estate in the summer of 2017 and said that Luisa's sister, Eva, was supposed to be her guardian but moved to California. Several neighbors had been calling Kuhr concerned for Luisa because they did not see anyone leave or exit the home for a prolonged period of time. It did not appear trash was being taken out of the residence and it did not appear that Luisa was getting any food. When officers made contact with Luisa under the above case number, they observed that Luisa appeared severely malnourished, had lice in her hair, was wearing soiled clothes that smelled of urine that were filthy and covered in dog hair. Luisa was very careful not to let the officer's see into the home at the time and had a large camera poised in the window by the door. Neighbors were also concerned for several dogs that appeared to be malnourished and in bad health that lived with Luisa. Luisa was reported to have a hoarding behavior that extended to her backyard. Adult Protective Services was contacted and started their own investigation. I contacted APS Supervisor, Rebecca Craig, and spoke to her about Luisa. She advised me that her case worker, Tiffany Sellers, had been to the home on two separate occasions and Luisa was refusing to open the door. Due to the concerns of Luisa's welfare, the multiple reports from the neighbors about Luisa obviously having some sort of mental health issues, her inability to care for basic needs to include hygiene and nutrition, the officers observations of Luisa's health and appearance in the above report, the report of the malnourished dogs, I conducted a home visit in coordination with Code Enforcement, the Animal Cruelty Unit, the Community Health Paramedic Program, and Adult Protective Services.

Upon walking up to the front door residence myself and Code Enforcement Officer Horn smelled the distinct odor of urine coming from the house. There was a large camera lens pointing towards the front door through the blinds in a window by the door. We could hear several dogs barking. Officer Horn knocked on the door and we could hear Luisa yelling saying that she would come to the door but needed a few minutes. From the info provided in the previous report, I expected that she was trying to call her sister, Eva. She eventually opened the door and quickly shut the door behind her. She was immediately apprehensive with our presence and turned as if she was going to go back inside the residence. Officer Reeves and myself grabbed her by her arms to keep her from going back inside. She appeared to be extremely thin and frail, she was wearing a filthy over sized sweatshirt covered in dog hair that smelled of urine, her hair was dirty and unkempt and it

Case 1:20-cv-00207-RP    Document 6-2    Filed 02/25/20    Page 52 of 82

How Austin Handles Mental Health Emergencies: Police, EMS, and Integr... to serve people in psychiatric crisis - News - The Austin Chronicle    6/2/18, 12:56 PM

# NEWS

## How Austin Handles Mental Health Emergencies

Police, EMS, and Integral Care work together to serve people in psychiatric crisis

BY SARAH MARLOFF, FRI., DEC. 15, 2017

Share 428    Tweet    G+    print    write a letter



*APD's Crisis Intervention Team (l-r): Sergeant Michael King, Rocky Reeves, Jaime Von Seltmann, and James Turner (Photo by Jana Birchum)*

## TODAY'S EVENTS



**Queerbomb 2018**
Fair Market

**MOONLIGHT**
at Alamo Drafthouse at the Ritz

**BROWNOUT (ALBUM RELEASE), THIRD ROOT, SUPERFÓNICOS [OUTDOOR]** at

MUSIC | MOVIES | ARTS | COMMUNITY

When a police officer brings someone to the Judge Guy Herman Center for Mental Health Crisis Care, they're greeted in a clean, white, and sterile space that does not lack for warmth. The officer is offered a cushioned seat and granola bar while an on-call nurse whisks the potential client away to determine whether they're in the best place to receive care. So long as no pressing medical needs are found, the officer is free to go.

One of the Herman Center's many goals is to get law enforcement back to their patrols within 15 minutes of dropping off any individual put on emergency detainer. In Texas, a peace officer emergency detention, known shorthand as a POED (or just ED), can only be issued after an officer determines a person in the throes of a mental health crisis represents an immediate risk to themselves or others, or is deteriorating mentally to the point where they're unable to make safe choices. (An example, said Integral Care practice

## NEWSLETTERS

Your Email Address

**Subscribe to All**
AC Daily, Events and Promotions, Luvdoc Answers

**Chronicle Daily**
Breaking news, recommended events, and more

**Events and Promotions**
Official Chronicle events, promotions, and giveaways

**SXSW News**
Updates for SXSW 2018

**Luv Doc Answers**
All questions answered (satisfaction not guaranteed)

SUBSCRIBE


EXHIBIT
*N*

administrator Laura Wilson-Slocum, would be someone experiencing delusions about crossing a highway to "save Austin from the apocalypse.") Once that decision is made, the officer detains the person and transports them to a facility for psychiatric care. Tracy Abzug, Herman's practice manager, said her facility has been meeting that 15-minute mark. "We recognize that our interaction with officers directly informs how they interact with people in mental health crisis," she said.

Once they get checked out, clients are taken to the exam room for a skin check, urine test, drug screen, and Breathalyzer, so staff can tease out any contributing factors to their crisis. The client is offered a private shower and fresh clothes. Wilson-Slocum believes a shower offers its own therapeutic benefits, and could be the first time in hours that the client has been alone. The showerhead is flush with the wall. The curtain bar breaks away when the slightest bit of pressure is applied. The pipes from both the sink and toilet have been filled with metal to ensure no ligature points can be accessed. "We recognize it's one of the worst days of their lives and they may not want to be here," said Wilson-Slocum. "Tracy and her team really took care with how to best create a safe environment while still being therapeutic."

Finally, the client is taken to their private bedroom on the extended observation unit, where they'll spend the next 48 to 72 hours recuperating. There are four beds on the unit, each with their own bathroom. The bed frames are made of thick plastic, and the mattresses resemble those found in a bunk at an expensive camp. The walls are bare, but the rooms get a healthy dose of diffuse, natural light. Down the hall is a day room where warm meals are brought in three times a day. Ideally, EOU patients transfer to the west side of the center once their detainers have been lifted. On the crisis residential floor, clients move around more freely. The community area has a TV, numerous books, arts & crafts options, and a private phone booth area. Guests can ask a staff member to accompany them to the outside patio. The floor's 12 bedrooms remain separate, but the bathrooms are communal. In October when I visited, the space was decorated for Día de los Muertos.

The west side of Herman is less restrictive than the EOU, and features an open workstation for staff and nurses, which Abzug said is "beneficial" because it allows clients to more freely interact with a staff member when they have a need. On weekday mornings, Edward, the cook, can be heard chopping vegetables for that day's meals. A registered nurse and one licensed vocational nurse are on duty at all times, and counselors are on-site from 8am to 10pm. Case managers who help link clients to ongoing care are in house seven days a week, as are a handful of nurse practitioners. Through these channels, the Herman Center, which is located on the northeast corner of Montopolis and Ben White and named to honor Travis County Judge Guy Herman's commitment to improving the lives of residents living with mental health issues, works to resolve the client's crisis episode, creating a personalized recovery path and providing resources to prevent future crises.

## What a Crisis Looks Like

There's no cut-and-dried definition of what a crisis looks like. Wilson-Slocum called the term "subjective." Members of the Austin Police Department's Crisis Intervention Team said "it changes per individual – someone might not have a diagnosable mental health condition, but they may still be in crisis."

They should know: The Crisis Intervention Team is the one tasked with administering follow-up for each of the department's mental health calls. Pressed to provide a specific example of what a mental health crisis could look like, Senior Officer Jaime Von Seltmann cited a young adult, on their own for the first time, who gets their first flat tire while driving on MoPac. "That could be enough to send the person into full-blown crisis," she said.

Individuals also face repeated or chronic crises. "The aliens attack them nightly," explained CIT Sgt. Michael King. "These cases are the ones we deal with repeatedly. And they're the hard ones,

There's no cut-and-dried definition of what a crisis

because I don't know if we're ever going to be able to help them. We just do the best we can. What's happening to them – that's real. You have to remember that."

looks like.

Anyone can experience a mental health crisis. Wilson-Slocum said it's crucial for mental health professionals to convey this bit of information to law enforcement, paramedics, and civilians during mental health awareness and de-escalation trainings, which she frequently facilitates as part of Integral Care's services. But some folks are more prone to repeated crises; specifically those living with severe mental illness (like major depressive disorders, bipolar disorders, and schizophrenia disorders) or people with a long history of trauma, especially sexual trauma.

According to the National Alliance on Mental Illness (NAMI), nearly 10 million adults in the United States are currently living with severe mental illness. But 43.8 million Americans will experience a mental health issue in any given year. "Anyone can experience a mental health crisis," Wilson-Slocum reiterated, "and the likelihood that all of us experience one mental health crisis in our lifetime, I would say is very high."

In Austin on any given day, APD receives between 3,000 and 4,000 service calls. It's unclear how many of those are mental health cases (not everyone who calls makes clear that they're experiencing a mental health crisis while on the phone), but in 2016 alone the six officers and one sergeant comprising the Crisis Intervention Team received nearly 12,000 reports, 5,500 of which were emergency detainers. Up until August, when Integral Care opened the Herman Center's doors for the first time, those 5,500 folks likely suffering from a psychiatric crisis were taken to either a nearby emergency room, or a psychiatric hospital

---

SECTIONS        SEARCH                                           ADVERTISE      f    

NEWS    FOOD    MUSIC    SCREENS    ARTS    EVENTS    CLASSIFIEDS    SUPPORT US

Texas. Gros described his 47-bed ER as a "goldfish bowl" with no privacy. "That's the last thing you need when you're in an agitated state or having a psychotic break."

For years, Austin lacked intermediate intervention options, forcing first responders to choose between leaving an individual in a state of crisis within their community (if their symptoms fell short of ED standards) or taking them to a bustling and costly emergency room. Wilson compared the previous options to clothing sizes: "You had an extra large or an extra small, and just everyone had to wear it."

## Finding Red Flags

Von Seltmann has served on the Crisis Intervention Team for six years. In this line of work, she said, the phrase "it takes a village" gets taken seriously. Crisis intervention is about institutions working together, "because that's what it takes to get somebody healthy. If there's gaps, that's when we see someone relapse."

The Crisis Intervention Team was founded in 1999 as APD's response to intense media scrutiny after a series of officer-involved shootings ended the lives of several people living with mental health issues. The incidents sparked a realization at APD: Officers needed more robust guidance on how to de-escalate tense situations – and, more so, how to recognize when someone might have a mental health issue. Today, the unit's officers function primarily as secondary responders, by looking for "red flags" in patrol reports. These include signs of hoarding, someone who isn't getting out of bed or might not be eating or bathing, and erratic behavior. "If I have that gut feeling something's just not right," said Von Seltmann, she and her colleagues will make a house call to suss out what is happening, and how their unit can help.

The team also leads cadet trainings on mental health with the help of Integral Care and NAMI Austin. Though the state recently increased law enforcement's mental health training requirement from 16 hours

to 40, APD cadets have been receiving 40 hours for years, said King. Officers can additionally elect to take a weeklong mental health peace officer course through the Texas Commission on Law Enforcement.

State law grants all civil service officers the ability to issue emergency detainers, but APD has opted for a heightened level of selectivity. Only officers who've taken the additional training can write EDs, for which they receive a small stipend. Currently 162 of the 1,800 sworn officers are receiving the pay incentive, but King says that number does not reflect the numerous officers who've taken the training and promoted out of patrol or are no longer receiving additional pay.

Regardless, King attests that every cop at APD doubles as a CIT officer, because all of APD is trained in crisis intervention. He credits the department's commitment to the community and the intensive training cadets receive. "We train all our officers because it's not a matter of if they're going to come into contact with somebody who has a mental illness, it's a matter of when – in their shift," said Von Seltmann. Officer Rocky Reeves, who joined the team in September, seconds that sentiment. Some days, during his time spent on patrol, he said, "I would do nothing but mental health calls all day."

## It Takes a Village

Of the 12,000 reports the CIT received in 2016, 6,500 did not result in emergency detainment. Because those individuals are taken to a medical professional, it's these non-ED cases that make up the bulk of the unit's work. Some get cleared without much trouble. Others require greater community collaboration. According to Von Seltmann, a large portion of CIT's reports come from friends or family members who've grown worried about a loved one and don't know where else to turn. "They've been down this road before and they can see the train coming, but it hasn't really gotten to the level where we can intervene," she said. "It's a lot of, 'Okay, now what do we do?'"

Most of the time, they call MCOT, Integral Care's Mobile Crisis Outreach Team. The team is made up of two sections: one dispatched to calls through Integral Care's crisis hotline, and another that responds to first responders. They're master's-level clinicians trained to go into the community to treat a person in need of mental health services who is unable or unwilling to seek treatment on their own. While other cities rely on mobile teams, what sets Travis County's apart is its extended care. For each consumer, MCOT can follow up with counseling and medication services for up to 90 days, with the goal of connecting the client to long-term treatment. Wilson-Slocum said the practice "removes a lot of barriers and impediments to people seeking services on their own."


*Laura Wilson-Slocum (Photo by Jana Birchum)*

*"Most people experiencing a mental health crisis, even if they're on an emergency detention, can usually resolve the worst, most destabilizing part within 48 hours."*

*— Laura Wilson-Slocum, Integral Care*

MCOT was originally developed in 2006 to better serve people in crisis without interfering with law enforcement or paramedics, who Wilson-Slocum noted are "not mental health experts." As the county's mental health authority, Integral Care felt the team should be the first responders for mental health crises. MCOT grew in 2012 when the state approved additional funding. One year later, they began working with APD and responding to officers on patrol.

Because they're countywide, EMS, the Travis County Sheriff's Office, Lakeway Police, the Department of Public Safety, and TCSO administrators at the county jail can all request MCOT's services. Like the Herman Center, MCOT aims to release first responders within 10-15 minutes and succeeds 85-90% of the time. Julie Guirguis, an MCOT team lead, said each of the 33 full-time staff members (and one part-timer) responds to two to three calls a day, on average. For fiscal year 2017, they served 4,563 unduplicated individuals – not including repeat visits.

For Austin/Travis County EMS Division Chief Andy Hofmeister, MCOT was a welcome addition to the first responders' lineup, which he now refers to as the "trifecta." Until the mobile crisis team partnered with EMS in 2013, Hofmeister grappled with the lack of places to take individuals experiencing a mental health crisis – torn between leaving them in the community with little support, or taking them on an expensive ride to an ER despite there being no medical concerns. Hofmeister has been an advocate for more robust mental health services for years. In 2009, driven to better serve EMS "frequent users" (people who call EMS multiple times each month), he began the Community Health Paramedic Program. CHP works with repeat, low-priority callers to link them with ongoing care in order to reduce or eliminate their dependency on emergency services. Today, he also leads a paramedic's course on mental health first aid and is working toward incorporating additional mental health training for EMS staff.

## Intermediate Intervention

With the expansion of MCOT, a much needed gap in the county's continuum of care was filled. But it didn't solve the issue of where to take folks on emergency detention who don't require pricey ER stays or longer, more restrictive (and expensive) inpatient care. In 2013, in hope of sussing out a solution to this missing level of care, St. David's Foundation led a group of local mental health stakeholders on a field trip to Lufkin, Texas, for a visit to the Burke Center for mental health services. After studying their extended observation unit, stakeholders agreed the Lufkin model, from which the Herman Center is derived, would fill a critical gap in Travis County's local mental health safety net by offering an intermediate level of care in between MCOT and restrictive inpatient stays. Together, Integral Care, St. David's Foundation, and Central Health created the Herman Center. St. David's funds the standalone facility, and Central Health leased the land to Integral Care, which staffs and runs the space.

There are less than a dozen facilities like the Herman Center in Texas, and it's the county's first and only non-hospital setting that takes folks on emergency detention. Aside from those, Herman can also accept voluntary referrals from the mobile crisis teams and Integral Care's outpatient clinic Psychiatric Emergency Services, as well as voluntary and involuntary emergency room transfers. Incoming clients just have to meet Herman's criteria. Wilson-Slocum explained that because it's not a hospital, Herman cannot accept people with significant medical or wound care needs. Nor can patients be actively engaging in violent behavior. This is not for philosophical reasons, Wilson-Slocum told me. "We believe people engaging in violent behavior in crises deserve services just as much as anyone else." But logistically, Herman cannot administer restraints; those folks require a higher level of care. She also emphasized that most people experiencing a mental health crisis are not violent.

The philosophy behind Herman, said Wilson-Slocum, is that "most people experiencing a mental health crisis, even if they're on an emergency detention, can usually resolve the worst, most destabilizing part within 48 hours." This negates the need to send folks to a psychiatric hospital, which is more costly and more restrictive. Wilson-Slocum said consumers are unlikely to benefit from an ER stay due to lack of specialized care – though Gros did say that all three Travis County St. David's locations now use telepsychiatry, which allows those detained to video conference with a psychiatrist and start therapy immediately.

Because of Herman's relative newness to the county's continuum of care, stakeholders remain uncertain of the impact it will have. King, who's been vocal about his appreciation for Integral Care and its work, points to simple math: Herman's EOU (where EDs are taken) only holds four beds "when we're dealing with 5,500" clients. Gros said his ER has served approximately 200-250 ED patients each month for nearly half a decade. The difference now is that the stay is shorter. Previously, ED patients would stay at South Austin Medical for an average of four to seven days due to lack of resources. Now there's a much faster turnaround, with ED stays reduced to 24-48 hours before they're transferred. Von Seltmann said she's personally seen an uptick in hospital transfers to Herman. As of Nov. 1, Abzug said Herman only once had to turn someone away due to lack of beds.

## Sustained Recovery

The question now is whether Travis County's continuum of care is growing at the rate that's needed. CIT's numbers show a large jump in mental health reports made by officers in the last seven years – from 7,881 in 2010 to just shy of 12,000 in 2016. King and Reeves credit the majority of the increase to better officer training, but Gros isn't so sure. Regarding Herman's goal of clearing up emergency rooms, he said he hopes to see a decline in the number of EDs. But he added that as Austin continues its rapid growth, "we may actually be doing good to break even, and might actually avoid an increase."

But what happens to people after they leave Herman, and when MCOT's 90-day follow-up ends? One of the biggest challenges the center's staff face is creating a reliable discharge plan to keep clients on a track

Case 1:20-cv-00207-RP    Document 6-2    Filed 02/25/20    Page 58 of 82

How Austin Handles Mental Health Emergencies: Police, EMS, and Integr... to serve people in psychiatric crisis - News - The Austin Chronicle    6/2/18, 12:56 PM

to sustained recovery. Because Integral Care offers so many services, clients can smoothly access the outpatient clinic or MCOT. But because both of those methods only provide temporary aid, the goal is to link each client to ongoing care and medication. Staff help uninsured clients enroll in the Medical Access Program to cover medications and assist in setting up appointments and figuring out transportation.

Sometimes that's enough, but as King notes, it's still voluntary. With Herman's opening, Austin's front-end services have improved a great deal. But what CIT officers worry about is the lack of "back-end" services and long-term care. "We can do all the necessary steps, take them to the facilities, help them see the doctors, but there's no guarantee what's going to happen once they're released," said Reeves. "Because the long term, days where you put people in an institution forever, that's over." Asked if that wasn't a good thing, Von Seltmann spoke up: "I think that back then the pendulum was swung to where if someone breathed mental health, then they would throw them into an institution. Now the pendulum has swung the other way, and there's got to be a happy medium."

Whatever the solution, NAMI Austin Executive Director Karen Ranus believes Austin is moving in the right direction to support folks who experience mental health complications. "Here's the good news," she said. "Integral Care, NAMI, APD, the Sheriff's Office – we're all working together in ways we never have before. It's a mammoth, complex issue, but if we all work together and challenge each other sometimes, we're on the right track."

*Anyone in crisis can call Integral Care's 24/7 hotline (512/472-HELP) to speak with a qualified mental health professional. Walk-ins are also welcome at the Psychiatric Emergency Services clinic, 56 East Ave.*

*A version of this article appeared in print on December 15, 2017 with the headline:* **At Times of Crisis**

**A note to readers:** Bold and uncensored, *The Austin Chronicle* has been Austin's independent news source for over 36 years, expressing the community's political and environmental concerns and supporting its active cultural scene. Now more than ever, we need your support to continue supplying Austin with independent, free press. If real news is important to you, please consider making a donation of $5, $10 or whatever you can afford, to help keep our journalism on stands.

SUPPORT THE *CHRONICLE*  →

## READ MORE

MORE BY **SARAH MARLOFF**



### CodeNEXT Petition Authors Sue City...
Anti-rewrite group seeks judicial guidance on public vote

JUNE 1, 2018



### Queerbomb and Austin Black Pride Kick Off...
The city proves that pride has no limits

JUNE 1, 2018

**KEYWORDS** FOR THIS STORY

Guy Herman Center for Mental Health Crisis Care,
Judge Guy Herman Center for Mental Health Crisis Care, Laura Wilson, Jaime Von Seltmann,
Mobile Crisis Outreach Team, Integral Care

MORE IN THE ARCHIVES

How Austin Handles Mental Health Emergencies: Police, EMS, and Integr... to serve people in psychiatric crisis - News - The Austin Chronicle          6/2/18, 12:56 PM

**2 Comments**          The Austin Chronicle                                     Login ⌄

♡ Recommend  32          ⤴ Share                                  Sort by Best ⌄



Join the discussion…

LOG IN WITH          OR SIGN UP WITH DISQUS ⓘ

Name

**Joseph Meyer** · 6 months ago
From the article: "Today, the unit's officers function primarily as secondary responders, by looking for red flags in patrol reports." This suggests to me that the four members of the Austin Police Department's Crisis Intervention Team are not first-responders, only getting involved after a person in a mental health crisis has been approached by regular patrol officers who receive the basic 40 hours of mental health crisis training that is required by state law. Meanwhile in San Antonio, a city roughly 50% larger than Austin, a Mental Health Detail composed of ten specialized plain-clothes officers patrol the city in unmarked cars and attempts to serve as the first-responders for all mental health crisis calls. San Antonio's Restoration Center and Haven for Hope also provide greater space than what is available in Austin for stabilizing people in mental health crisis. Why is San Antonio's model not even mentioned in this article, when many consider it to be a gold standard for crisis intervention in the United States? For a city that likes to think of itself as very progressive, I think Austin can develop a better program than what is described in this article.

5    ⌃   ⌄   •  Reply  •  Share ›

 **JP** → Joseph Meyer · 6 months ago
"a city that likes to think of itself as very progressive"

Thinking about something is quite often better than doing it. :)

⌃   ⌄   •  Reply  •  Share ›

✉ Subscribe     ○ Add Disqus to your siteAdd DisqusAdd     🔒 Disqus' Privacy PolicyPrivacy PolicyPrivacy

Sponsored

How Austin Handles Mental Health Emergencies: Police, EMS, and Integr… to serve people in psychiatric crisis - News - The Austin Chronicle       6/2/18, 12:56 PM

Copyright © 1981-2018 Austin Chronicle Corp. All rights reserved.

CONTACT · PRIVACY POLICY · ADVERTISE WITH US · INTERNSHIPS & JOBS · SUPPORT US · SITE MAP



**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EDP INTERVENTION WITH CONTACT)**
**GO#  2018-890666**


EXHIBIT



Follow Up Report #   4 - NOT COMPLETED

and possibly lice crawling over here. Ofc. Von Seltmann was even bitten by one on her arm while holding Lupi. Myself and SPC Schwettmann decided to don full PPE suits, boots, and gloves in order to enter the house to secure the animals. We did not want to be bitten or become a host to the bugs that may be inside the residence. Also based on the strong smell of ammonia just from the front porch, we both donned respirator masks with special filters to filter out the ammonia in the air.

When we tried to open the front door, 3 dogs were there barking. Animal Control was able to open the front door slightly and used the catch pole to contain one of the red colored shepherd mixes (later given ID #A770275 named Ruby) and brought her outside while shutting the door to keep the other 2 dogs contained. Ruby appeared to be in bad health. She was missing fur on large portions of her body and also appeared geriatric. She was also a bit thin. The 2nd dog removed by the front door was a yellow shepherd mix (A770276 named Polar Bear). Polar Bear had a open wound on its muzzle and was a little thin. The 3rd dog removed through the front door was a blk/bro/whi shepherd mix dog (A770273 named Sheera). Sheera appeared unkempt but had lots of fur so it was hard to tell her overall condition. All 3 of these dogs were put on the Animal Control truck. Once it was determined there were no more aggressive dogs at the front door, entry was made into the residence to find the 4th dog that Lupi mentioned.

The house can only be described as a hoarder house. There was boxes and boxes of items and trash piled from floor to ceiling covering at least 80-90% of the space in the house. There was only a small pathway in between all of this stuff in order to move around from room to room. There was dust, dirt, and debris over everything. The kitchen was littered with trash on every surface and most of it covered in dust and dirt. The living room had 2 small mattresses lying on the ground and appears to be the sleeping area for the dogs and Lupi. Every surface was covered in hair and dirt. This living arrangement is not healthy for Lupi or the dogs. In the living room, we found one more dog lying on the mattress. The dog was the worst condition of the 4. It too was missing fur over half of its body and the areas of skin had turned gray and looked like elephant skin. The dog was very thin and you could see its ribs and hip bones protruding from its skin. Since the dog would not move, SPC Schwettmann picked up the dog and carried it to the truck. The dog was later assigned ID #A770274 and we had no name associated with this dog. We then searched the house for more animals. It appears the house is a 3 bed, 1 bath house. 2 of the bedrooms are used as cat rooms. Inside each room there was a large metal dog kennel with a litter box inside that were both full of feces and urine. The rooms smelled strongly of urine/ammonia. On each door was a sign indicating the name of the cat in each room. The rooms were also filled floor to ceiling with boxes and items barely had room to move around. I observed one blk/whi cat in one of the rooms but Animal Control was never able to catch it as it ran up into the plethora of boxes and hiding spots and without moving everything out of that room there was no way to find the cat. We saw no cat(s) in the other room. It was then that I made the decision to open a window on the back of the house leading into this one room where the blk/whi cat was observed. At this time we had no idea how long Lupi would be committed and she said she had no one in town to care for her animals. There was some water and food for the cat, so by opening the window the cat could at least come and go as needed and we didn't have to worry about it dying in that room if she ended up being committed for a long period of time. I was the one who made that decision and take full responsibility for that. Lupi would later tell me at the hospital that she has a total of 4 cats inside the house. She later asked if we had left the doors shut so the cats could not get out into the rest of the house and I told her no, that we opened all the doors so that way no cats would be trapped in one room. In the 3rd bedroom we were not able to enter because the room was filled from floor to ceiling with boxes, to the point that the door would only open about 1-1.5ft. I also left that door open in case there were any cats in there. Only the one window was left open. Video was taken of the house while I was walking around to document everything. It was then that we believed we had gotten all the dogs and had left access for any cats to get outside if needed. We found keys



**AUSTINCODE**
DEPARTMENT

# CITY OF AUSTIN
# CODE DEPARTMENT
# (ADMINISTRATIVE) CITATION

CITATION NUMBER  09630

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Lupi | Luisa | |

OWNER ADDRESS
6837  Auckland  DR

| CITY | STATE | ZIP |
|---|---|---|
| Austin | TX | 78749 |

| PHONE NUMBER | ZONING VIOLATION (CIRCLE ONE) |
|---|---|
| | YES      NO |

| VIOLATION DATE | VIOLATION TIME |
|---|---|
| 4-17-2018 | 2:16 Pm |

| VIOLATION ADDRESS | OCCURANCE NUMBER |
|---|---|
| 6837  Auckland  DR    Austin | ① 2   3+ |

| VIOLATION | CITY CODE |
|---|---|
| Accumulation of Rubbish or Garbage  IPMC 308.1 | 25-12-211 |

CODE OFFICER (PRINT)
Joseph Lucas

| CODE OFFICER (SIGNATURE) | OFFICER NUMBER |
|---|---|
| Josh Lucas | 6609 |

I ACKNOWLEDGE RECEIPT OF A COPY OF THIS ADMINISTRATIVE CITATION AND I UNDERSTAND THAT I MAY APPEAR AT THE ADMINISTRATIVE HEARING THAT WILL BE HELD AT THE AUSTIN CODE DEPARTMENT, 5202 E. BEN WHITE BLVD STE. 550, AUSTIN, TX 78741, ON THE SCHEDULED HEARING DATE IN ORDER TO ANSWER THE VIOLATION(S) LISTED ON THIS CITATION. THIS HEARING MAY BE RESET FOR CAUSE BY SUBMITTING A WRITTEN REQUEST TO ACDCRED@AUSTINTEXAS.GOV AT LEAST FIVE (5) DAYS PRIOR TO THE SCHEDULED HEARING DATE. ANY REQUESTS AFTER THE STATED TIME CONSTRAINT WILL NOT BE CONSIDERED. (SEE AUSTIN CITY CODE SECTION 2-13-21(I)).

RECONOZCO HABER RECIBIDO UNA COPIA DE ESTA CITACIÓN ADMINISTRATIVA, Y ENTIENDO QUE EXISTE LA POSIBILIDAD DE PRESENTARME EN UNA AUDIENCIA ADMINISTRATIVA QUE SE REALIZARA EN LA OFICINA DEL DEPARTAMENTO EN 5202 E. BEN WHITE BLVD. STE. 550, AUSTIN, TX 78741 EN LA FECHA ESTABLECIDA PARA LA AUDIENCIA PARA PROVEER UNA RESPUESTA ACERCA DE LAS VIOLACIONES LISTADAS EN ESTA CITACIÓN. LA AUDIENCIA PUEDE SER REINICIADA POR CAUSA AL ENVIAR UNA SOLICITUD ESCRITA A ACDCRED@AUSTINTEXAS.GOV POR LO MENOS CINCO (5) DÍAS ANTES DE LA FECHA DE LA AUDIENCIA PROGRAMADA. SOLICITUDES RECIBIDAS DESPUÉS DEL TIEMPO ESTABLECIDO NO SERÁN CONSIDERADAS (VEA EL CÓDIGO DE LA CUIDAD DE AUSTIN SECCIÓN 2-13-21(I)).

SIGNATURE/FIRMA

Posted      2-12-2012

SIGNING THIS CITATION IS NOT AN ADMISSION OF LIABILITY.
FIRMAR ESTA CITACIÓN NO ES UNA ADMISIÓN DE RESPONSABILIDAD.



EXHIBIT
P

## PAYMENT INFORMATION | INFORMACIÓN DE PAGO

| | |
|---|---|
| **AUSTIN CODE DEPARTMENT:**<br>5202 E. Ben White Blvd. Ste. 550<br>Austin, TX 78741<br>Hours: Monday - Friday: 9 am – 4 pm<br>**Hearing Coordinator: 512-974-8547** | **PAYMENT**<br>**Make checks/money orders payable to:**<br>City of Austin Code Department, Finance<br>**Mailing Address:**<br>Austin Code Department<br>P.O. Box 1088 Austin, TX 78767 |

| CITY CODE | VIOLATION |
|---|---|
| 10-5-21 | Unsanitary Conditions |
| 25-11-32 | Work Without Permit (Commercial) |
| 25-12-241 | Work Without Permit (Residential) |
| 25-2-794 | General Requirements for Short-Term Rentals |
| 25-2-795 | Occupancy Limits for Short-Term Rentals |
| 25-12-211 | Property Maintenance Code - All International Property Maintenance Code (IPMC) Violations including Work Without Permit (Previous Activity) |

YOU HAVE THE RIGHT TO A HEARING, WHICH WILL BE LOCATED AT 5202 E. BEN WHITE BLVD STE. 550 AUSTIN, TX 78741. HEARINGS START AT 9:00 AM AND 1:00 PM AND ARE HEARD ON A FIRST COME FIRST SERVED BASIS. THE DATE OF YOUR HEARING WILL BE IDENTIFIED ON THE NOTICE OF HEARING, WHICH WILL BE MAILED AND POSTED AT THE TEXAS CENTRAL APPRAISAL DISTRICT (TCAD) ADDRESS OF RECORD TEN (10) CALENDAR DAYS BEFORE THE HEARING. FAILURE TO TIMELY APPEAR AT THE TIME AND PLACE OF THE SCHEDULED HEARING IS CONSIDERED AN ADMISSION OF LIABILITY FOR THE VIOLATION CHARGED AND A PENALTY WILL BE ASSESSED (SECTION 2-13-22). IN ADDITION, SHOULD THE VIOLATOR NOT APPEAR AT THE SCHEDULED HEARING, THE VIOLATOR IS NOT ENTITLED TO AN APPEAL HEARING (SECTION 2-13-31(B)).

FOR ZONING VIOLATIONS, A **MAIL-IN-PENALTY** OPTION OF $500.00 IS AVAILABLE TO RESOLVE THIS CITATION FOR THE FIRST OFFENSE, $750.00 FOR THE SECOND OFFENSE AND $1000.00 FOR EVERY OFFENSE THEREAFTER.
FOR NON-ZONING VIOLATIONS, A **MAIL-IN-PENALTY** OPTION OF $250.00 IS AVAILABLE TO RESOLVE THIS CITATION FOR THE FIRST OFFENSE, $500.00 FOR THE SECOND OFFENSE AND $750.00 FOR EVERY OFFENSE THEREAFTER.
THE PAYMENT MUST BE RECEIVED WITHIN TEN (10) DAYS FROM THE DATE OF THE CITATION, AND MUST REFERENCE THE CITATION NUMBER ON THE SUBMITTED PAYMENT. UNDER THIS OPTION THE VIOLATOR IS NOT REQUIRED TO APPEAR FOR THE HEARING BUT IS REQUIRED TO REACH COMPLIANCE TO AVOID FURTHER ENFORCEMENT.

USTED TIENE EL DERECHO A UNA AUDIENCIA LA CUAL ESTÁ UBICADA EN 5202 E. BEN WHITE BLVD STE. 550 AUSTIN, TX 78741. LAS AUDIENCIAS EMPIEZAN A LAS 9:00 AM Y A LA 1:00 PM Y SERÁN RECIBIDOS CON UN SISTEMA POR ORDEN DE LLEGADA. LA FECHA DE SU AUDIENCIA SERÁ IDENTIFICADA EN UNA CARTA CERTIFICADA QUE SE LE ENVIARÁ A LA DIRECCIÓN ACTUAL DEL PROPIETARIO DE ACUERDO A LA PROPIEDAD GRABADA POR EL CONDADO DIEZ (10) DÍAS ANTES DE SU AUDIENCIA. LA FALTA DE SU PRESENCIA EN EL MOMENTO Y EL LUGAR DE LA AUDIENCIA SE CONSIDERARÁ UNA ADMISIÓN DE RESPONSABILIDAD POR LA OFENSA ACUSADA Y SE LE DARÁ UNA PENALIDAD (SECCIÓN 2-13-22). ADEMÁS, SI LA PERSONA A LA CUAL SE LE ACUSA LA INFRACCIÓN NO COMPARECE EN LA FECHA ESTABLECIDA PARA LA AUDIENCIA, LA PERSONA NO TIENE EL DERECHO DE APELAR LA AUDIENCIA (SECCIÓN 2-13-31(B)).

PARA VIOLACIONES DEL CÓDIGO DE ZONAS, EXISTE UNA OPCIÓN DE PENALIZACION POR CORREO DE $500.00 **PARA RESOLVER ESTA CITACIÓN.** POR LA PRIMERA OFENSA, $750.00 PARA LA SEGUNDA OFENSA; Y $1000.00 POR CADA VIOLACIÓN SIGUIENTE.
PARA LAS VIOLACIONES QUE NO ESTÁN RELACIONADAS CON EL CÓDIGO DE ZONAS, EXISTE UNA OPCIÓN DE PENALIZACIÓN POR CORREO DE $250.00 **POR LA PRIMERA OFENSA;** $500.00 PARA LA SEGUNDA OFENSA; Y $750.00 POR CADA VIOLACIÓN SIGUIENTE.
EL PAGO SE DEBE RECIBIDO DIEZ (10) DÍAS APARTIR DE LA FECHA DE LA CITACIÓN Y DEBE REFERIRSE EL NÚMERO DE CITACIÓN EN EL PAGO ENVIADO. BAJO ESTA OPCIÓN, EL INFRACTOR NO ESTÁ OBLIGADO A PRESENTARSE A LA AUDIENCIA, PERO SI SE REQUIERE QUE CUMPLA LOS REQUISITOS ESTABLECIDOS PARA EVITAR MULTAS ADICIONALES.

FOR CITY CODE CHAPTER 2-13 (ADMINSTRATIVE AJUDICATION OF VIOLATIONS) AS A USEFUL REFERENCE.
PLEASE VISIT THE ONLINE LINK
(https://library.municode.com/tx/austin/codes/code_of_ordinances?nodeId=TIT2AD_CH2-13ADADVI)

POR EL CÓDIGO DE LA CIUDAD CAPÍTULO 2-13 (ADJUDICACIÓN ADMINSTRATIVA DE VIOLACIONES) COMO REFERENCIA ÚTIL.
POR FAVOR VISÍTE EL ENLACE EN LÍNEA
(https://library.municode.com/tx/austin/codes/code_of_ordinances?nodeId=TIT2AD_CH2-13ADADVI)

The City of Austin complies with the Americans with Disabilities Act, as amended. To request a sign language interpreter at the hearing, ensure mobility access to the meeting room, or request alternates to print format, i.e., Braille, large print, contact the ADA office at (512) 974-3256. If you require translation services or accommodations at the hearing, contact The Hearing Coordinator at (512) 974-8547 or email ACDCRED@AUSTINTEXAS.GOV. Please make any requests no later than two days prior to the hearing.

La Ciudad de Austin sigue La Ley de Estadounidenses con Discapacidades (ADA, por sus siglas en inglés), en su forma enmendada. Si usted necesita un intérprete de lenguaje por señas que esté presente en la audiencia, o si necesita asegurar acceso de movilidad en el cuarto, o para solicitar alternativas al formato de impresión (por ejemplo, Braille o caracteres grandes) comuníquese con la oficina de ADA al 512-974-3256. Si requiere un intérprete en otro idioma en la audiencia o acomodaciónes especiales, comuníquese con Hearing Coordinator al 512-974-8547 o ACDCRED@AUSTINTEXAS.GOV. Por favor haga sus solicitudes no más tarde de dos días antes de la audiencia.



**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EMERGENCY DETENTION)**
**GO#  2018-1070418**



EXHIBIT

Q



## AUSTIN POLICE DEPARTMENT
### GENERAL OFFENSE HARDCOPY
#### (EMERGENCY DETENTION)

GO# 2018-1070418
NOT APPROVED

## Related Text Page(s)

| | |
|---|---|
| **Document** | SUPPLEMENTS |
| **Author** | AP7219 - REEVES, ROCKY |
| **Subject** | CIT SUPP |
| **Related Date/Time** | APR-17-2018 (TUE.) 1312 |

On 4/17/2018 I Officer Reeves #7219 a member of the crisis intervention team assisted Officer Von Seltmann at 6837 Auckland Dr at 0930am. Adult protective services, code compliance, animal control, and EMS were all out there assisting as well. Officer Von Seltmann and I made contact with the resident female identified as

Lupi, Luisa W/F

upon walking up to the front door I could right away smell a strong urine/ammonia smell coming from the house. Also I observed a camera pointed at us as well. The female resident Luisa opened the door and I observed that she was very thin (appeared malnutritioned possibly). We could hear numerous animals inside the home barking as well. Officer Von Seltmann began to speak with Luisa about why we were there and Luisa, right away became apprehensive and began to go back inside. Due to the information provided to us by APS and past police reports about Luisa's health and living conditions, and with the condition we observed her in today she was placed under emergency detention. Officer Von Seltmann and I each held onto Luisa's wrist ( I had right wrist) and walked her out onto the driveway. Luisa was not actively pulling away but kept spinning her wrist while I was holding it. She ask me to loosen my grip which was not tight as she was able to spin her wrist, I loosened it even more. Handcuffs were not used and Luisa was escorted over to our police unit without any problems where we let her speak to her sister on the phone at her request.

Luisa had her sister on speaker phone and kept agitating the situation by telling Luisa to not answer any questions and refuse everything. She also told me that her sister needed a lawyer. I explained to both of them that Luisa was not in any way in trouble and no crime had been committed, and that we were there to get Luisa help. I attempted to explain to Luisa and her sister what a emergency detention was but her sister kept saying there was nothing wrong with the conditions. Animal control advised that at least one dog inside the house had mange and it appeared that Luisa was sleeping on a mattress with the dogs which was on the floor. Animal feces and potential hoarding were also noted by Officer Vonseltmann. Animal control wore full hazmat suits with mask to go inside the residence.

Luisa rode with EMS to Seton Main and I followed. Once there I provided Officer Vonseltmann's emergency detention form to the nurse in charge. Our supervisor Sgt. King was briefed on the situation as well.

See initial report for more information.

NOI

THE STATE OF TEXAS       X       IN THE JUSTICE COURT,
COUNTY OF TRAVIS       X       PRECINCT 5,
                     X       TRAVIS COUNTY, TEXAS

## AFFIDAVIT FOR SEIZURE OF ANIMALS

The undersigned affiant, being a peace officer under the laws of the State of Texas and being duly sworn, on oath makes the following statements and accusations for legal seizure under Statute 821.022 of the Health and Safety Code.

**Seizure is requested of:**     A770273 – tri colored shepherd mix
                                 A770274 – red shepherd mix
                                 A770275 – red shepherd mix named Ruby
                                 A770276 – yellow shepherd mix named Polar Bear

**Located at:** 6837 Auckland Dr., Austin, Travis County, Texas

Based on information contained in Austin Police report numbers ████████, ████████, and observations made by affiant, to wit:

On March 30, 2018, Austin Police were called out to 6837 Auckland Dr. in response to a check welfare type call. The caller stated she was calling on behalf of several neighbors that were concerned about a Luisa Lupi at the above address. The caller advised that Lupi use to have a caretaker that moved out about 8 months ago and that no one has been coming by to care for Lupi since. The caller advised that Lupi appeared to be intellectually challenged and was unable to care for herself due to her mental disabilities. The caller advised that the trash had not been put out for months, that they have not seen Lupi bringing any food into the house, and that they are worried because Lupi is very thin. The neighbors can smell a foul odor emanating from the house. They believe Lupi is a hoarder and living in unsanitary conditions.

Officers arrived on scene and met with Lupi (who quickly came outside and would not let officers see into the house). They advised that the house smelled strongly of urine and feces when she opened the door. They also advised Lupi was very thin and frail and that her clothing was soiled and smelled. They also noticed she had what appeared to be lice in her hair. Lupi got her sister on the phone while officers were on scene and the sister did most of the talking. The sister advised that Lupi was just fine and that she was taken care of. Neither the sister nor Lupi were very cooperative with providing information.

Officers then spoke to a neighbor who advised that she has seen 2 dogs at the Lupi house and that one is very skinny and the other had a sore on its face. The officers contact Adult Protective Services (APS) who scheduled future follow ups. The officers then left the scene.

After reviewing this report, your affiant made contact with the APD Crisis Intervention Team (CIT). They advised that they had planned a home visit with Lupi on April 17, 2018. They planned to have code enforcement, EMS, APS, and your affiant (Animal Cruelty Unit) meet with Lupi as a team and assess her mental condition as well as the condition of the house and any animals she may have. Once on scene, the CIT met with Lupi and determined that she was a danger to herself based on what they observed and they completed and emergency detention on Lupi in order to have her mentally evaluated. Lupi was then transported to the hospital. Lupi stated that she had several animals inside that needed to be cared for so your affiant, along with Animal Control, entered the house. Inside the house, 4 dogs were found. The two red colored dogs had very

Det. Tim Diven #4417                      Page 1 of 4                 APD Report: ████████ /



EXHIBIT
B

bad mange/allergies to where the fur was missing on over half their bodies. One of them was very thin and would not get up and walk and had to be carried to the truck. Both dogs were older and appeared in very bad condition. There was also a tri-colored medium sized dog that appeared generally healthy compared to the other two. There was also a yellow large mixed breed dog that had a large sore on its face. All the dogs were seized and transported to the Austin Animal Center, where they are currently undergoing tests and cruelty exams.

The inside of the house was a typical hoarder house. The smell of ammonia was very strong to the point that several entities, including your affiant, wore a respirator. Your affiant also donned a hazmat suit as Lupi was covered in bugs. There was trash, debris, and belongings stacked floor to ceiling in all corners of the house. There was a small walkway space available to get around the entire house, with items stacked everywhere else. Lupi appeared to be sleeping on the floor in the living room with her 4 dogs as there was nowhere else in the entire house to lay. She had one bedroom so full of boxes to the ceiling that you could not even open the door to the room. Her other 2 bedrooms were converted into cat rooms. Only one black/white cat was observed in one of the rooms but Animal Control was unable to catch it as it hid amongst the many boxes in the room. A window was opened in that room to allow the cat to get in and out as necessary to survive.

It is your affiant's belief that these animals were cruelly treated by Lupi, as she can barely care for herself, let alone these animals. It is unknown if/when any of these animals were last seen by a veterinarian and 2 of the 4 dogs were in really bad condition. It is unknown at this time the outcome of these animals until fully examined by the veterinarians at the AAC.

Wherefore, affiant requests a Warrant for Seizure of Animals be issued to protect the life of this animal and whereas care can be given by the Austin Animal Center, located at 7201 Levander Loop, in Austin, Travis County, Texas.

SWORN AND SUBSCRIBED TO before me by the said Affiant, on April 17, 2018

_____    _____
Affiant: Detective Tim Diven    MAGISTRATE, JUSTICE COURT 5, TRAVIS COUNTY, TEXAS

On this the 17th day of April, 2018, I hereby acknowledge I have examined the foregoing affidavit and have determined that probable cause does exist for the issuance of a warrant of Seizure of the above mentioned animal.

_____
MAGISTRATE, JUSTICE COURT 5, TRAVIS COUNTY, TEXAS





**AUSTIN POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**(EMERGENCY DETENTION)**
**GO#  2018-1070418**



EXHIBIT

*S*



## AUSTIN POLICE DEPARTMENT
### GENERAL OFFENSE HARDCOPY
#### (EMERGENCY DETENTION)

GO# 2018-1070418
**NOT APPROVED**

Follow Up Report #   1

## Follow Up Report  # 1

### ASSIGNMENT INFORMATION

| | |
|---|---|
| **Assigned To** | AP7219 - REEVES, ROCKY |
| **Capacity** | SUPPLEMENTAL |
| **Assigned On** | APR-17-2018  (TUE.) 1311 |
| **Report Due On** | APR-17-2018  (TUE.) |

**Org Unit** CRISIS INTERVENTION TEAM
**By** AP7219 -  REEVES, ROCKY

### SUBMISSION INFORMATION

**Submitted On** APR-17-2018  (TUE.) 1311
**Checked By** AP4127 -  KING, MICHAEL LEWIS
**Approved On** APR-17-2018  (TUE.)        **By** AP4127 -  KING, MICHAEL LEWIS

### FOLLOW UP CONCLUSION

**Follow Up Concluded** YES

Cause Number $\underline{JS-AD-18-001957}$

# WARRANT FOR SEIZURE OF ANIMALS

| THE STATE OF TEXAS | X | IN THE JUSTICE COURT, |
| COUNTY OF TRAVIS | X | PRECINCT 5, |
| | X | TRAVIS COUNTY, TEXAS |

### THE STATE OF TEXAS
### TO ANY PEACE OFFICER OF THE STATE OF TEXAS, GREETINGS:

#### You are hereby commanded to:

**Enter the property located at:** 6837 Auckland Dr., in Austin, Travis County, Texas.

**And seize the following animal(s):** A770273 – tri color shepherd mix
A770274 – red shepherd mix
A770275 – red shepherd mix named Ruby
A770276 – yellow shepherd mix named Polar Bear

And cause said animals to be impounded at the Austin Animal Center at 7201 Levander Loop, Austin, Texas, pending a hearing to determine whether the animals have been cruelly treated.

HEREIN FAIL NOT but of this writ make due return, showing that you have executed the same. WITNESS my official signature, this the 17th day of April, 2018.

MAGISTRATE, JUSTICE COURT 5, TRAVIS COUNTY, TEXAS

**PEACE OFFICER'S RETURN:**

Came at hand the 17th day of April , A.D., 2018 , at 1420 o'clock P M. and executed on the 17th day of April , A.D., 2018, at 1500 o'clock P M. by T. Diven #4417 , for the purpose herein stated.

RECEIVED JP FIVE TRAVIS COUNTY 2018 APR 19 PM 4:27

---

Det. Tim Diven #4417        Page 3 of 4        APD Report:



EXHIBIT
T



RIGHT LATERAL



possible hyperplasia

small "cheese cyst"

black skin tag



EXHIBIT
U



# AUSTIN POLICE DEPARTMENT
## GENERAL OFFENSE HARDCOPY
## (EMERGENCY DETENTION)
## GO#  2018-1070418





## AUSTIN POLICE DEPARTMENT
### GENERAL OFFENSE HARDCOPY
#### (EMERGENCY DETENTION)

GO# 2018-1070418
NOT APPROVED

## Related Text Page(s)

| | |
|---|---|
| **Document** | INITIAL REPORT |
| **Author** | AP5984 - VON SELTMANN, JAIME |
| **Subject** | CIT UNIT EMERGENCY DETENTION |
| **Related Date/Time** | APR-17-2018  (TUE.) 1228 |

On 04/17/18, I conducted a home visit with the subject:

Luisa Lupi W/F 05/09/74

I am assigned as a follow-up investigator to a related case #18-1070418 in which several neighbors called police concerned for Luisa's welfare. Neighbor and witness:

McKeena Kuhr

reported that Luisa had been living in the home for eight or nine months. Kuhr had been involved in the family's estate in the summer of 2017 and said that Luisa's sister, Eva, was supposed to be her guardian but moved to California. Several neighbors had been calling Kuhr concerned for Luisa because they did not see anyone leave or exit the home for a prolonged period of time. It did not appear trash was being taken out of the residence and it did not appear that Luisa was getting any food. When officers made contact with Luisa under the above case number, they observed that Luisa appeared severely malnourished, had lice in her hair, was wearing soiled clothes that smelled of urine that were filthy and covered in dog hair. Luisa was very careful not to let the officer's see into the home at the time and had a large camera poised in the window by the door. Neighbors were also concerned for several dogs that appeared to be malnourished and in bad health that lived with Luisa. Luisa was reported to have a hoarding behavior that extended to her backyard. Adult Protective Services was contacted and started their own investigation. I contacted APS Supervisor, Rebecca Craig, and spoke to her about Luisa. She advised me that her case worker, Tiffany Sellers, had been to the home on two separate occasions and Luisa was refusing to open the door. Due to the concerns of Luisa's welfare, the multiple reports from the neighbors about Luisa obviously having some sort of mental health issues, her inability to care for basic needs to include hygiene and nutrition, the officers observations of Luisa's health and appearance in the above report, the report of the malnourished dogs, I conducted a home visit in coordination with Code Enforcement, the Animal Cruelty Unit, the Community Health Paramedic Program, and Adult Protective Services.

Upon walking up to the front door residence myself and Code Enforcement Officer Horn smelled the distinct odor of urine coming from the house. There was a large camera lens pointing towards the front door through the blinds in a window by the door. We could hear several dogs barking. Officer Horn knocked on the door and we could hear Luisa yelling saying that she would come to the door but needed a few minutes. From the info provided in the previous report, I expected that she was trying to call her sister, Eva. She eventually opened the door and quickly shut the door behind her. She was immediately apprehensive with our presence and turned as if she was going to go back inside the residence. Officer Reeves and myself grabbed her by her arms to keep her from going back inside. She appeared to be extremely thin and frail, she was wearing a filthy over sized sweatshirt covered in dog hair that smelled of urine, her hair was dirty and unkempt and it



## AUSTIN POLICE DEPARTMENT
### GENERAL OFFENSE HARDCOPY
#### (EMERGENCY DETENTION)

GO# 2018-1070418
NOT APPROVED

appeared that she might have lice. Due to the above information, her paranoid demeanor, and her deteriorated physical appearance, I believed that her mental health had declined to the point that she was not capable of making safe and rational decisions and I made the decision to place Luisa under an Emergency Detention for Deterioration. Luisa was uncooperative and paranoid. Immediately she called her sister on the phone. I explained to her that she was being placed under the Emergency Detention and notified her that she was needed to come with me to the hospital. We escorted her to our patrol car, I held onto her left wrist and Officer Reeves held onto her right wrist. She kept twisting her hands around trying to get out of our grasp and asked Officer Reeves to loosen his grip because it was hurting her (handcuffs were never applied). She had no visible injury to her wrist. I explained to her that she was on a temporary hold (Emergency Detention) and that we were simply trying to get her to a doctor to be evaluated further. I also explained this to the sister via the phone. She sat in the back of our car with the door open talking to her sister on her cell phone. At one point Officer Reeves used Luisa's cell phone to speak with the sister. Her sister appeared to just be agitating the situation by instructing Luisa not to cooperate. An EMS unit arrived and I attempted to walk Luisa to the back of the unit. She was very hesitant and refused to cooperate with them at all until she got her phone back. Officer Reeves told her sister that Luisa was going to be transported by EMS to Seton Main Hospital. The phone was giving back to Luisa and EMS left the scene. Officer Reeves responded to the hospital and gave them my completed ED paperwork (I had to stay at the residence to secure the home).

Animal Cruelty removed four dogs from the home. All of them appeared malnourished and ==two of the dogs appeared to have severe cases of mange.== Additionally, two cats were located in a bedroom one of which Animal Control was able to catch. They opened a window for the other cat to leave. When I walked in the home there was a foul odor of urine emanating through out the residence. There was a small walking path cleared throughout the house, on either side of the path there was furniture, garbage, and various items piled up to the ceiling. Dog hair, feces, and dirt covered the floor and there were two mattresses with filthy sheets and blankets laying on the living room floor where it appeared she had been sleeping. There were piles of papers, items, and garbage on nearly ever surface of the home. She had a large TV screen monitoring five cameras set up around her premises. One of the bedrooms appeared to be the "cat" room as there were a couple of cats and the distinct odor of cat urine coming from the room. The other bedroom had so many items piled in it that the door could not be fully opened. I checked her refrigerator and observed several hardboiled and eggs and a couple dozen containers of raw eggs and well as multiple bottles of tomato sauce, some half eaten others full. I was able to locate a set of keys to the residence and once Code Enforcement, Animal Control, and Animal Cruelty were finished, I was able to lock front and back doors. I then responded to Seton Main Hospital where Luisa had been transported and gave them to Tami, the ER social worker. The ED paperwork was given to the social worker. The decision of whether or not to transfer her to a mental health treatment facility lies with the doctor and medical staff.

NOI
JVS #5984

















# City of Austin

P.O. Box 1088, Austin, TX, 78767



**NOTICE OF VIOLATION**
Case Number: CV-2018-071401
via Certified Mail #7014 2870 0000 3273 6738

January 13, 2020

LUPI LUISA
6837 AUCKLAND DR
AUSTIN, TX 78749-4139

RE:     6837  AUCKLAND DR  AUSTIN TX 78749
        Locally known as 6837  AUCKLAND DR  AUSTIN TX 78749
        Legally described as LOT 10 BLK I CIRCLE C RANCH PHS A SEC 4
        Zoned as I-SF-2
        Parcel Number 0416402107

Dear LUPI LUISA:

The City of Austin Code Department investigated the property described above. Austin City Code violations were found that require your immediate attention. A description of the violation(s) and compliance timeframe(s) are provided in the attached violation report.

After receipt of this Notice, and until compliance is attained, the Austin City Code prohibits the sale, lease, or transfer of this property unless:

- You provide the buyer, lessee, or other transferee a copy of this Notice of Violation; and
- You provide the name and address of the buyer, lessee, or other transferee to the Code Official.

For additional information, I can be reached at 512-974-6561 or Joseph.Lucas@austintexas.gov. Please reference **case number** CV-2018-071401. Hours of operation are: Monday – Friday, 7:30 a.m. - 4:00 p.m.  If I am unavailable, contact the Code Connect line at (512) 974-CODE (2633) or codeconnect@austintexas.gov.

Para obtener más información, llame al 512-974-6561 o enviar un correo electrónico a Joseph.Lucas@austintexas.gov. Por favor, consulte **caso número** CV-2018-071401. El horario de atención es: lunes a viernes, 7:30 a.m. - 4:00 p.m.  Si no estoy disponible, comuníquese con Code Connect marcando al (512) 974-CODE (2633) o por correo electrónico codeconnect@austintexas.gov.

Sincerely,

Joseph Lucas, Inspector C
City of Austin Code Department



FOR CODE QUESTIONS, CONTACT:
512.974.CODE (2633)
CODECONNECT@AUSTINTEXAS.GOV
MONDAY - FRIDAY 8:00 AM - 4:00 PM



EXHIBIT
X

## VIOLATION REPORT

**Date of Notice:**          **January 13, 2020**

**Code Officer:**            **Joseph Lucas**
**Case Number:**             **CV-2018-071401**
**Property Address:**        6837  AUCKLAND DR  AUSTIN TX 78749
                             Locally known as 6837  AUCKLAND DR  AUSTIN TX 78749
                             Zoned as I-SF-2

The items listed below are violations of the Austin City Code, and require your immediate attention. If the violations are not brought into compliance within the timeframes listed in this report, enforcement action may be taken.  Timeframes start from the Date of Notice.

## Violation Type: **STRUCTURE MAINTENANCE**

Austin City Code Section: Accumulation of rubbish or garbage (§308.1)
Description of Violation: All exterior property and premises, and the interior of every structure, shall be free from any accumulation of rubbish or garbage.
Date Observed: 04/17/2018
Timeframe to Comply: 7 Day(s)
Recommended Resolution: Please remove all accumulation at the property.  This includes trash, debris, unsightly and objectionable matter.

Austin City Code Section: General (§305.1)
Description of Violation: The interior of a structure and equipment therein shall be maintained in good repair, structurally sound and in a sanitary condition.
Date Observed: 04/17/2018
Timeframe to Comply: 7 Day(s)
Recommended Resolution: Please remove all fecal matter and urine from the interior of the structure.

**Notes:** If the corrective action requires a permit or demolition, please contact the Development Services Department at 311. You can also visit http://www.austintexas.gov/department/development-services for more information.

**In order to close the above code violation(s), an inspection will need to be conducted. Please contact Austin Code Department Officer Joseph Lucas at 512-974-6561 or Joseph.Lucas@austintexas.gov to schedule an inspection.**

**Si no puede leer esta notificación en inglés, pida una traducción en español.**
**Appeal:** Any structure maintenance issue indicated in this report may be appealed to the Building and Standards Commission. The appeal must be filed no later than **20 days** after the date of this notice and contain **all** of the following information:

- a brief statement as to why the violation is being appealed
- any facts that support the appeal
- a description of the relief sought
- the reasons why the appealed notice or action should be reversed, changed, or set aside
- the name and address of the appellant

An appeal may be delivered in person to our office located at 5202 E. Ben White Blvd.  Unit 5, Suite 550, Austin, TX 78741 or mailed to: **Building and Standards Commission, c/o Austin Code Department, P.O. Box 1088 Austin, Texas 78767.**



# SAFE & SOUND
## ⚠ WITH AUSTIN CODE ⚠

To report a potential code violation:
### CALL 3-1-1

## What does a code inspector check for?

### DANGEROUS STRUCTURES



- Abandoned Buildings
- Open & Accessible Buildings
- Severely Damaged
  - Roofs
  - Wall Cracks
  - Cracked Foundations

CALL 3-1-1

### SUBSTANDARD CONDITIONS



- Water Leaks
- Lack of Hot Water
- Exposed Electrical Wiring
- Broken Windows
- Doors or Windows That Won't Open

ACKNOWLEDGE • ASSESS • ACT

### FIRE-DAMAGED BUILDINGS



- Broken Glass
- Unsure Footing
- Possible Collapse
- Exposed Electrical Wires
- Potential Gas Leaks
- Water Pipe Damage

RESPECT THE TAPE



AUSTINCODE
DEPARTMENT
The Austin Code Education and Outreach Division



## ¿Que verifica un inspector de codigo?

### ESTRUCTURAS PELIGROSAS



- **Edificios abandonados**
- **Edificios abiertos y accesibles**
- **Daños graves a:**
  - **Techos**
- **Grietas en la pared**
- **Fundaciones agrietadas**

**LLAME AL 3-1-1**

### CONDICIONES DE SUBSISTENCIA



- **Fugas de agua**
- **Falta de agua caliente**
- **Cables eléctricos expuestos**
- **Ventanas rotas**
- **Puertas o ventanas que no abren**

**RECONOZCA • EVALUE • ACTUE!**

### EDIFICIOS DAÑADOS POR FUEGO



- **Vidrios quebrados**
- **Paso inseguro**
- **Posible colapso**
- **Cables eléctricos expuestos**
- **Posibles fugas de gas**
- **Daño en la tubería de agua**

**RESPETE LA CINTA!**



La División de Educación y Alcance del Código de Austin

## RE: Auckland

**Lucas, Joseph <Joseph.Lucas@austintexas.gov>**
Tue 1/21/2020 5:04 PM
**To:** J P <atl.63@hotmail.com>

The posted notice is the same Notice of Violation that was originally issued back on April 17 of 2018, when this case was opened. The Notice expires after a year so I had to regenerate a new one.

The violations were as follows:
Austin City Code Section: Accumulation of rubbish or garbage (§308.1)
Description of Violation: All exterior property and premises, and the interior of every structure, shall be free from any accumulation of rubbish or garbage.
Date Observed: 04/17/2018
Timeframe to Comply: 7 Day(s)
Recommended Resolution: Please remove all accumulation at the property. This includes trash, debris, unsightly and objectionable matter.

Austin City Code Section: General (§305.1)
Description of Violation: The interior of a structure and equipment therein shall be maintained in good repair, structurally sound and in a sanitary condition.
Date Observed: 04/17/2018
Timeframe to Comply: 7 Day(s)
Recommended Resolution: Please remove all fecal matter and urine from the interior of the structure.

I have taken this case to the top of my chain of command. I am being advised to repost the property and at the conclusion of the 7 days, issue a citation for the offenses so we can get it into the legal process. This case has been open way too long and your family refuses to cooperate with the violation. All we asked for Code was to clean up the property inside and out then let us see that is has been done.

I have not been able to verify it is no longer in violation so we will file the case and take it to a judge. We do have photos from the day in question to prove the case.



**Joseph Lucas**
*Inspector*

City of Austin, Code Department

P: 512-974-6561 | E: joseph.lucas@austintexas.gov

*"Preserving Austin's Quality of Life"*

**From:** J P [mailto:atl.63@hotmail.com]
**Sent:** Tuesday, January 21, 2020 3:04 PM
**To:** Lucas, Joseph <Joseph.Lucas@austintexas.gov>
**Subject:** Re: Auckland