IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LUISA LUPI and EVA LUPI, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:20-CV-207-RP |
| | § | |
| TIMOTHY DIVEN, JAIME VON SELTMANN, ROCKY REEVES, MICHAEL GUETZKE, LAUREN VILLARREAL, JERRY FLOYD, EWA WEGNER, ALAN SCHWETTMANN, JOSHUA VISI, MICHAEL LEWIS KING, BRIAN ROBINSON, THOMAS HORN, JOSEPH LUCAS, ELIZABETH GLIDDEN, MCKENNA KUHR, TIMOTHY HEDRICK, STEVE WHITE, CITY OF AUSTIN, and TRAVIS COUNTY, | § § § § § § § § § § § § § | |
| Defendants. | § | |

## ORDER

Before the Court is Plaintiffs Luisa Lupi ("Luisa") and Eva Lupi's ("Eva"); (collectively, "Plaintiffs") Motion for a Preliminary Injunction. (Dkt. 6). The parties filed responsive briefing, (Resp., Dkt. 26; Reply, Dkt. 34), and the Court held a hearing on the motion, (Dkt. 35). Having considered the briefing, the arguments made at the hearing, the evidence, and the relevant law, the Court will deny the motion.

**I. BACKGROUND**

Plaintiffs are two sisters seeking a preliminary injunction ordering Defendants to return their four dogs and various pieces of antique jewelry. They contend that Austin Police Department ("APD") officers seized their dogs and their jewelry "illegally without a warrant, consent, probable

1

cause, or exigent circumstances."¹(Mot. Prelim. Inj., Dkt. 6, at 1). In support of their application, Plaintiffs allege the following facts.

Around September 2017, Plaintiffs' neighbor, Elizabeth Glidden ("Glidden"), moved in next door. (*Id.* at 4). Because Glidden "didn't want a disabled person . . . living next door, she concocted continually escalating false complaints to Austin Police about Luisa."² (*Id.*). Plaintiffs contend that Glidden conspired with APD and Defendant McKenna Kuhr ("Kuhr") "to create a set of false reports" to APD about Plaintiffs' living conditions. (*Id.* at 4).

Kuhr called APD on March 30, 2018, to voice concerns about Luisa. (APD Report, Dkt. 6-2, at 1). While Kuhr lived seven miles away, she indicated to APD that she was calling on behalf of several neighbors who wished to remain anonymous. (Mot. Prelim. Inj., Dkt. 6, at 4). Kuhr told APD that Luisa's trash had not been seen out on the curb in months, stated that she believed Luisa was living in unsanitary conditions and not eating properly, and described a "foul odor coming from inside [Luisa's] house." (*Id.*). In response to the call from Kuhr, APD Officers Lauren Villarreal ("Villarreal") and Michael Guetzke ("Guetzke") conducted a "well-check" on Luisa that same day. (Am. Compl., Dkt. 33, at 17).

When Luisa opened the door, Villarreal noted that she "was unable to see inside the residence because [Luisa] was very secretive" but she did smell "a strong odor of urine and feces coming from inside the residence." (*Id.* at 2). Villarreal further noted that Luisa "appeared to be extremely thin and frail," that her clothing "had a strong smell of being soiled" and was "too large for her size," and that her pants "were covered in dog hair." (*Id.*). Finally, Villarreal observed what appeared to be lice in Luisa's hair. (*Id.*). After speaking with Luisa, Villarreal contacted Adult

---

¹ While Plaintiffs dropped their state-law theft claim under the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code § 134.002, they continue to request that the Court order Defendants to release the jewelry because it was seized in violation of Plaintiffs' constitutional rights. (*See* Am. Compl., Dkt. 33, at 49, 64).
² Plaintiffs assert that while Luisa struggles with dyslexia, she has "no history of physical disabilities, mental disabilities, or criminal behavior" and "does not require or need anyone's assistance in her daily life." (Mot. Prelim. Inj., Dkt. 6, at 1).

Protective Services ("APS") and briefed Corporal Jerry Floyd on the well-check. (Am. Compl., Dkt. 33, at 19). APS told Villarreal it would check on Luisa within 24 hours. (*Id.*).

Plaintiffs contest the facts contained in Villarreal's report. (Mot. Prelim. Inj., Dkt. 6, at 5). Specifically, they contend that Luisa's clothing was clean, did not smell, and that she was wearing loose clothing at home to be comfortable. (*Id.*). With respect to Luisa's weight, Plaintiffs state that Luisa has always been slim and weighed a healthy 110 pounds when she was weighed at the hospital two weeks later. (*Id.*). Plaintiffs take special exception to Villarreal's observation that she could see lice in Luisa's hair. (*Id.*). Plaintiffs note that this is "medically impossible" because "the detection of lice requires careful close-up work even by trained doctors, sometimes involving a microscope." (*Id.*).

Later that day, Glidden told Villarreal that she intended to make a report to APS because she thought Luisa was unable to care for herself because of her disabilities. (Am. Compl., Dkt. 33, at 19–20). Glidden also told Villarreal about a large sore on the face of one of Luisa's dogs and another with "ribs sticking out." (*Id.*). Plaintiffs contend this "large sore" was in fact a "small growth about the size of a pinky nail that had been tested and found benign, to be removed electively during his next anesthesia." (*Id.* at 20).

On April 6, 2018, Officer Jamie Von Seltmann ("Von Seltmann") with the Crisis Intervention Team reviewed Villlarreal and Guetzke's report from the well-check. (Am. Compl., Dkt. 33, at 20). While Von Seltmann determined that Luisa "was not an imminent threat to herself or others," she decided to report the case to APS "because of Luisa's physical condition." (*Id.* at 21). That same day, Officer Timothy Diven of the Animal Cruelty Unit was appointed the lead investigator on Luisa's case. (*Id.*). Von Seltmann then coordinated with APS, Code Enforcement, the Animal Cruelty Unit, and the Community Health Paramedic Program to make a follow-up visit to Luisa's home on April 17, 2018. (*Id.*).

3

As planned, officers from these respective units convened outside Luisa's home on April 17, 2018 along with "several EMS personnel" and an animal control truck. (*Id.* at 23). Officers Thomas Horn with Code Enforcement and Von Seltmann with the Crisis Intervention Team knocked on Luisa's door. (*Id.*). Diven, who stood approximately 10–15 feet from the closed door, reported that he smelled a "strong odor of ammonia, urine, and feces emanating from behind the front door." (*Id.*). When Luisa opened the door, Diven and Von Seltmann reported that Luisa was wearing clothes that appeared to be soiled and "too large for her slender frame." (*Id.* at 24). They further reported that she "appeared to be mentally challenged," had "issues with her speech," and had lice in her hair. (*Id.*). Both officers noted that the smell of urine intensified once Luisa opened the door. (*Id.*). Von Seltmann and APS social worker Rocky Reeves then "grabbed Luisa by the wrists and began pulling her off the porch, down the driveway, and toward the street." (*Id.*). Officers with the Crisis Intervention Team then placed Luisa in an EMS van and took her to Seton Medical Center for an evaluation. (*Id.*). Luisa told officers "not to go into her house" and that she "was not consenting to a search of her house." (*Id.* at 25).

According to Plaintiffs, officers nevertheless entered and searched their home, seized their four dogs, and took several pieces of antique jewelry,[3] all "in violation of Plaintiffs' constitutional rights." (Mot. Prelim. Inj., Dkt. 6, at 7). Specifically, Plaintiffs allege various APD officers entered Plaintiffs' home "without a warrant,[4] consent, probable cause, or exigent circumstances." (*Id.* at 8). Plaintiffs contend that Diven "completed a seizure warrant" only after the dogs had been unlawfully seized and that this "after-the-fact warrant" was based on an affidavit "filled with numerous false,

---

[3] Plaintiffs include few facts pertaining to the alleged theft of their jewelry and only note that when Luisa returned home from the hospital, she discovered that "over $220,000.00 of jewelry and some other personal property belonging to her and Eva were missing." (Am. Compl., Dkt. 33, at 38).
[4] While Plaintiffs contend officers entered their home without a warrant, they also note that Diven "obtained a Warrant for Seizure of Animals in Case Number J5-AD-18-001957" at 2:20 p.m. on April 17, 2018—the day officers allegedly searched Plaintiffs' home—and executed that warrant less than an hour later at 3:00 p.m." (Am. Compl., Dkt. 33, at 39). Plaintiffs also note that Diven served Luisa with a copy of the warrant and a notice of hearing at the hospital around 3:30 p.m. (*Id.*).

4

and even deliberately fabricated material statements" about Luisa's mental state and the dogs' living conditions. (*Id.* at 12–16).

Diven ordered that Animal Control transport the four dogs to the Austin Animal Center and requested city veterinarians to conduct full cruelty exams on all four dogs. (Am. Compl., Dkt. 33, at 33). Dr. Rachel M. Hays ("Dr. Hays") examined the dogs. (*Id.* at 34). While Dr. Hays found that the dogs' blood work appeared normal and that none of the dogs had lung, cardiac, or neurological problems, she did find that the dogs had fleas, tapeworms, and dirty coats. (*Id.* at 36). She further found that two of the dogs were underweight, one was "borderline emaciated," and another had what appeared to be a urinary tract infection. (*Id.* at 37). Plaintiffs contend they only ever treated their dogs with "great care and love," and insist that any health issues documented by Dr. Hays arose from the dogs' old age and previously diagnosed allergy conditions. (*Id.*).

On April 24, 2018, Travis County Justice of the Peace Judge Nicholas Chu held a hearing pursuant to Texas Health and Safety Code §§ 821.022(b) and 821.023 "to determine ownership of the animals, whether the animals were cruelly treated . . . and to determine disposition of the [dogs]." (Order, Dkt. 26-1, at 1). After hearing the evidence, Judge Chu found that Luisa had "cruelly treated the animals . . . as defined by Tex. Health & Safety Code § 821.021, by torturing them and by unreasonably depriving the animals of necessary food, care and shelter." (*Id.* at 2). He then issued an order divesting Luisa "and all other owners" of ownership of the animals. (*Id.* at 3).

Plaintiffs appealed this decision and Travis County Court at Law Judge David Phillips held a de novo appeal hearing on June 13, 2018. (Order, Dkt. 26-2, at 1). After the hearing, Judge Phillips issued an order finding that both Luisa and Eva were the owners of the four dogs and that they had both treated their dogs cruelly by unreasonably depriving them of necessary food, care and shelter. (*Id.* at 2). He then entered an order upholding Judge Chu's decision divesting Luisa "and all other

5

owners" of ownership rights in the dogs and turned the dogs over to the Austin Animal Center. (*Id.* at 3).

On February 25, 2020, over a year and a half after the state court proceeding concluded, Plaintiffs filed a lawsuit in this Court alleging various constitutional violations under 42 U.S.C. § 1983 against the individual officers and the City of Austin ("City").[5] Specifically, Plaintiffs allege that the individual officers violated their Fourth and Fourteenth Amendment rights when they searched their home and seized their dogs and jewelry "without a warrant, consent, probable cause, or exigent circumstances." (Mot. Prelim. Inj. Dkt. 6, at 1–2). They also contend the City is liable under § 1983 for maintaining "unwritten, unconstitutional customs" that allowed police officers to enjoy "unfettered discretion" to "(1) apprehend a person by abusing or disregarding the Peace Officer's Emergency Detention ("POED") requirements as set out in Texas Health and Safety Code § 573.001 and take the person to a mental health facility, (2) enter the home of a person perceived to have a mental or intellectual disability without a warrant or consent, (3) search the home of a person perceived to have a mental or intellectual disability without a warrant or consent, and (4) seize a dog and other personal property of a person who is perceived to be mentally disabled while illegally searching the person's house." (Am. Compl., Dkt. 33, at 44). Plaintiffs also allege that the City, through the actions of its individual officers, subjected Luisa to intentional discrimination based on her perceived disabilities, dyslexia, or both in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101. (*Id.* at 60).

---

[5] Plaintiffs also seek to hold Glidden, Kuhr, and Dr. Hays liable under § 1983 for conspiring to violate Plaintiffs' constitutional rights. (Am. Compl., Dkt. 33, at 52). Specifically, Plaintiffs contend that Kuhr and Glidden "conspired to willfully, recklessly, and callously harass Plaintiffs, especially Luisa, and egregiously violate their due process rights to own, use and quietly enjoy their home; to own their pets and other property and enjoy the companionship of their pets; and to live their lives quietly and peacefully." (*Id.* at 55). Plaintiffs contend that Dr. Hays "deliberately and maliciously reported fabricated statements to support the seizure of Plaintiffs' pet dogs and falsely testified against Plaintiffs," and thus violated their Fourteenth Amendment rights. (*Id.* at 55). Plaintiffs added Dr. Hays as a party when they filed their amended complaint, which they filed just hours before the Court held a hearing on their motion for a preliminary injunction. (*See id.*; Minute Entry, Dkt. 35).

6

That same day, Plaintiffs filed a motion for a preliminary injunction requesting that the Court order Defendants to "immediately release Plaintiffs' dogs and stolen jewelry items." (Mot. Prelim. Inj, Dkt. 6, at 33). Defendants filed a response in opposition, (Dkt. 26), Plaintiffs filed a reply, (Dkt. 34), and the Court held a hearing on Plaintiffs' motion on April 1, 2020, (Minute Entry, Dkt. 35).[6]

## II. DISCUSSION

Defendants oppose Plaintiffs' motion for a preliminary injunction for two reasons. First, Defendants contend the Court should deny Plaintiffs' motion because Plaintiffs have not met their burden on any of the preliminary injunction prongs. (Resp., Dkt. 26, at 1). Second, Defendants argue that under the *Rooker–Feldman* doctrine, the Court does not have jurisdiction to issue a preliminary injunction ordering the return of Plaintiffs' dogs. (*Id.*). Because the *Rooker–Feldman* doctrine implicates this Court's jurisdiction, the Court will address this issue first. *See Truong v. Bank of Am., N.A.*, 717 F.3d 377, 381–382 (5th Cir. 2013) ("Because the *Rooker–Feldman* doctrine is jurisdictional, we must address this issue first.").

### A. Subject-Matter Jurisdiction

Defendants argue that the Court does not have subject-matter jurisdiction under the *Rooker–Feldman* doctrine to issue a preliminary injunction ordering the return of Plaintiffs' dogs[7] because the Travis County Court divested Plaintiffs' ownership rights in the dogs on June 13, 2018. (Resp., Dkt. 26, at 1; *see also* Order, Dkt. 26-2, at 1–2).

---

[6] Only the City and the individual APD officers filed a response. (Dkt. 26). Glidden, Kuhr, and Dr. Hays did not file a response in opposition to Plaintiffs' motion for a preliminary injunction.

[7] In their motion, Plaintiffs make two requests for injunctive relief: they request that the Court order the immediate release of their dogs and their stolen jewelry. (Mot. Prelim. Inj., Dkt. 6, at 33). Defendants appear to limit their jurisdictional argument to Plaintiffs' claims involving the allegedly unlawful seizure of the dogs, presumably because the state court did not render judgment on the ownership of the allegedly stolen antique jewelry. (*See* State Court Orders, Dkt. 26-1). Accordingly, the *Rooker-Feldman* analysis that follows applies only to the claims involving the seizure of Plaintiffs' dogs.

7

"Plaintiffs bear the burden of establishing subject-matter jurisdiction." *In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Mississippi Plaintiffs)*, 668 F.3d 281, 286 (5th Cir. 2012). The question of whether a court has subject-matter jurisdiction "presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010). "When courts lack subject matter jurisdiction over a case, they lack the power to adjudicate the case." *Nat'l Football League Players Ass'n v. Nat'l Football League*, 874 F.3d 222, 225 (5th Cir. 2017). Therefore, the Court cannot assess the merits of Plaintiffs' motion for a preliminary injunction if it does not have the statutory or constitutional power to hear the case. *See id.* at 229 (vacating the preliminary injunction issued by the district court because it lacked subject-matter jurisdiction at the time it was issued).

Among federal courts, only the Supreme Court of the United States has the appellate authority "to reverse or modify" a state-court judgment. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Federal district courts "lack the requisite appellate authority" to reverse or modify state-court judgments because their jurisdiction is "strictly original." *Id.* The *Rooker–Feldman* doctrine stands for this jurisdictional principle and bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* The doctrine has four elements: "(1) a state-court loser; (2) alleging harm caused by a state-court judgment; (3) that was rendered before the district court proceedings began; and (4) the federal suit requests review and reversal of the state-court judgment." *Houston v. Venneta Queen*, 606 F. App'x 725, 730 (5th Cir. 2015) (quoting *Exxon*, 544 U.S. 280 at 284).

The Court concludes that the first three elements of *Rooker–Feldman* are easily satisfied: (1) Plaintiffs lost possession of their dogs in state court; (2) Plaintiffs allege injuries caused by the state-court judgment (the loss of their dogs); and (3) the state court rendered its final judgment on June

13, 2018, long before the district court proceeding began. *See id.* In assessing the fourth element, the Court must determine whether Plaintiffs seek what in substance would be appellate review of the state court's divestment order, or whether Plaintiffs instead allege independent claims that may trigger principles of preclusion, but do not present a jurisdictional bar to adjudication under the *Rooker–Feldman* doctrine.

While the *Rooker–Feldman* doctrine bars a plaintiff from seeking review and reversal of an unfavorable state-court judgment, it does not preclude federal jurisdiction "simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Exxon*, 544 U.S. 280 at 293. "If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.* (cleaned up); *see also Houston*, 606 F. App'x at 730 ("*Rooker–Feldman* does not preclude federal jurisdiction over an independent claim, even one that denies a legal conclusion that a state court has reached.").

Plaintiffs argue that the *Rooker–Feldman* doctrine does not preclude the Court from ordering the return of their dogs because their illegal seizure claim under § 1983 is "entirely different from the claim addressed in the state court proceeding." (Reply, Dkt. 34, at 5). Specifically, Plaintiffs note that while the state court based its divestment order on Plaintiffs' violation of the Texas Health and Safety Code, they seek injunctive relief in this Court based on Defendants' alleged violation of Plaintiffs' Fourth Amendment rights. (*Id.*). Because the state court did not address Plaintiffs' illegal seizure claim under § 1983, Plaintiffs contend they are not asking the Court to sit in review of the state court's order and that *Rooker–Feldman* therefore does not apply. (*Id.* at 4).

9

Though Plaintiffs cast their motion for a preliminary injunction as one premised on independent civil rights claims, the Court cannot grant the requested relief—a return of the dogs[8]—without voiding a state-court order. *See Truong*, 717 F.3d at 382 ("One hallmark of the *Rooker–Feldman* inquiry is what the federal court is being asked to review and reject."). The state-court order at issue here expressly divested Plaintiffs' ownership right to the dogs; the Court cannot order Defendants to "immediately release Plaintiffs' dogs" without reversing that express divestment order. (Order, Dkt. 26-2, at 3; Mot. Prelim. Inj., Dkt. 6, at 33). This is precisely the kind of "review and reversal" *Rooker–Feldman* precludes.

Nevertheless, Plaintiffs argue that the *Rooker–Feldman* doctrine is inapplicable for two additional reasons. First, Plaintiffs note that Eva was not a named defendant in either the original state-court action or the appeal and argue that the *Rooker–Feldman* doctrine does not apply to nonparties. (Reply, Dkt. 34, at 2–3 (citing *Lance v. Dennis*, 546 U.S. 459, 466 (2006) ("The *Rooker–Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment."))). Second Plaintiffs argue that they allege claims for damages in their amended complaint—relief they did not seek in the underlying state-court action—and that these independent claims exempt this case from *Rooker–Feldman*'s scope. The Court finds these arguments unpersuasive and addresses each in turn.

First, while Eva was not a named party in the underlying state proceeding, Plaintiffs concede that the state-court judgment divested Eva of her ownership interest in the dogs. (*See* Reply, Dkt, 34, at 3; *see also* Order, Dkt. 26-2, at 3). Judge Phillips handwrote Eva's name alongside Luisa's in his order and specifically found that Luisa Monica Lupi *and* Eva Lupi had "cruelly treated the animals

---

[8] Plaintiffs also ask the Court to order the immediate return of several items of antique jewelry. While the *Rooker-Feldman* does not preclude the Court from adjudicating that request, the Court nevertheless concludes that Plaintiffs have not met their burden on irreparable harm and are therefore not entitled to injunctive relief. *See infra* Part II.B.

10

. . . as defined by Tex. Health & Safety Code § 821.021 by unreasonably depriving the animals of necessary food, care and shelter"; determined that "Luisa Monica Lupi and Eva Lupi [were] the owners of the animals" and then divested "Luisa Monica Lupi *and all other owners*" of ownership rights in the dogs. (*Id.* at 2–3). Because the state-court divestment order applies as much to Eva as it does to Luisa, Eva's request that the Court order the release of Plaintiffs' dogs—like Luisa's—invites the Court to reverse the state-court divestment order, which *Rooker–Feldman* prohibits. (*See id.*).

Moreover, while Plaintiffs cite to the Supreme Court's decision in *Lance* for the proposition that *Rooker–Feldman* is inapplicable to nonparties, the Supreme Court expressly acknowledged in *Lance* that *Rooker–Feldman* could apply to a nonparty in "limited circumstances," including circumstances in which a nonparty effectively seeks a "*de facto* appeal in the district court" of an unfavorable state-court decision. 546 U.S. at 465 ("In holding that *Rooker–Feldman* does not bar the plaintiffs here from proceeding, we need not address whether there are any circumstances, however limited, in which *Rooker–Feldman* may be applied against a party not named in an earlier state proceeding."); *id.* ("The doctrine applies only in 'limited circumstances' where a party in effect seeks an appeal of an unfavorable state-court decision to a lower federal court."). This situation falls squarely within that narrow circumstance: in seeking the immediate release of the dogs, Eva effectively seeks a *de facto* appeal of an unfavorable state-court decision that divested her ownership rights in the dogs. *Rooker–Feldman* therefore applies and the Court lacks jurisdiction to order the requested relief.

Second, Plaintiffs' argument that they seek additional relief in the form of damages in their amended complaint does little to address the issue of whether the injunctive relief sought in their motion for a preliminary injunction triggers the *Rooker–Feldman* doctrine. (Minute Entry, Dkt. 35). Indeed, Plaintiffs seek damages in their amended complaint for injuries arising from Defendants'

11

alleged constitutional violations. (Am. Compl., Dkt. 33, at 65). These claims for damages are ostensibly separate from the state-court divestment order because they arise from alleged independent wrongs. *See Truong*, 717 F.3d at 383. But the motion currently before the Court is a motion for a preliminary injunction asking the Court for injunctive relief, not damages. "[R]eversal of the state court's judgment would be a necessary part of the relief requested by [Plaintiffs]" at this stage.[9] *Houston*, 606 F. App'x at 730–31 (citing *Magor v. GMAC Mortg., L.L.C.,* 456 F. App'x 334, 336 (5th Cir. 2011)). The Court lacks subject-matter jurisdiction under the *Rooker–Feldman* doctrine to grant such relief. *Compare Truong*, 717 F.3d at 383 (holding that the plaintiff's state unfair-trade-practice claims were independent of a state foreclosure judgment because the plaintiff "did not seek to overturn the state-court judgment, and the damages she requested were for injuries caused by the [defendants'] actions, not injuries arising from the foreclosure judgment"), *with Morris v. Am. Home Mortg. Serv., Inc.*, 443 Fed. App'x. 22, 24 (5th Cir. 2011) (holding that the plaintiff's claims for unlawful debt-collection practices in connection with a state foreclosure judgment were barred by *Rooker–Feldman* "because, crucially, the only relief [the plaintiff] sought was the setting aside of the state foreclosure judgment and staying of the execution of the writ of possession," which "demonstrate[d] that [the plaintiff's] injuries arose from the state court judgments").

Accordingly, Plaintiffs' request that the Court order the immediate return of their dogs is barred by the *Rooker–Feldman* doctrine. Having concluded that the *Rooker–Feldman* doctrine precludes this Court from ordering the return of Plaintiffs' dogs, the Court now turns to the Plaintiffs' second request for injunctive relief: that the Court enter a preliminary injunction ordering

---

[9] In reaching this determination, the Court does not reach the question of whether the *Rooker-Feldman* doctrine precludes the Court from exercising jurisdiction over claims for damages alleged in Plaintiffs' amended complaint. (*See* Am. Compl., Dkt. 33, at 65 (seeking compensatory and punitive damages against Defendants for alleged constitutional violations, claims Plaintiffs argue are beyond the scope of the state-court judgement).

Defendants to immediately release various pieces of allegedly stolen antique jewelry. (Mot. Prelim. Inj., Dkt. 6, at 33).

**B. Preliminary Injunction**

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A movant cannot be granted a preliminary injunction unless it can establish that it will suffer irreparable harm without an injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

1. Irreparable Harm

The party seeking a preliminary injunction must prove that irreparable harm is likely, not merely possible. *Winter*, 555 U.S. at 22. Irreparable harm "consists of harm that could not be sufficiently compensated by money damages or avoided by a later decision on the merits." *Canon, Inc. v. GCC Int'l Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008). Undue delay in seeking a preliminary injunction tends to negate the contention that the feared harm will truly be irreparable. *See Gonannies, Inc. v. Goupair.com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (finding that a delay of over six months rebutted any presumption of irreparable harm); *id.* ("Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.").

Here, the Court's analysis begins and ends with its finding that Plaintiffs have not met their burden to show that they will be irreparably harmed in the absence of an injunction. Plaintiffs waited nearly two years to seek a preliminary injunction ordering Defendants to return the allegedly stolen jewelry, negating the contention that the feared harm will be irreparable.[10] *See Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-CV-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017). Plaintiffs' delay in seeking injunctive relief in this Court is fatal to their request for a preliminary injunction. *Id.*; *see also* 11A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2948.1 (3d ed. Apr. 2017 update) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). In light of Plaintiffs' delay, the Court finds there is no apparent urgency to the request for injunctive relief and that Plaintiffs have not met their burden on irreparable harm.

In the Fifth Circuit, "preliminary injunctions will be denied based on a failure to prove separately each of the four elements of the four prong test for obtaining the injunction." *Gonannies*, 464 F. Supp. 2d at 608. Accordingly, absent a showing of irreparable harm, Plaintiffs are not entitled to a preliminary injunction ordering the release of the allegedly stolen jewelry.

### III. CONCLUSION

For these reasons, **IT IS ORDERED** that Plaintiffs' motion for a preliminary injunction, (Dkt. 6), is **DENIED**.

**SIGNED** on April 3, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

[10] The Court notes that even if the *Rooker-Feldman* doctrine did not preclude the Court from ordering the return of Plaintiffs' four dogs, Plaintiffs would likewise not be entitled to a preliminary injunction ordering such relief on account of their delay. *See Embarcadero Techs., Inc.*, 2017 WL 5588190, at *3.